UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

　　　　　　　　　Plaintiff,

　　v.

JUSTIN SUN, TRON FOUNDATION LIMITED,
BITTORRENT FOUNDATION LTD.,
RAINBERRY, INC., AUSTIN MAHONE, and
DEANDRE CORTEZ WAY,

　　　　　　　　　Defendants.

Case No.  1:23-cv-02433

Hon. Edgardo Ramos

---

## MEMORANDUM OF LAW IN SUPPORT OF
## TRON FOUNDATION LIMITED, BITTORRENT FOUNDATION LTD., JUSTIN SUN, AND RAINBERRY, INC.'S MOTION TO DISMISS AMENDED COMPLAINT

Dean S. Kristy
Michael S. Dicke (*admitted pro hac vice*)
Jennifer C. Bretan (*admitted pro hac vice*)
Casey O'Neill
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:     415.875.2300
Facsimile: 415.281.1350

Rebecca T. Matsumura (*admitted pro hac vice*)
FENWICK & WEST LLP
401 Union Street, 5th Floor
Seattle, WA 98101
Telephone:  206.389.4510
Facsimile: 206.389.4511

*Attorneys for Defendants Tron Foundation
Limited, BitTorrent Foundation Ltd.,
Justin Sun, and Rainberry, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT .......................................................................... 1

FACTUAL BACKGROUND ............................................................................... 5

    A.    The Tron Protocol Modernizes Entertainment Worldwide Through
        Blockchain Technology .......................................................................... 5

    B.    TRX (ERC-20) Launches On The Ethereum Blockchain ....................... 6

    C.    TRX (TRON) Is Launched On The TRON Blockchain ......................... 7

    D.    The Alleged Improper "Offers and Sales" Of "TRX" ......................... 7

    E.    The BitTorrent Protocol, BitTorrent Foundation Ltd., And The Alleged
        Improper "Distributions" Of BTT .......................................................... 8

    F.    Procedural History And Claims Asserted .............................................. 10

LEGAL STANDARD .......................................................................................... 10

ARGUMENT ....................................................................................................... 11

I.    PERSONAL JURISDICTION OVER THE FOREIGN DEFENDANTS IS
    ABSENT ....................................................................................................... 11

    A.    The SEC Fails To Establish Personal Jurisdiction Over Each Foreign
        Defendant For Each Claim ..................................................................... 12

    B.    General Personal Jurisdiction Over The Foreign Defendants Is Absent ... 13

    C.    Specific Personal Jurisdiction Over The Foreign Defendants Is Lacking ... 13

        1.    No Specific Personal Jurisdiction Over Mr. Sun ....................... 17

            a.    The Conclusory "Control" Allegations Fail ................... 18

            b.    Analyzed Claim-By-Claim, The AC Fails To Plead A Basis
                For Exercising Jurisdiction Over Mr. Sun ..................... 19

        2.    No Specific Personal Jurisdiction Over Either Foreign Entity ... 23

            a.    Tron Foundation ............................................................. 24

            b.    BitTorrent Foundation .................................................... 25

D.     Exercising Jurisdiction Over The Foreign Defendants Also Is Unreasonable ..................................................................................26

E.     If This Action Survives As To Rainberry, It Should Be Transferred ...................27

II.     ALL CLAIMS FAIL DUE TO IMPERMISSIBLE GROUP PLEADING ......................28

III.     THE U.S. SECURITIES LAWS DO NOT APPLY TO THE ALLEGED CONDUCT .........................................................................................31

A.     The SEC Fails To Allege Domestic Transactions Satisfying *Morrison* ...............31

     1.     Morrison Does Not Allow Claims Based On "TRX" Secondary Sales ........................................................................................34

     2.     Morrison Does Not Allow Claims Based On Worldwide Contests And Giveaways Of "TRX" And BTT .........................................35

     3.     Morrison Does Not Allow Claims Based on Airdrops of BTT .................36

B.     The AC Also Fails The "Conduct and Effects" Test ...........................................36

C.     All Claims Fail Because "TRX" and BTT Were Not Offered Or Sold As "Investment Contracts" ......................................................................38

     1.     Social Media Contests And Giveaways Do Not Satisfy *Howey* ..............39

     2.     Airdrops of BTT Do Not Satisfy *Howey* ..................................................42

     3.     Secondary Market Sales Do Not Satisfy *Howey* ......................................42

IV.     THE CLAIMS ARE INADEQUATELY PLEADED ......................................................43

A.     The Market Manipulation Allegations Are Insufficient And Illogical .................43

B.     Aiding And Abetting Disclosure Violations Is Not Adequately Alleged .............45

C.     The SEC Does Not Adequately Allege Fraud With Particularity .........................48

V.     DEFENDANTS LACKED FAIR NOTICE OF THE SEC'S CLAIMS. ..........................49

CONCLUSION .............................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. SEC*,
446 U.S. 680 (1980)............................................................................................48

*Absolute Activist Master Value Fund, Ltd. v. Ficeto*,
2013 WL 1286170 (S.D.N.Y. Mar. 28, 2013) ........................................................17

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)....................................................................32, 35, 36

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
529 F. Supp. 3d 111 (S.D.N.Y. 2021)........................................................16, 19, 26

*Allen v. Credit Suisse Sec. (USA) LLC*,
895 F.3d 214 (2d Cir. 2018)................................................................................10

*Alwie Handoyo v. Tjong Very Sumito*,
[2013] SGCA 44 (Aug. 6, 2013)...........................................................................29

*AmTrust Fin. Servs., Inc. v. Lacchini*,
260 F. Supp. 3d 316 (S.D.N.Y. 2017)..............................................................21, 23

*Anderson v. Binance*,
2022 WL 976824 (S.D.N.Y. Mar. 31, 2022) *overruled on other grounds by
Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024) ...........................................31, 32

*Asahi Metal Indus. Co.* v. *Superior Ct. of California, Solano Cnty.*,
480 U.S. 102 (1987)..........................................................................................25, 26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................10

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ................................................................................44

*Aubrey v. New School*,
624 F. Supp. 3d 403 (S.D.N.Y. 2022)....................................................................6

*Berdeaux v. OneCoin Ltd.*,
561 F. Supp. 3d 379 (S.D.N.Y. Sept. 20, 2021) ..............................................*passim*

*Bittner v. United States*,
598 U.S. 85 (2023)..............................................................................................49

*BNSF Ry. Co. v. Tyrrell*,
 581 U.S. 402 (2017)........................................................................................12, 13

*In re Braskem S.A. Sec. Litig.*,
 246 F. Supp. 3d 731 (S.D.N.Y. 2017).......................................................................19

*Brown v. Lockheed Martin Corp.*,
 814 F.3d 619 (2d Cir. 2016)....................................................................................13

*Burger King Corp. v. Rudzewicz*,
 471 U.S. 462 (1985)..........................................................................................21, 24

*Cavello Bay Reinsurance Ltd. v. Shubin Stein*,
 986 F.3d 161 (2d Cir. 2021)........................................................................33, 34, 35

*Chill v. Gen. Elec. Co.*,
 101 F.3d 263 (2d Cir. 1996)....................................................................................11

*City of Pontiac Policemen's & Fireman's Ret. Sys. v. UBS AG*,
 752 F.3d 173 (2d Cir. 2014)..............................................................................32, 34

*Core-Vent Corp. v. Nobel Indus. AB*,
 11 F.3d 1482 (9th Cir. 1993) ..................................................................................27

*In re Crude Oil Commodity Litig.*,
 2007 WL 1946553 (S.D.N.Y. June 28, 2007) .........................................................43

*Cunney v. Bd. of Trustees of Vill. of Grand View*,
 660 F.3d 612 (2d Cir. 2011)....................................................................................49

*De Jesus v. Sears, Roebuck & Co.*,
 87 F.3d 65 (2d Cir. 1996) ........................................................................................29

*Decker v. Massey-Ferguson, Ltd.*,
 681 F.2d 111 (2d Cir. 1982).....................................................................................47

*DeLorenzo v. Ricketts & Assocs., Ltd.*,
 2017 WL 4277177 (S.D.N.Y. Sept. 25, 2017), *aff'd*, 757 F. App'x 6 (2d Cir.
 2018) ..................................................................................................................14, 22

*Dfinity Found. v. New York Times Co.*,
 2023 WL 7526458 (S.D.N.Y. Nov. 13, 2023)......................................................4, 7

*Dhir v. Carlyle Grp. Emp. Co.*,
 2017 WL 4402566 (S.D.N.Y. Sept. 29, 2017).........................................................45

*Dresner v. Utility.com, Inc.*,
 371 F. Supp. 2d 476 (S.D.N.Y. 2005)......................................................................29

*Euro Trade & Forfaiting, Inc. v. Vowell*,
  2002 WL 500672 (S.D.N.Y. Mar. 29, 2002) ................................................................37, 38

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
  2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ........................................................................16

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
  843 F.3d 1257 (11th Cir. 2016) ............................................................................................45

*Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*,
  2011 WL 1142916 (S.D.N.Y. Mar. 22, 2011) ......................................................................30

*In re GeoPharma, Inc. Sec. Litig.*,
  399 F. Supp. 2d 432 (S.D.N.Y. 2005) ..................................................................................45

*Gillis v. QRX Pharma Ltd.*,
  197 F. Supp. 3d 557 (S.D.N.Y. 2016) ..................................................................................45

*Glob. Gold Mining, LLC v. Ayvazian*,
  983 F. Supp. 2d 378 (S.D.N.Y. 2013) ..................................................................................17

*Golden v. NBCUniversal Media, LLC*,
  2023 WL 5434378 (S.D.N.Y. Aug. 23, 2023) ........................................................................6

*Goodyear Dunlop Tires Ops., S.A. v. Brown*,
  564 U.S. 915 (2011) ..............................................................................................................13

*HB v. Monroe Woodbury Cent. Sch. Dist.*,
  2012 WL 4477552 (S.D.N.Y. Sept. 27, 2012) ........................................................................7

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
  466 U.S. 408 (1984) ..............................................................................................................16

*Holsworth v. BProtocol Found.*,
  2021 WL 706549 (S.D.N.Y. Feb. 22, 2021) ....................................................................16, 21

*ICO Servs., Ltd. v. Coinme, Inc.*,
  2018 WL 6605854 (S.D.N.Y. Dec. 17, 2018) ..........................................................12, 15, 20

*Interbrew v. EdperBrascan Corp.*,
  23 F. Supp. 2d 425 (S.D.N.Y. 1998) ....................................................................................37

*Int'l Bhd. of Teamsters v. Daniel*,
  439 U.S. 551 (1979) ..............................................................................................................39

*Int'l Shoe Co. v. Wash.*,
  326 U.S. 310 (1945) ..............................................................................................................13

*JCorps Int'l, Inc. v. Charles & Lynn Schusterman Fam. Found.*,
    828 F. App'x 740 (2d Cir. 2020) .........................................21

*Jenkins v. Miller*,
    983 F. Supp. 2d 423 (D. Vt. 2013) ...................................14, 20, 24, 25

*Joseph Victori Wines Inc. v. Vina Santana Carolina, S.A.*,
    933 F. Supp. 347 (S.D.N.Y. 1996) .......................................48

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ............................................11

*King Cnty., Wash. v. IKB Deutsche Industriebank, AG*,
    769 F. Supp. 2d 309 (S.D.N.Y. 2011) ...............................18, 19

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*,
    2017 WL 1113080 (S.D.N.Y. Mar. 10, 2017) .........................21

*Laydon v. Cooperatieve Rabobank U.A.*,
    55 F.4th 86 (2d Cir. 2022) .............................................31

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) ........................12

*Loveman v. Lauder*,
    484 F. Supp. 2d 259 (S.D.N.Y. 2007) ...................................4

*Marine Bank v. Weaver*,
    455 U.S. 551 (1982) ....................................................38

*Medina v. Bauer*,
    2004 WL 136636 (S.D.N.Y. Jan. 27, 2004) .........................29

*Mega Tech Int'l Corp. v. Al-Saghyir Establishment*,
    1999 WL 269896 (S.D.N.Y. May 3, 1999) ...........................26

*Melendez v. Sirius XM Radio, Inc.*,
    50 F.4th 294 (2d Cir. 2022) ............................................50

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996) ..........................................24, 26, 27

*Milan v. Wertheimer*,
    808 F.3d 961 (2d Cir. 2015) ...........................................10

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) ............................................... *passim*

*In re Nat. Gas Commodity Litig.*,
   358 F. Supp. 2d 336 (S.D.N.Y. 2005)..................................................................43

*Nesbeth v. New York City Mgmt. LLC*,
   2019 WL 110953 (S.D.N.Y. Jan. 4, 2019) ......................................................28, 29

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
   540 F. Supp. 2d 438 (S.D.N.Y. 2007)..................................................................37

*Noto v. 22nd Century Grp., Inc.*,
   35 F.4th 95 (2d Cir. 2022) ..................................................................................45

*OOO v. Empire United Lines Co., Inc.*,
   557 F. App'x 40 (2d Cir. 2014) ...........................................................................30

*In re Optimal U.S. Litig.*,
   865 F. Supp. 2d 451 (S.D.N.Y. 2012)..................................................................36

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
   763 F.3d 198 (2d Cir. 2014) ..........................................................................33, 35

*In re Parmalat Sec. Litig.*,
   376 F. Supp. 2d 449 (S.D.N.Y. 2005)..................................................................19

*Ponce v. SEC*,
   345 F.3d 722 (9th Cir. 2003) ...............................................................................46

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
   784 F. App'x 4 (2d Cir. 2019) ..............................................................................22

*RAR, Inc. v. Turner Diesel, Ltd.*,
   107 F.3d 1272 (7th Cir. 1997) .............................................................................18

*Rayner v. E*TRADE Fin. Corp.*,
   248 F. Supp. 3d 497 (S.D.N.Y. 2017), *aff'd*, 899 F.3d 117 (2d Cir. 2018) ............5

*Red Ball Interior Demolition Corp. v. Palmadessa*,
   874 F. Supp. 576 (S.D.N.Y. 1995)........................................................................28

*Reed Int'l, Inc. v. Afghanistan Int'l Bank*,
   657 F. Supp. 3d 287 (S.D.N.Y. 2023)..............................................................15, 20

*Reingold v. Deloitte Haskins & Sells*,
   599 F. Supp. 1241 (S.D.N.Y. 1984).....................................................................14

*Reliance First Cap., LLC v. Mid Am. Mortg., Inc.*,
   2019 WL 2504039 (E.D.N.Y. June 17, 2019) ............................................. *passim*

*Revak v. SEC Realty Corp.*,
  18 F.3d 81 (2d Cir. 1994) .........................................................................................38

*Risley v. Universal Navigation Inc.*,
  2023 WL 5609200 (S.D.N.Y. Aug. 29, 2023) ...................................................4, 5, 6

*SEC v. Am. Renal Assoc. Holdings*,
  2022 WL 1166087 (S.D.N.Y. Apr. 20, 2022)..........................................................28

*SEC v. Coinbase*,
  2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) ....................................39, 41, 42, 43

*SEC v. Competitive Techs., Inc.*,
  2005 WL 1719725 (D. Conn. July 21, 2005) ..........................................................43

*SEC v. Energy Grp. of Am., Inc.*,
  459 F. Supp. 1234 (S.D.N.Y. 1978).........................................................................41

*SEC v. Farnsworth*,
  2023 WL 5977240 (S.D.N.Y. Sept. 14, 2023).........................................................11

*SEC v. Hill Int'l, Inc.*,
  2020 WL 2029591 (S.D.N.Y. Apr. 28, 2020)..........................................................28

*SEC v. Hwang*,
  2023 WL 6124041 (S.D.N.Y. Sept. 19, 2023).........................................................44

*SEC v. LBRY, Inc.*,
  No. 21-cv-260, ECF No. 105 (D.N.H. Jan. 30, 2023) ...........................................42

*SEC v. Monarch Funding Corp.*,
  192 F.3d 295 (2d Cir. 1999)....................................................................................48

*SEC v. Parnes*,
  2001 WL 1658275 (S.D.N.Y. Dec. 26, 2001) ..........................................................3

*SEC v. Ripple Labs, Inc.*,
  2022 WL 762966 (S.D.N.Y. Mar. 11, 2022) ................................................. *passim*

*SEC v. Ripple Labs, Inc.*,
  2023 WL 4507900 (S.D.N.Y. July 13, 2023) ...........................................38, 39, 42

*SEC v. Ripple Labs, Inc.*,
  2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023) .................................................39, 40

*SEC v. Sason*,
  433 F. Supp. 3d 496 (S.D.N.Y. 2020).....................................................................46

*SEC v. Sharef*,
    924 F. Supp. 2d 539 (S.D.N.Y. 2013)............................................................12, 18

*SEC v. Terraform Labs Pte Ltd.*,
    2022 WL 2066414 (2d Cir. June 8, 2022) ...............................................................15

*SEC v. Terraform Labs Pte. Ltd.*,
    2023 WL 4858299 (S.D.N.Y. July 31, 2023) .....................................15, 38, 39, 43

*SEC v. Tourre*,
    2012 WL 5838794 (S.D.N.Y. Nov. 19, 2012)........................................................35

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)....................................................................................... *passim*

*SEC v. Wey*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017)..............................................................48, 49

*Shenzhen OKT Lighting Co. v. JLC-Tech LLC*,
    2021 WL 4443637 (S.D.N.Y. Sept. 28, 2021) (Ramos, J.) .....................................12

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)....................................................................................11

*Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
    253 F. Supp. 359 (S.D.N.Y. 1966)..........................................................................43

*In re Smith Barney Transfer Agent Litig.*,
    884 F. Supp. 2d 152 (S.D.N.Y. 2012)......................................................................19

*In re SSA Bonds Antitrust Litig.*,
    420 F. Supp. 3d 219 (S.D.N.Y. Oct. 4, 2019) (Ramos, J.) ............................ *passim*

*Stephens v. Uranium Energy Corp.*,
    2016 WL 3855860 (S.D. Tex. July 15, 2016).........................................................45

*TAGC Mgmt., LLC v. Lehman*,
    2011 WL 3796350 (S.D.N.Y. Aug. 24, 2011).........................................................21

*Tamam v. Fransabank SAL*,
    677 F. Supp. 2d 720 (S.D.N.Y. 2010)......................................................................17

*Tarsavage v. CITIC Tr. Co.*,
    3 F. Supp. 3d 137 (S.D.N.Y. 2014).........................................................................19

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 659 (2d Cir. 2013)....................................................................................12

*Three Crown Ltd. P'ship v. Caxton Corp.*,
  817 F. Supp. 1033 (S.D.N.Y. 1993)................................................................28, 29

*Triple Up Ltd. v. Youku Tudou Inc.*,
  235 F. Supp. 3d 15 (D.D.C. 2017), *aff'd*, 2018 WL 4440459 (D.C. Cir. July
  17, 2018) ........................................................................................................14

*Tymoshenko v. Firtash*,
  2013 WL 1234943 (S.D.N.Y. Mar. 27, 2013) ........................................................27

*United States ex. rel. TZAC, Inc. v. Christian Aid*,
  2021 WL 2354985 (S.D.N.Y. June 9, 2021), *aff'd*, 2022 WL 2165751 (2d Cir.
  June 16, 2022)................................................................................................22

*United Hous. Found., Inc. v. Forman*,
  421 U.S. 837 (1975)........................................................................................41

*Upton v. SEC*,
  75 F.3d 92 (2d Cir. 1996) ................................................................................49

*Uselton v. Com. Lovelace Motor Freight, Inc.*,
  940 F.2d 564 (10th Cir. 1991) .........................................................................40

*V'soske, Inc. v. Vsoske.com*,
  2001 WL 546567 (S.D.N.Y. May 23, 2001) .........................................................18

*Verschleiser v. Frydman*,
  2023 WL 5835031 (S.D.N.Y. Sept. 7, 2023)........................................................30

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016)...........................32

*Williams v. Binance*,
  96 F.4th 129 (2d Cir. 2024) .......................................................................32, 34, 35

*Williams v. Block one*,
  2022 WL 5294189 (S.D.N.Y. Aug. 15, 2022) .................................................5, 33, 34, 35

*Whitaker v. Am. Telecasting, Inc.*,
  261 F.3d 196 (2d Cir. 2001)..............................................................................22

*Wuhan Airlines v. Air Alaska, Inc.*,
  1999 WL 223493 (S.D.N.Y. Apr. 14, 1999)...........................................................29

*In re Yukos Oil Co. Sec. Litig.*,
  2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ..........................................................7

*Zurich Am. Life Ins. Co. v. Nagel*,
    571 F. Supp. 3d 168 (S.D.N.Y. 2021) ..................................................................18

**Statutes and Rules**

28 U.S.C. § 1391 ...............................................................................................................27

28 U.S.C. § 1404 ...............................................................................................................27

Federal Rules of Civil Procedure
    Rule 8(a)(2) ............................................................................................................28
    Rule 9(b) .........................................................................................................*passim*
    Rule 12(b)(2)............................................................................................................1
    Rule 12(b)(6)............................................................................................................1

Fed. R. Evid. 201 .................................................................................................................6

Securities Act of 1933
    15 U.S.C. § 77a *et seq.* ....................................................................................*passim*

Securities Exchange Act of 1934
    15 U.S.C. § 78a *et seq.* ....................................................................................*passim*

**Other Authorities**

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-
    203, 124 Stat. 1376 (2010)....................................................................................36

Payment Services Act (Act No. 2/2019) (Sing.).............................................................27

Press Release, House Passes Financial Innovation and Technology for the 21st
Century Act with Overwhelming Bipartisan Support (May 22, 2024),
    https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=409277 ..............27

*SEC v. Bittrex et al.*, Final Judgment, No. 2:23-cv-00580-RSM
(W.D. Wash. Aug. 15, 2023), ECF No. 54 ...............................................................34

Tron Foundation Limited, BitTorrent Foundation Ltd., Justin Sun, and Rainberry, Inc. (together, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Securities and Exchange Commission's ("SEC") Amended Complaint ("AC") (ECF No. 59) pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

## PRELIMINARY STATEMENT

Yet another salvo in the SEC's ever-widening campaign seeking dominion over digital assets whenever created, in whatever form, for whatever purpose, and wherever they may be found, this action levels a series of hyperbolic "securities" claims against two foreign entities and a foreign national.  Allegations relating to the sole U.S.-based defendant, an entity acquired for its decades-old peer-to-peer data sharing technology, lack specificity and are unrelated in time and substance to the great weight of the alleged wrongdoing.  Despite clear ambitions otherwise, the SEC is not a worldwide regulator.  Its efforts to leverage highly attenuated contacts to the United States, to extend U.S. securities laws to cover predominantly foreign conduct, go too far and should be rejected.  The defects in this approach to enforcement also cannot be cured.  Faced with a motion targeting the inadequate jurisdictional footing for its claims, the AC offers nothing to fix the lack of relevant contacts.  If anything, the SEC just tacks on more of the same.

This case is also fundamentally ***unlike*** the vast majority of enforcement actions involving digital assets to date.  It involves the development of blockchain projects designed to promote, reward, speed, and democratize content sharing, not securities offerings.  Ignoring that focus, the SEC elevates one aspect of project design, tokens allowing ecosystem participants and the blockchain to function collectively, as if the tokens are the ***only*** aim of the projects.  Doing so disregards whitepapers outlining the technology, purpose, and governance of the projects, and function of tokens therein, reducing those technical documents in hindsight to "investor"

1

communications about "token offerings."  That narrow reading does not hold up.

Significantly, the SEC **does not allege** that the digital assets at issue here were offered or sold initially to **any** U.S. residents.  Nor could it; those offerings were conducted **entirely** overseas.  *See* ¶¶ 37, 76, 81-83.[1]  Instead, in a strained attempt to establish a U.S. nexus, the AC seeks to turn ordinary course **secondary market trading** and **contests, giveaways, and free airdrops** of tokens – taking place months or years later – into unregistered, improper **U.S.** "securities offerings."  These claims misfire.  Global contests, giveaways, and airdrops, and sales on internet-based platforms serving users worldwide, are not activities targeting the United States (much less implicating our securities laws).  Similar jurisdictional defects plague other claims.  For example, no "wrongful" acts related to so-called "wash trading" are alleged to have taken place in the U.S., even if the global platform on which the trades allegedly took place happened to be based here.  Accordingly, as a threshold matter, the AC fails to plead facts showing that the Court has personal jurisdiction over each foreign defendant for each claim.[2]

But even if it could be shown that the exercise of personal jurisdiction over the foreign defendants is appropriate here, the claims still fail for myriad, equally powerful reasons.  For one, among numerous other pleading defects, the SEC's group-pleaded allegations exemplify why this action misses the mark.  Absent are the detailed factual allegations, laying out *each* defendant's role in *each* claim, that the law demands.  The SEC cannot just label everyone "the Sun Defendants" (¶ 2) and assert "the Sun Defendants" did various acts (*e.g.*, ¶¶ 3, 5, 7, 79, 82, 87-88, 96, 101, 118, 125, 131, 136, 141, 147, 151, 157) to satisfy Rule 9(b)'s strict requirement

---

[1] References to "¶" are to the paragraphs in the AC.  References to "Ex[s]. _" are to the exhibits to the accompanying Declaration of Jennifer C. Bretan.  With respect to citations, unless otherwise stated, all emphasis is added and citations and internal quotation marks have been omitted.

[2] Rainberry, the sole U.S. domiciled defendant, does not contest the Court's jurisdiction over it, but joins in moving to dismiss the undifferentiated claims against it which involve predominantly foreign conduct (Claims 1-4, 6).

to plead fraud with particularity.  *See, e.g.*, *SEC v. Parne*s, 2001 WL 1658275, at *4 (S.D.N.Y. Dec. 26, 2001) ("The SEC's complaint in this case makes undifferentiated references to . . . the 'ADAR Defendants' . . . [i]n this respect, it fails to satisfy one of the principal purposes of Rule 9(b)."). Conclusory averments that Mr. Sun "controlled" the other defendants, or that they were "alter-ego entities," do not avoid that burden. The AC offers no specific facts supporting those claims, much less suggesting liability running to each defendant on each claim on that basis.

The AC fails on other, more substantive grounds too. Supreme Court precedent under *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010) prevents the extraterritorial application of U.S. laws as the SEC attempts here, and no other basis for such an extension is sufficiently alleged. And, because the facts fail to show that the alleged transactions constitute investment contracts (and thus "securities") under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946), this action lacks a foundational predicate, which alone is a basis to dismiss all claims.

Exacerbating the issues, despite years to investigate and substantiate its claims with the requisite detail, and despite availing itself of the opportunity to amend, the SEC largely relies on generalizations and conclusions to support its already thin, frequently indiscernible claims. For example, although the SEC purports to allege fraud, ***no material misstatement is alleged***, leaving Defendants (and the Court) to speculate on the precise basis for those claims. While accusing Defendants of market manipulation in a series of alleged "wash trades," no particularized facts show the trades were actually "wash trades," wrongfully executed for illegitimate purposes (much less affecting anyone in the United States). To the extent the SEC offers any detail, it is implausible that the negligible trades alleged – respectively accounting for 0.0039% and 0.0017% of the total dollar value of "TRX" traded on the days in question – could possibly have

affected the global "TRX" market as the SEC claims.[3]  The SEC also does not allege a single victim, anywhere, of this supposed "manipulative" trading.

Likewise, the claim for aiding and abetting violations of the anti-touting laws cannot survive.  No primary violation is adequately alleged.  And where are the necessary details of *each* defendant's knowledge that celebrities were failing to disclose compensation despite a legal duty to do so?  Where are the facts showing each defendant's substantial assistance in the alleged nondisclosures?  If anything, the fact that the supposed "paid campaign" was short-lived, ceasing almost immediately *after* coming to any defendant's attention, suggests the opposite.

Finally, the AC is subject to dismissal on due process grounds.  There was no fair notice that the SEC would attempt to pursue claims like those alleged here – reaching global contests and giveaways, free airdrops, and secondary trading in tokens (issued overseas, years earlier) on a developing blockchain, with few specific ties to the United States.  The implication of such uncertainty is profound.  Not only does it impact one of the fastest growing segments of the U.S. economy, efforts to impose unwarranted burdens on the nascent digital asset industry reverberate far beyond our borders.  As a court in this District notably observed, "Congress and the courts have yet to make a definitive determination as to whether such tokens constitute securities, commodities, or something else."  *Risley v. Universal Navigation Inc.*, 2023 WL 5609200, at *3 (S.D.N.Y. Aug. 29, 2023).  Without that much needed clarity, this action is premature and should be dismissed.[4]

---

[3] The dollar value of alleged TRX trades on October 1, 2018 (¶ 180) and October 7, 2018 (¶ 182) was approximately $4,869 (out of $126,179,237 worldwide) and $2,988 (out of $174,293,595 worldwide), respectively.  *See* Exs. 1-3 (CoinGecko Data). Exhibits 1-3 are publicly available charts of the price and dollar trading volume of "TRX," USDT, and BTC on these days, which are subject to judicial notice and properly considered here. *See Dfinity Found. v. New York Times Co.*, 2023 WL 7526458, at *1 n.6 (S.D.N.Y. Nov. 13, 2023) ("Courts may take judicial notice of the publicly-available price of [digital] assets . . . at the motion to dismiss stage."); *Loveman v. Lauder*, 484 F. Supp. 2d 259, 267 n.48 (S.D.N.Y. 2007) (taking "judicial notice of the . . . volume of trading . . . on the date in question.").

[4] With good reason, Congress is now considering the bounds of regulatory oversight, and what rules should govern and apply to digital assets and those who participate in the global blockchain economy, like Defendants here.  Most

## FACTUAL BACKGROUND

A.    **The Tron Protocol Modernizes Entertainment Worldwide Through
Blockchain Technology**

First developed in 2017, the aim of the Tron protocol was to bring emerging blockchain

technology to the realm of online entertainment, allowing for a more equitable distribution of

profits to content creators than on existing media sharing platforms.  Ex. 4 (TRON Whitepaper)

at 1-3; ¶ 29.[5]  A blockchain is "an electronic distributed ledger list of entries . . . maintained by

various participants in a network of computers[.]  Each of these computers is a node in the

network which uses cryptography to process and verify transactions on the ledger[.]"  *Williams v.

Block one*, 2022 WL 5294189, at *1 (S.D.N.Y. Aug. 15, 2022).  As conceived, the goal of the

TRON blockchain was to act as both a file storage protocol and social and content network,

enabling media to be uploaded and shared and monetized.  Ex. 4 at 4, 9-15, 23-27; ¶ 29.

Over time, a decentralized group of developers helped build the TRON blockchain.[6]  *See

generally* Ex.4; ¶¶ 13-14.  The Tron Foundation was formed under Singapore law as a non-profit

entity "to operate TRON network publicly, fairly [and] transparently."  Ex. 4 at 37; ¶ 30.  It is

not alleged to have maintained offices or employed personnel in the United States.  ¶¶ 14-15.

Justin Sun is an entrepreneur, blockchain advocate, and the Tron protocol's founder.  Ex. 4 at 40.

Mr. Sun resides overseas.  ¶ 13.  Tron has been widely adopted and is a worldwide success.  On

---

[5] recently, on May 22, 2024, the U.S. House of Representatives, on a broad, bipartisan basis, passed a bill that would split the regulation of digital assets between the SEC and the Commodity Futures Trading Commission, and permit secondary market trading of such assets even if initially sold pursuant to an investment contract.  *See* Press Release, https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=409277.  If that bill becomes law, it will confirm that the SEC lacks authority to bring many of the claims in the AC.

[5] In deciding a motion to dismiss, the Court may consider documents "referenced in the complaint . . . that the plaintiff relied on in bringing suit . . .".  *Rayner v. E*TRADE Fin. Corp.*, 248 F. Supp. 3d 497, 500 (S.D.N.Y. 2017) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)), *aff'd*, 899 F.3d 117 (2d Cir. 2018); *see also Risley*, 2023 WL 5609200, at *1 (considering tweets that were incorporated by reference in the complaint). Exhibits 4, 6, 8, 10, 11, and 13 meet this requirement.

[6] "Tron" generally refers to projects using the TRON blockchain, not to defendant Tron Foundation.

average today, there are over 6 million transactions recorded on the TRON blockchain globally each day.  Ex. 5 (Tron Transactions).

###   B.   TRX (ERC-20) Launches On The Ethereum Blockchain

Cryptocurrency is a digital asset that can be created and transferred using blockchain technology.  ¶ 23.[7]  Blockchain protocols use cryptographic tokens to coordinate the collective action needed for the blockchain to function, such as clearing transactions and approving technological upgrades.  ¶¶ 24-25.  The Tron protocol initially launched with a token created and recorded on the Ethereum blockchain, TRX (ERC-20).[8]  *See* Ex. 6 (Medium Article); Ex. 4 at 32-33.  Anyone can create ERC-20 tokens on Ethereum.  *See Risley*, 2023 WL 5609200, at *3 (explaining ERC-20 tokens).

The Complaint alleges that Mr. Sun and the Tron Foundation distributed TRX (ERC-20) in an initial coin offering ("ICO") in September 2017.  ¶ 37; Ex. 4 at 35.  There is no allegation that the ICO involved solicitations to, offers to, or purchases by *any* U.S. resident, or was directed at the United States.  *Cf.* ¶ 37.  Indeed, the ICO website was only in Chinese.  *See* Ex. 7 (ICO Website).[9]  Instead, the SEC alleges that "on or about January 8, 2018," Mr. Sun sent an email attaching various materials including a "Listing Application" regarding "TRX" to Bittrex, a cryptocurrency trading platform servicing users worldwide, with headquarters in Seattle.  ¶¶ 39-40; Ex. 8 (Tweet).  The AC does not explain why asking a global platform to make a pre-

---

[7] This memorandum uses "digital assets" "digital token," "cryptographic token," "token," and "cryptocurrency" interchangeably.

[8] Although the AC does not differentiate, "TRX (ERC-20)" refers to tokens launched on Ethereum, while "TRX (TRON)" describes different tokens, launched on the TRON blockchain.  Because the SEC fails to distinguish between them, even after Defendants flagged this issue in their prior brief, this memorandum uses "TRX" in quotation marks where it is unclear which token is at issue.

[9] "[C]ourts have taken judicial notice of the contents of web pages available through the Wayback Machine . . . under Federal Rule of Evidence 201."  *Aubrey v. New School*, 624 F. Supp. 3d 403, 408 (S.D.N.Y. 2022) (quoting *Distributorsoutlet.com, LLC v. Glasstree, Inc.*, 2016 WL 3248310, at *2 (E.D.N.Y. June 10, 2016)); *see also Golden v. NBCUniversal Media, LLC*, 2023 WL 5434378, at *10 n.14 (S.D.N.Y. Aug. 23, 2023) (taking judicial notice of a webpage from the Wayback Machine).  Exhibit 7 is a web page archived on the Wayback machine.

existing digital asset available for secondary market trading worldwide means any defendant engaged in "the offer or sale" of securities **in the United States**.  Nor is it specifically alleged that **any U.S. resident** actually purchased or attempted to purchase TRX (ERC-20) on Bittrex from the United States.  *Cf.* ¶ 56 (vaguely alleging that individuals "in the United States . . . placed their orders [for "TRX"]" on Bittrex and that "multiple" individuals supposedly "located in this District . . . purchased TRX through Bittrex" at **unspecified points in time**).

### C.     TRX (TRON) Is Launched On The TRON Blockchain

The TRON blockchain went live on June 25, 2018.  *See* Ex. 9 (Medium post).[10]  A new token, TRX (TRON), launched on the TRON blockchain the same day.  *Id.*  Holders of TRX (ERC-20) tokens could exchange those tokens for TRX (TRON) on a 1:1 basis at participating third-party exchanges.  *Id*.  In turn, the exchanges sent TRX (ERC-20) back to the Tron Foundation, which burned the tokens (*i.e.*, removed them from circulation).  By July 17, 2018, substantially all TRX (ERC-20) was out of circulation.  Ex. 10 (Tweet); Ex. 9.

### D.     The Alleged Improper "Offers and Sales" Of "TRX"

Despite failing to identify which digital assets relate to which claims specifically, two types of improper distributions of some form of "TRX" are alleged over time.  First, the SEC alleges offers and sales of "TRX" on Bittrex from March 12, 2018 through February 11, 2019.  ¶ 56.[11]  This ostensibly includes a claim that "on or about September 18, 2018" "TRX" was made available for purchase with USD on Bittrex.  ¶ 42 (citing reports that this was "the first time that

---

[10] The Court may take judicial notice of information in public sources, including websites.  *See Dfinity Found.*, 2023 WL 7526458, at *1 n.5 ("Courts may take judicial notice of a party's website at the motion to dismiss stage"); *HB v. Monroe Woodbury Cent. Sch. Dist.*, 2012 WL 4477552, at *4 (S.D.N.Y. Sept. 27, 2012) ("courts may take judicial notice of publicly available documents on a motion to dismiss"); *In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *21 n.10 (S.D.N.Y. Oct. 25, 2006) ("Court may take judicial notice[] of [news] articles on a motion to dismiss").  Exhibits 9 and 12 are such public sources and properly subject to judicial notice.

[11] The alleged offers and sales on Bittrex start before the TRX (ERC-20) burn and continue after, so it is not clear which version of "TRX" is at issue or what this allegation is meant to encompass.

Tron has been paired with USD in the United States.").  Although the SEC also alleges that Mr. Sun and the Tron Foundation took unspecified steps to have "TRX" listed on another "U.S.-based platform on or about March 25, 2019" (¶ 40), there is no allegation that any U.S. resident purchased or attempted to purchase "TRX" on this unidentified platform, or that the effort to list "TRX" succeeded.  Second, the SEC alleges that "TRX" was distributed in two social media contests in late 2018 where participants had the chance to win tokens by posting certain content. ¶¶ 57-68.  There is no allegation that these contests targeted the United States or its residents, only that steps were not taken to *exclude* U.S. persons from participating.  *Id*.[12]  Allegedly, one winner was a U.S. resident and another a "U.S. person" (presumably abroad).  *Id.*

The AC also alleges that a negligible amount of the overall trading volume of "TRX" was "wash trading" in accounts of "Chinese nationals" (from April 18, 2018 to February 11, 2019) or associated with Rainberry employees in a short window (September 26 to October 18, 2018).  ¶¶ 168-73, 179, 181.  The AC fails to allege that any of these trades affected the price paid for "TRX" by any purchaser, anywhere, much less in the United States.  This is not surprising. Almost $66 billion worth of TRX traded globally in that same period.  Ex. 1.  To the extent the SEC offers any detail (¶¶ 180, 182), the identified trades are incremental by comparison (reflecting a few thousand dollars each day).  Internal documents described the trades as routine market-making, activity not alleged to be improper.  *See* ¶ 176.

### E.    The BitTorrent Protocol, BitTorrent Foundation Ltd., And The Alleged Improper "Distributions" Of BTT

Unrelated to cryptocurrency or the blockchain, the BitTorrent protocol originated as a peer-to-peer file-sharing technology in 2001, and by 2018, was the world's largest decentralized protocol for data sharing.  ¶ 69; Ex. 11 (BitTorrent Token Whitepaper) at 4-5.  Rainberry, a

---

[12] BitTorrent Foundation and Rainberry are not alleged to have any involvement in these "distributions" of "TRX."

California corporation (formerly known as BitTorrent, Inc.), developed and owned the BitTorrent peer-to-peer file sharing protocol.  ¶ 16.  Entities affiliated with Mr. Sun acquired Rainberry in June 2018.  ¶¶ 16, 69.  Thereafter, a strategic partnership was reached to integrate blockchain technology into BitTorrent's existing peer-to-peer protocol.  Ex. 11 at 5-7.  To that end, a new BTT token, running on the TRON blockchain, was designed as a mechanism to transact in computing resources.  *Id.* at 7; ¶ 15.  The BitTorrent Foundation was formed under Singapore law to launch the BTT token and promote adoption of the protocol.  ¶ 15.  At all times, it conducted business overseas, and did not keep offices or employ personnel in the United States.  *Id.* at ¶¶ 14-15.  While the SEC makes the conclusory claim that Mr. Sun wholly owns and controls BitTorrent Foundation and Rainberry (¶¶ 15-16), those claims lack factual support.

BTT was made available for purchase overseas "exclusively. . . to non-U.S. accounts" on the Binance exchange beginning in January 2019.  ¶¶ 76, 82-83.  No U.S. resident is alleged to have received BTT in this distribution.  *See* ¶ 95 (noting "apparent restrictions on U.S. investors' participation in the BTT IEO.").  Thereafter, BitTorrent Foundation "applied for and secured listings for BTT on various crypto asset trading platforms."  ¶ 87.  The AC does not allege any of this was unlawful.  Instead, the SEC assails a series of free "airdrops" of BTT to existing "TRX" holders, and various social media contests and giveaways providing a chance to win BTT.  ¶¶ 101-117; 118-61.  No facts suggest the airdrops were targeted at the United States; the SEC claims only that "persons in the United States" received airdropped BTT (in unidentified locations).  *See* ¶ 112.  Nor is it alleged that BTT social media contests were directed at the United States, or that any U.S. resident participated.  ¶¶ 130, 135, 140, 146, 150, 156, 161.

The AC also alleges Defendants aided and abetted supposed disclosure violations by various celebrities who tweeted about using the TRON blockchain, "TRX," and BTT over the

course of three days in early 2021.  ¶¶ 191-93.

### F.    Procedural History And Claims Asserted

This action was initially filed on March 22, 2023 – over five years after the TRX (ERC-20) ICO.  Despite having previewed the arguments, when faced with Defendants' actual motion to dismiss, rather than stand on or attempt to defend the original complaint, on April 18, 2024, the SEC instead elected to amend.  Little changed in the latest iteration, however.  Irrespective of time, place, or token involved, the AC still purports to assert claims against all Defendants for: (1) unregistered securities offerings under Securities Act of 1933 ("Securities Act") Sections 5(a) and (c) (based on secondary trading, contests and giveaways, and airdrops)[13]; (2) fraud under Securities Act Sections 17(a)(1) and (a)(3) (ostensibly based on alleged "wash trading"); (3) market manipulation under Securities Exchange Act of 1934 ("Exchange Act") Sections 9(a)(1) and (a)(2) (also based on alleged "wash trading"); (4) fraud under Exchange Act Section 10(b) and Rule 10b5-1 (based on amorphous "scheme" allegations and absent any material misstatement); and (5) aiding and abetting the undisclosed promotion of a security for consideration under Securities Act Section 17(b) (related to alleged celebrity touting).

### LEGAL STANDARD

A complaint fails where it lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  On a motion to dismiss, a court "need not accept conclusory allegations or legal conclusions couched as factual [] allegations." *Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015).  "Bald assertions and conclusions of law will not suffice to avoid dismissal, nor will factual allegations that are wholly conclusory." *Allen*

---

[13] As alleged, the Section 5 claim does not appear to apply to the 2017 TRX (ERC-20) ICO and 2019 BTT IEO (initial exchange offering).

*v. Credit Suisse Sec. (USA) LLC*, 895 F.3d 214, 222 (2d Cir. 2018).

Where claims sound in fraud they must also meet Rule 9(b)'s heightened pleading standard. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127-28 (2d Cir. 1994). This requires the SEC to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The AC must also "allege facts that give rise to a strong inference of fraudulent intent." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996). The scienter inference can be "established either by [i] alleging facts to show that the defendants had both motive and opportunity to commit fraud, or [ii] by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *SEC v. Farnsworth*, 2023 WL 5977240, at *14 (S.D.N.Y. Sept. 14, 2023). All of the claims here fail for numerous, independent reasons.

## ARGUMENT

## I.      PERSONAL JURISDICTION OVER THE FOREIGN DEFENDANTS IS ABSENT

This case originates with foreign digital asset offerings to foreign purchasers on global platforms, allegedly by Mr. Sun, the Tron Foundation, and the BitTorrent Foundation (all foreign defendants). With respect to the TRX (ERC-20) ICO, there is no allegation that tokens were offered to U.S.-based purchasers. And as for BTT's IEO, no sales to U.S. persons are alleged, and steps were taken **to avoid** the U.S. market. *See* ¶ 76 (BTT was "exclusively available to **non-U.S.** accounts"). As a result, those offerings are plainly out of the SEC's regulatory reach. Undeterred, the SEC seeks to hale the foreign defendants to this Court nonetheless, asserting that later secondary sales on a U.S.-based platform serving users worldwide, and global social media contests and airdrops of those same digital assets, somehow were "unregistered U.S. securities offerings," even though the connection to the U.S. forum in each instance is tenuous at best. The remaining claims suffer similar jurisdictional defects. Because there is no basis to extend the

SEC's mandate to cover conduct insufficiently tethered to the United States, this action presents the precise scenario against which personal jurisdiction requirements serve to protect.

A. **The SEC Fails To Establish Personal Jurisdiction Over Each Foreign Defendant For Each Claim**

The SEC "has the burden of establishing that the Court has jurisdiction over" each defendant. *Shenzhen OKT Lighting Co. v. JLC-Tech LLC*, 2021 WL 4443637, at *4 (S.D.N.Y. Sept. 28, 2021) (Ramos, J.). That obligation must be met, not just "with respect to each defendant individually," *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 396 (S.D.N.Y. Sept. 20, 2021), but also "with respect to each claim asserted," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2019 WL 1331830, at *6 (S.D.N.Y. Mar. 25, 2019). For this reason, "[a]llegations in the form of a group pleading are insufficient" to establish personal jurisdiction over a specific defendant. *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 233 (S.D.N.Y. Oct. 4, 2019) (Ramos, J.). A court "will not draw argumentative inferences in the plaintiff's favor . . . nor must [it] accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). Rather, "allegations or evidence of activity constituting the basis of jurisdiction must be non-conclusory and fact-specific." *ICO Servs., Ltd. v. Coinme, Inc.*, 2018 WL 6605854, at *2 (S.D.N.Y. Dec. 17, 2018).

General personal jurisdiction requires "affiliations [that are] . . . so 'continuous and systematic' as to render [defendant] essentially at home" in the forum. *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017).[14] Specific personal jurisdiction, in turn, "is a significantly more limited doctrine" and requires that "the suit must arise out of the defendants' contacts which create a substantial connection with the forum state." *SSA Bonds*, 420 F. Supp. 3d at 235. Even

---

[14] Consistent with Section 27 of the Exchange Act, the relevant inquiry is whether a foreign defendant has minimum contacts "with the United States as a whole." *SEC v. Sharef*, 924 F. Supp. 2d 539, 544 (S.D.N.Y. 2013).

if sufficient contacts exist, the exercise of jurisdiction must also satisfy "traditional notions of fair play and substantial justice" and be reasonable. *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945). Jurisdiction over the foreign defendants is not established under any of these standards.

**B.    General Personal Jurisdiction Over The Foreign Defendants Is Absent**

The SEC advances no viable argument that there is general jurisdiction over any foreign defendant. *Cf.* ¶ 11. Mr. Sun, a foreign national residing abroad (¶ 13), is not "at home" in the United States. *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 924 (2011) ("the paradigm forum for the exercise of general jurisdiction is the individual's domicile"). Tron Foundation and BitTorrent Foundation – Singaporean entities based abroad (¶¶ 14-15) – are also not alleged to be "at home" here or to have "continuous and systematic" contacts with the United States rendering them so. *BNSF Ry.*, 581 U.S. at 413; *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) ("except in a truly 'exceptional' case, a corporate defendant [is at home] only where it is incorporated or maintains its principal place of business").

**C.    Specific Personal Jurisdiction Over The Foreign Defendants Is Lacking**

The SEC also fails to show that any foreign defendant has the necessary contacts to support specific personal jurisdiction in the United States in connection with each claim. There are "two methods for proving minimum contacts: (1) 'purposeful availment,' in which the defendant purposefully availed itself of the privilege of doing business in the forum state and could foresee being haled into court there, and (2) 'purposeful direction,' also known as the 'effects test,' which . . . requires that plaintiffs show that the defendants' conduct was intentional and expressly aimed at the forum state with the knowledge that substantial injury would be felt there." *SSA Bonds*, 420 F. Supp. 3d at 235. On the facts alleged and claims asserted here, the foreign defendants cannot be said to have "purposefully availed" themselves of the U.S. forum, nor did they "purposefully direct" any relevant conduct at it. *See infra* § I.A (claim-by-claim

analysis of alleged contacts with the forum required).  Far from clear evidence supporting

jurisdiction, the SEC's allegations are confusingly vague, leaving Defendants (and the Court) to

guess at the purported jurisdictional basis for each claim.  That does not suffice.  *DeLorenzo v.*

*Ricketts & Assocs., Ltd.*, 2017 WL 4277177, at *5 (S.D.N.Y. Sept. 25, 2017) ("[C]onclusory

non-fact-specific jurisdictional allegations or a legal conclusion couched as a factual allegation

will not establish a *prima facie* showing of jurisdiction."), *aff'd*, 757 F. App'x 6 (2d Cir. 2018).

Apparently recognizing that the foreign defendants did not direct conduct at the United

States for the contest-related claims and airdrops, the SEC appears to assert that jurisdiction

exists nonetheless because the "Sun Defendants" did not "exclude U.S. persons."  ¶¶ 64, 68, 112,

124, 130, 135, 140, 146, 150, 156, 161.  This group pleaded "jurisdiction by omission" position

is not tenable.  A failure to act "does not constitute the type of direct, affirmative and overt

conduct necessary to supply specific personal jurisdiction."  *Jenkins v. Miller*, 983 F. Supp. 2d

423, 449 (D. Vt. 2013); *see also*, *e.g.*, *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 25

(D.D.C. 2017) ("[T]he court is unaware of any authority suggesting that a *failure to act* might

constitute purposeful availment"), *aff'd*, 2018 WL 4440459 (D.C. Cir. July 17, 2018) (emphasis

in original); *Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1259 n.16 (S.D.N.Y. 1984)

(declining to "recogniz[e] inaction as a jurisdictionally significant contact").

Equally insufficient for jurisdictional purposes is the allegation that U.S. residents could

buy "TRX" on Bittrex or another "U.S.-based platform" after the initial overseas distribution.

¶¶ 38-40.  No detailed facts accompany supposed purchases of "TRX" by U.S. residents, much

less establish the transactions were **with** any foreign defendant.  *See*, *e.g.*, ¶ 56 (generic allegation

that "multiple investors located in this District . . . purchased TRX through Bittrex"); ¶ 53

(generic allegation that unspecified "purchasers were located in the United States").  This does

not describe concrete and purposeful acts directed at the United States and its residents by any foreign defendant.  *See ICO Servs.*, 2018 WL 6605854, at *2 ("activity constituting the basis of jurisdiction must be non-conclusory and fact-specific").  Without more, the mere ability to purchase tokens online in the secondary market, even from the United States, does not establish specific jurisdiction.  *See, e.g.*, *Reed Int'l, Inc. v. Afghanistan Int'l Bank*, 657 F. Supp. 3d 287, 305 (S.D.N.Y. 2023) ("Internet activity is an insufficient basis for personal jurisdiction [b]ecause websites are generally speaking, equally accessible everywhere, the mere availability of the site to users in New York, standing alone, does not amount to transacting business in the state.").

The character of the forum contacts also matters.  Here, the jurisdictional allegations stand in stark contrast to those credited in *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *7 (S.D.N.Y. July 31, 2023).  There, the foreign defendants had "extensive U.S. contacts," contracted "to sell close to 200 million [tokens] to institutional investors in the United States," loaned "nearly 100 million [tokens] to a U.S. trading firm," held "meetings and investor conferences with U.S. investors," and retained "U.S.-based employees whose sole duty was to solicit investment in the United States."  *Id.* at *2, 5-7.  If anything, *Terraform* illustrates the nature and level of factual support needed to plead specific personal jurisdiction; facts that cannot be found in the AC.  *See also SEC v. Terraform Labs Pte Ltd.*, 2022 WL 2066414 (2d Cir. June 8, 2022) (jurisdiction to pursue a related subpoena based on similar facts).

Unable to satisfy these meaningful requirements on a defendant-by-defendant, claim-by-claim basis, the SEC offers instead group pleading, control person, and alter-ego allegations, which only serve to highlight the lack of minimum contacts here.  *See* ¶¶ 11-16; *see also infra* § II.  Courts do not credit "attempt[s] to extend an allegation levied against one particular Defendant to the remaining Defendants" through such "speculative and conclusory allegations."

*OneCoin*, 561 F. Supp. 3d at 397; *see also SSA Bonds*, 420 F. Supp. 3d at 233 ("Allegations in the form of a group pleading are insufficient" to establish jurisdiction over a specific defendant); *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 137 (S.D.N.Y. 2021) (control of U.S. entity, even if well pleaded, "does not provide for specific jurisdiction.").

Equally unavailing are the AC's remaining jurisdictional allegations, none of which suffice (individually or in the aggregate) to support jurisdiction, including that: (1) information was posted online (sometimes by third parties), and accessible globally, including in the United States  (¶¶ 41, 45, 47-50, 57-62, 67, 70, 71, 75, 76, 90, 92, 104-13, 119, 120-22, 125-29, 132, 133, 136-40, 142-46, 151-55, 158, 191-93); and (2) that "TRX" was paired with and could be purchased in secondary sales with USD (¶¶ 42, 43).  The "fact that electronic communications were routed through U.S.-wires or servers, or that recipients of those communications were located in the United States, is insufficient to establish minimum contacts with the United States." *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017 WL 3600425, at *7 (S.D.N.Y. Aug. 18, 2017).  That communications take place on worldwide platforms does not suffice. *Reliance First Cap., LLC v. Mid Am. Mortg., Inc.*, 2019 WL 2504039, at *10 (E.D.N.Y. June 17, 2019) (tweets do not create claim-related contacts with the forum).  This is true even where online content is promotional in nature. *Holsworth v. BProtocol Found.*, 2021 WL 706549, at *2 (S.D.N.Y. Feb. 22, 2021) ("[P]romotional activities, touting the company's digital activities are insufficient to support personal jurisdiction over citizens of another country.").  And because "the relationship with the forum 'must arise out of contacts that the 'defendant *himself*' creates with the forum State," and not others, that third parties may have posted content from the United States is entirely beside the point. *FrontPoint*, 2017 WL 3600425, at *7 (emphasis in original); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S.

408, 417 (1984) ("[The] unilateral activity of another party . . . is not an appropriate

consideration when determining whether a defendant has sufficient contacts with a forum"). Nor

does denominating secondary sales in U.S. dollars constitute "purposeful availment" of the U.S.

forum. *See Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 729 (S.D.N.Y. 2010) (dismissing

for lack of jurisdiction where, "given the worldwide availability of U.S. currency, it does not

follow that New York (or even the United States) is essential to the provision of said currency").

For these reasons, and as further described below, the Court lacks specific personal jurisdiction

over Mr. Sun or either of the foreign entity defendants.

### 1.    No Specific Personal Jurisdiction Over Mr. Sun

The SEC concedes that Mr. Sun resides and works abroad. ¶ 13. Sporadic contacts

between Mr. Sun and the United States do not erase that gap. Mere attendance at a January 2019

blockchain industry event in San Francisco (¶¶ 66[15], 73, 78), and appearing in a single livestream

video from San Francisco (¶ 77), are not such meaningful connections to the United States that

Mr. Sun can be said to have availed himself of the privilege of doing business here. *See, e.g.*,

*Glob. Gold Mining, LLC v. Ayvazian*, 983 F. Supp. 2d 378 (S.D.N.Y. 2013) (isolated visits to

forum do not satisfy minimum contacts for specific jurisdiction); *Absolute Activist Master Value

Fund, Ltd. v. Ficeto*, 2013 WL 1286170, at *12 (S.D.N.Y. Mar. 28, 2013) ("fundraising trips" to

the United States insufficient to establish personal jurisdiction). The SEC altogether fails to

tether Mr. Sun's conference attendance and livestream to any of its claims, none of which arise

out of or relate to the Tron ecosystem (of which tokens are a small part), the Tron community,

the relationship between TRX and BTT, the history of TRX usage, or the BitTorrent platform.

---

[15] Originally, the SEC alleged that the niTron Summit conference was to discuss "current technological progress within the industry, the future of blockchain, and best practices to inspire others to empower the development of blockchain." ECF No. 1 at ¶ 60. The AC engages in a liberal rewrite, now claiming that the event's focus was to "discuss and promote the Tron ecosystem, TRX, and BTT." ¶ 66.

*See* ¶¶ 77-78 (subject matters of niTron Summit and livestream); *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 180 (S.D.N.Y. 2021) ("It would render the minimum contacts analysis meaningless to find that [defendant] purposefully avails itself of the U.S. forum . . . if its employees travel to United States to conduct business that is not related to the claims at issue.").

The same is true of Mr. Sun's newly-alleged extended visits to the United States in 2017, 2018, and 2019.  ¶ 11.  Not only are those allegations lacking in specifics and untethered to any claim, aged trips are far from a reasonable basis to hale Mr. Sun into a U.S. court *today*.  *See, e.g.*, *King Cnty., Wash. v. IKB Deutsche Industriebank, AG*, 769 F. Supp. 2d 309, 321 (S.D.N.Y. 2011) (no specific personal jurisdiction where defendants' last visit to New York was at least four years ago); *V'soske, Inc. v. Vsoske.com*, 2001 WL 546567, at *5 (S.D.N.Y. May 23, 2001) (no specific personal jurisdiction based on transaction more than decade ago); *see also RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997) ("We cannot simply aggregate all of a defendant's contacts with a state—no matter how dissimilar in terms of geography, time, or substance—as evidence of the constitutionally-required minimum contacts.").  Because none of the alleged violations occurred during Mr. Sun's visits to the United States years ago (much less at any time), it can hardly be said that the SEC's "claim[s] arise[ ] out of, or relate[ ] to" Mr. Sun's contacts with the United States.  *Sharef*, 924 F. Supp. 2d at 544-45.[16]

### a.    The Conclusory "Control" Allegations Fail

Because his actual contacts are de minimis, the AC tries to use Rainberry (a U.S. corporation, which Mr. Sun allegedly controls) to carry the jurisdictional weight.  *See, e.g.*, ¶¶ 13, 16.  The problem is that Rainberry (which is not in the digital assets business) is not alleged to have played a significant role in *any* of the claims, so Mr. Sun's alleged control over it is not

---

[16] Also irrelevant is the claim that Mr. Sun may have stayed in an apartment rented by Rainberry on certain unidentified occasions.  ¶ 11.  What that allegation has to do with the SEC's securities claims is anyone's guess.

legally relevant.  Setting that substantial defect aside, "conclusory labels and allegations" that

Mr. Sun controls Rainberry are not enough.  *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d

731, 770 (S.D.N.Y. 2017) (rejecting as inadequate bald allegations that defendant "had the power

to influence and control and did influence and control, directly or indirectly, the decision-making

of [a] Company"); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 166 (S.D.N.Y.

2012) (plaintiff must plead "actual control" ***over the matters at issue***; "conclusory allegations of

control are insufficient as a matter of law.").

Even if adequately pleaded, the mere "ability to control" a U.S. entity "does not provide

for specific jurisdiction."  *In re Aegean*, 529 F. Supp. 3d at 137; *see also Tarsavage v. CITIC Tr.

Co.*, 3 F. Supp. 3d 137, 147 (S.D.N.Y. 2014) ("Control person status alone [is] insufficient to

warrant the conclusion that [defendant's] contacts with the United States satisf[y] the

requirements of due process."); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 454 (S.D.N.Y.

2005) (due process "is made of sterner stuff than a mere allegation of control").  Similarly,

"status as an officer without more, does not give rise to jurisdiction."  *In re Aegean.*, 529 F.

Supp. 3d at 143; *see also King Cnty., Wash.*, 769 F. Supp. 2d at 320-21 (entity's contacts cannot

be imputed to individuals based on "the mere fact of their positions").  That the SEC's

allegations against Mr. Sun largely take the form of undifferentiated group pleading against the

"Sun Defendants" also renders them insufficient.  *OneCoin*, 561 F. Supp. 3d at 397 (rejecting

"attempt to extend an allegation levied against one particular Defendant to the remaining

Defendants in the group").

> **b.  Analyzed Claim-By-Claim, The AC Fails To Plead A Basis For Exercising Jurisdiction Over Mr. Sun**

***Section 5***:  With respect to unregistered offerings, the AC alleges only incidental U.S.

contacts and does nothing to connect those contacts to actions by Mr. Sun.  Of the more than

2,439 winners of "TRX" or BTT across the 10 worldwide social media contests and giveaways alleged in the AC, a grand total of **one** winner is alleged to be a U.S. resident and another is alleged to the a "U.S. person" (presumably residing abroad).  ¶¶ 57-68, 118-61.  Those are not well-pleaded facts suggesting that any such contest was "purposefully directed" at the United States; the dearth of U.S. residents among the winners strongly suggest the opposite.  Nor is it enough to generally allege that "[n]either Sun nor [his entities] took any steps to exclude U.S. persons" from participating in contests and giveaways (*see, e.g.*, ¶¶ 64, 124) to establish jurisdiction.  *Jenkins*, 983 F. Supp. 2d at 449 (failure to act insufficient for specific personal jurisdiction); *SSA Bonds*, 420 F. Supp. 3d at 235 (conduct must be "intentional and expressly aimed at the forum state").  As for airdrops, while the AC now makes the conclusory claim that unspecified "persons in the United States" did receive BTT (¶ 112), there is no allegation that any Defendant knew (or could have known) that airdrops to pseudonymous wallets were to "persons in the United States."  Absent that knowledge, there is no basis for claiming that distributions were ever intentionally directed at the United States.  The AC does not even try to grapple with this issue, much less connect any of it to actions taken by Mr. Sun.

The allegation that "TRX" was made available on U.S.-based trading platforms also does not suggest activity directed at the United States.  While loosely tied to actions (somewhere in the world) by Mr. Sun and Tron Foundation (¶ 39, alleging that Mr. "Sun sent an email (from his Tron email address) to Bittrex personnel" at some unidentified location), Bittrex was a worldwide, online platform.  The fact that U.S. residents, along with the rest of the world, could use it to purchase tokens on the global secondary market does not establish specific personal jurisdiction over **Mr. Sun** as a result.  *Reed Int'l*, 657 F. Supp. 3d at 305 ("websites . . . equally accessible everywhere . . . [do] not amount to transacting business in the state"); *ICO Servs.*,

2018 WL 6605854, at *2.  It is also "elementary that 'an individual's contract with an out-of-state party *alone* can[not] automatically establish sufficient minimum contacts in the other party's home forum."  *JCorps Int'l, Inc. v. Charles & Lynn Schusterman Fam. Found.*, 828 F. App'x 740, 745 (2d Cir. 2020) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) (emphasis in original)).  Even if the Bittrex employee Mr. Sun allegedly emailed was a "United States recipient, the facts pled would fall far short of establishing the requisite minimum contacts."  *AmTrust Fin. Servs., Inc. v. Lacchini*, 260 F. Supp. 3d 316, 332 (S.D.N.Y. 2017); *see also TAGC Mgmt., LLC v. Lehman*, 2011 WL 3796350, at *7 (S.D.N.Y. Aug. 24, 2011) (no minimum contacts where defendant directed one email and one letter to a recipient in the United States) (collecting cases).  Finally, statements by Mr. Sun on globally available social media sites like Medium or Twitter (¶¶ 38-47, 50, 59, 71, 85, 88, 89-91, 95, 103, 104, 114-16) do not suffice to confer personal jurisdiction over him either.  Such statements "do not create claim-related contacts with the forum, even if people within the forum state can see them."  *Reliance First*, 2019 WL 2504039, at *10 (tweets insufficient to create claim-related contacts with the forum).  The same is true of Mr. Sun's participation in a livestream or appearance at an event discussing the future of the blockchain and Tron's ecosystem (¶¶ 77-78).  *Holsworth*, 2021 WL 706549, at *2 ("[P]romotional activities, touting the company's digital activities are insufficient to support personal jurisdiction over citizens of another country.").  In sum, none of these contacts satisfy the SEC's burden to plead facts support specific personal jurisdiction over Mr. Sun with respect to the Section 5 claims.

> ***Market Manipulation/Fraud***:  There is no allegation that Mr. Sun perpetrated a fraud, sold securities, manipulated any market, or engaged in wash trading during his alleged time in the United States.  *See, e.g.*, *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, 2017 WL 1113080,

at *4 (S.D.N.Y. Mar. 10, 2017) (absent allegations that purported market manipulation occurred *during* trip to forum, no suit-related contacts); *United States ex. rel. TZAC, Inc. v. Christian Aid*, 2021 WL 2354985, at *4 (S.D.N.Y. June 9, 2021), *aff'd*, 2022 WL 2165751 (2d Cir. June 16, 2022) (attendance at a few conferences in forum were "insufficient contacts" to support exercise of specific jurisdiction).

The only non-conclusory U.S. nexus for these claims is the allegation that undefined members of "Sun's team" (location unspecified) created nominee accounts in the names of two U.S.-based Rainberry employees, allegedly to engage in improper "wash trades" of "TRX" on Bittrex.  ¶¶ 164, 170, 174, 182.  But again, opening an account (which is not wrongdoing) on a platform providing for worldwide trading in digital assets, without more, is not enough to support specific jurisdiction.  *See Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001) (for specific jurisdiction, "the situs of injury . . . is the place where the underlying, original event occurred which caused the injury").  While the SEC alleges "Sun directed and was aware of his team's wash trading" activities (¶ 164), that is a "legal conclusion couched as a factual allegation," which is insufficient to establish jurisdiction.  *DeLorenzo*, 2017 WL 4277177, at *5.

Even if the Bittrex accounts were used for improper purposes (and as discussed herein, they were not), jurisdiction over Mr. Sun is not established simply because the SEC posits a scheme that "was international in scope, and harmed investors across the planet . . . including investors in [the forum]."  *OneCoin*, 561 F. Supp. 3d at 406.  The relevant inquiry is ***where the event causing the alleged injury took place***.  *Id.*  Here, other than that accounts were opened in the names of employees of Rainberry, none of the alleged "market manipulation" involves action by Mr. Sun, or anyone else, in the United States.  *See Prime Int'l Trading, Ltd. v. BP P.L.C.*, 784 F. App'x 4, 9-10 (2d Cir. 2019) (rejecting specific personal jurisdiction where complaint did not

allege that defendant "manipulated markets in the United States or conducted any physical []
trades in the United States").  Again, if the claim is based on "market manipulation," the AC tells
us nothing about where the supposed "wrongful" conduct took place.  Who placed these alleged
orders?  Where were they located?  Who, if anyone, was injured and where?  The "wash trading
scheme" allegations here lack any relevant jurisdictional detail.  *Cf.*, *e.g.*, ¶¶ 167, 168, 173, 175,
185.  Nor is it enough for the SEC to baldly allege that because Bittrex was based in the U.S., the
scheme "had a foreseeable and substantial effect within the United States."  ¶ 165.  *See AmTrust
Fin. Servs.*, 260 F. Supp. 3d at 333 ("that harm in the forum is foreseeable is insufficient for the
purpose of establishing specific personal jurisdiction").

  ***Aiding and Abetting Non-Disclosure of Payments for Alleged Promotion***:  The SEC
alleges that Mr. Sun made payments to celebrities (¶¶ 187-92) and approved language for tweets
(¶ 189), but publicly denied those payments (¶ 194).  Even if those claims were accurate (they
are not), there is no allegation that ***any of this*** took place in the United States.  *Cf.* ¶ 188
(conspicuously failing to allege *from where* Mr. Sun "approved" or "arranged" payments).[17]
That some celebrities allegedly had U.S. followers (*i.e.*, ¶ 189), is insufficient to allege that any
action was directed at the United States, or foreseeably caused harm here.  *Reliance First*, 2019
WL 2504039, at *10 (tweets do not suffice to create claim-related contacts with the forum).

  Simply put, because the facts do not suggest U.S. contacts sufficient to establish specific
personal jurisdiction over Mr. Sun with respect ***any*** of the claims, he should be dismissed.

  **2. No Specific Personal Jurisdiction Over Either Foreign Entity**

  Tron Foundation and BitTorrent Foundation are Singaporean entities that conducted their
business entirely abroad, did not keep offices here, and did not employ U.S. personnel.  ¶¶ 14-15,

---

[17] In another revealing amendment, the AC omits the prior complaint's admission that payments were made by an
"offshore intermediary."  ECF No. 1 at ¶ 180.

30.  Quintessential foreign entities, they do not belong in a U.S. legal action absent a substantial

showing not made here.  *SSA Bonds*, 420 F. Supp. 3d at 235 (requiring conduct "expressly aimed

at the forum state.").  As described below, none of the SEC's claims credibly arise out of either

foreign entity's insubstantial contacts with the United States.

a.        **Tron Foundation**

*Section 5*:  At most, the AC alleges incidental contacts with the United States related to

distributions of "TRX."  Claims that **one** U.S. resident and **one** "U.S. person" won "TRX" in

worldwide social media contests are the type of isolated, sporadic contacts courts find

insufficient to establish jurisdiction over a foreign company.  *See Burger King*, 471 U.S. at 475

("[A] defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or

'attenuated' contacts.").  That an overseas foundation did not take measures "to exclude U.S.

persons" from participating (¶¶ 62, 68) is irrelevant.  *Jenkins*, 983 F. Supp. 2d at 449 (failure to

act does not establish specific personal jurisdiction); *SSA Bonds*, 420 F. Supp. 3d at 235.

Finally, internet posts about "TRX" made by the Tron Foundation abroad, and accessible

to U.S. residents (along with the rest of the world) (¶¶ 30, 38-42, 47-49, 58, 70, 71, 103, 104) do

not support jurisdiction for Section 5 claims either. *Metro. Life Ins. Co. v. Robertson-Ceco*

*Corp.*, 84 F.3d 560, 567-68 (2d Cir. 1996) ("Specific jurisdiction exists when . . . suit aris[es] out

of or relate[s] to the defendant's contacts with the forum").  Tweets and posts disseminated

worldwide "do not create claim-related contacts with the forum, even if people within the forum

state can see them."  *Reliance First*, 2019 WL 2504039, at *10.

*Market Manipulation/Fraud*:  There is no allegation that the Tron Foundation had any

contact with the United States related to these claims.  *See* ¶¶ 167, 175 (alleging only that Tron

Foundation employees were directed to open accounts on Bittrex's exchange and allegedly

executed trades in "TRX" – presumably from offices overseas).  Rote allegations that "wash-

trading" had a "foreseeable and substantial" impact in the United States (¶ 165) do not save this claim. As described *infra* § IV.A, the supposed "wash-trades" were minimal and had no foreseeable effect.

**Aiding and Abetting**: Similarly, there is no allegation that the Tron Foundation had any contact with the United States related to this claim. The AC alleges only that Mr. Sun "acting on behalf of the Tron Foundation" undertook certain activities, and, as explained above, those allegations lack any jurisdictionally relevant detail. *See* ¶¶ 187-92.

### b.   BitTorrent Foundation

**Section 5**: There is no allegation that BTT-related social media contests were directed at the United States or **that any U.S. resident or person participated**. ¶¶ 130, 135, 140, 146, 150, 156, 161. As noted, an alleged failure to "exclude" "U.S. persons" from receiving BTT in airdrops or social media contests is not enough. ¶¶ 112, 124, 130, 135, 140, 146, 150, 156, 161. Specific jurisdiction cannot be predicated on omitting to act. *Jenkins*, 983 F. Supp. 2d at 449 ("direct, affirmative and overt conduct" required); *SSA Bonds*, 420 F. Supp. 3d at 235 (conduct must be "intentional and expressly aimed at the forum"). Even if unspecified "persons in the United States" did receive BTT airdrops, that too is insufficient to confer jurisdiction. The SEC does not allege BitTorrent Foundation knew (or could have known) ex ante where airdrop recipients were located. *Cf Asahi Metal Indus. Co.* v. *Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 111 (1987) (due process "require[s] something more than that the defendant was aware of its product's entry into the forum State through the stream of commerce"). Nor do tweets or posts accessible globally (including here), ¶¶ 71, 104-06, "create claim-related contacts with the forum." *Reliance First*, 2019 WL 2504039, at *10. Finally, the allegation that BitTorrent Foundation "applied for and secured listings for BTT on various crypto asset trading platforms" (¶ 87) is irrelevant. No Section 5 claim arises from or relates to that allegation.

***Market Manipulation/Fraud***:  The lone allegation tying BitTorrent Foundation to market manipulation is that it later claimed to own or control the two "Chinese national" accounts used by ***others*** for purported "wash trading."  ¶ 184.  That does not suggest relevant actions here ***by BitTorrent Foundation*** that would render jurisdiction over it on this claim appropriate.

***Aiding and Abetting***:  There are no aiding and abetting allegations against BitTorrent Foundation that are not group pleaded.  *See* ¶¶ 187-95 (alleging "Sun, acting on behalf of the Tron Foundation, BitTorrent Foundation" did various acts).  Those allegations are far from a sufficient basis for exercising jurisdiction over a foreign defendant.  *See In re Aegean*., 529 F. Supp. 3d at 137 (group pleaded jurisdictional allegations fail); *OneCoin Ltd.*, 561 F. Supp. 3d at 397 (rejecting "attempts to extend an allegation levied against one particular Defendant to the remaining Defendants in the group"); *SSA Bonds*, 420 F. Supp. 3d at 232-33.

### D.    Exercising Jurisdiction Over The Foreign Defendants Also Is Unreasonable

Exercising jurisdiction over the foreign defendants also violates traditional notions of fair play and substantial justice, which is an independent basis for dismissal.  Courts balance five factors in making this assessment: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."  *Metro. Life Ins.*, 84 F.3d at 568.  These factors weigh decisively in the foreign defendants' favor.

First, there is enormous hardship in defending a case from abroad.  *Asahi Metal Indus. Co.*, 480 U.S. at 114 (recognizing "unique burdens placed upon one who must defend oneself in a foreign legal system").  Here, the foreign defendants face non-trivial obstacles, both financial and logistic, in defending from Singapore (or elsewhere) a suit in New York.  *See Mega Tech*

*Int'l Corp. v. Al-Saghyir Establishment*, 1999 WL 269896, at *6 (S.D.N.Y. May 3, 1999) (despite "conveniences of modern communication and transportation," still costly and cumbersome for overseas defendant to litigate in New York).

Second, the U.S. forum "must give way" where, as here, the foreign defendants "lack connections to the United States and whose purposeful interjection into the forum state has been very limited." *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1490 (9th Cir. 1993).

Third, the SEC's interests do not outweigh Singapore's interests, which has its own robust regulatory regime regarding digital assets and is the "home" jurisdiction of the two foreign entities. *See* Payment Services Act (Act No. 2/2019) (Sing.).

Fourth, efficient resolution of this controversy is not in the United States. Courts evaluating this factor "generally consider where witnesses and evidence are likely to be located." *Metro. Life Ins.*, 84 F.3d at 574. Here, relevant witnesses and evidence are largely outside of the United States. *See, e.g.*, *Tymoshenko v. Firtash*, 2013 WL 1234943, at *6 (S.D.N.Y. Mar. 27, 2013) (interest weighs in favor of defendant where "[m]ost of the relevant evidence and witnesses . . . are located . . . beyond the Court's subpoena power").

Finally, since "courts must [also] consider the procedural and substantive policies of other nations in deciding whether to assert jurisdiction," at best the "social policy" factor is in equipoise, if not tilting elsewhere, given the dearth of facts suggesting U.S. interests were specifically targeted or at risk. *Tymoshenko*, 2013 WL 1234943, at *7. On balance, these factors strongly suggest that the exercise of jurisdiction over the foreign defendants is unreasonable.

### E.      If This Action Survives As To Rainberry, It Should Be Transferred

Rainberry, a California corporation (¶ 16), does not challenge jurisdiction but respectfully submits that if it is the only remaining defendant, the case should be transferred under 28 U.S.C. §§ 1391 and 1404. Courts balance nine factors in determining whether transfer is appropriate:

"(1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice." *SEC v. Am. Renal Assoc. Holdings*, 2022 WL 1166087, at *2 (S.D.N.Y. Apr. 20, 2022).  All of these factors favor transfer to the Northern District of California (where Rainberry, potential witnesses, and relevant documents may be found) as the more appropriate and convenient forum. Because the SEC "has not shown that any of the operative facts arose in the Southern District of New York" transfer is "substantially favor[ed]."  *SEC v. Hill Int'l, Inc.*, 2020 WL 2029591, at *4 (S.D.N.Y. Apr. 28, 2020) (granting motion to transfer SEC action).

## II.     ALL CLAIMS FAIL DUE TO IMPERMISSIBLE GROUP PLEADING

Even if jurisdiction could be established, other pleading defects doom the AC. Throughout, and across all claims, the SEC attempts to cloud the predominantly foreign character of this case by relying on impermissible group pleading.  Courts in this district have long held that allegations against "defendants" collectively do not meet Rule 9(b)'s particularity requirements or even notice pleading under Rule 8(a)(2).  *See, e.g.*, *Nesbeth v. New York City Mgmt. LLC*, 2019 WL 110953, at *3 (S.D.N.Y. Jan. 4, 2019) ("It is well-established in this Circuit that plaintiffs cannot simply lump defendants together for pleading purposes"); *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 584 (S.D.N.Y. 1995) ("complaint may not rely upon blanket references to acts or omissions by all of the defendants"); *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1040 (S.D.N.Y. 1993) (dismissing fraud claim where defendants were "clumped together in vague allegations regarding 'some or all [] defendants'").

Here, nearly every allegation is pleaded against the "Sun Defendants," a grouping defined to include Mr. Sun, Tron Foundation, BitTorrent Foundation, and Rainberry.  *See ¶¶* 2-3, 5, 7, 11, 12, 79, 82, 87-88, 91, 93-94, 96-97, 101, 109, 117-18, 120, 123-24, 129-31, 134-36, 139-41, 145-51, 155-57, 160-61, 198-99, 201-02, 204-05, 207-08, 214-15, Prayer for Relief.  Because this approach does not give any Defendant adequate notice of the basis for claims levied against him or it, it fails to satisfy even basic notice pleading requirements.  *Medina v. Bauer*, 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004) ("allegations fail to give adequate notice to these defendants as to what they did wrong" by "lumping all the defendants together and failing to distinguish their conduct"); *Nesbeth*, 2019 WL 110953, at *3 (purpose of pleading requirements is "to give fair notice of a claim and the grounds").  And for claims sounding in fraud, it is far from pleading with the requisite particularity. *See Three Crown*, 817 F. Supp. at 1040 (undifferentiated pleading unacceptable under Rule 9(b)).

The SEC's conclusory contention that Mr. Sun "controls" the three entity defendants cannot overcome "the 'presumption of separateness' afforded to related corporations."  *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996); *see Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 494 (S.D.N.Y. 2005) ("conclusory, vague allegations that [individual defendants] exercised control over [an entity defendant] . . . insufficient to satisfy the requirements of [Rule 9(b)]").  The same is true of the inadequately pleaded claim that Tron Foundation and BitTorrent Foundation are "alter-egos" of Mr. Sun.  *Cf. ¶¶* 14-15.  No well-pleaded facts support that contention.  Under Singapore law,[18] an entity is an alter ego of an owner where the owner "made no distinction between himself" and the entity.  *Alwie Handoyo v. Tjong Very Sumito*, [2013] SGCA 44 at ¶ 99 (Aug. 6, 2013), *available at* https://www.elitigation.sg/gd/s/2013 SGCA 44.

---

[18] "When determining whether to pierce the corporate veil the court must apply the law of the state of incorporation of the defendant."  *See Wuhan Airlines v. Air Alaska, Inc.*, 1999 WL 223493, at *1 (S.D.N.Y. Apr. 14, 1999).

The AC can be searched in vain for a single fact relevant to factors courts routinely consider in determining whether an entity is the alter ego of a shareholder. *See OOO v. Empire United Lines Co., Inc.*, 557 F. App'x 40, 45-46 (2d Cir. 2014) (among others, factors include "intermingling of corporate and [shareholder] funds, undercapitalization of the corporation, failure to observe corporate formalities . . .  insolvency at the time of a transaction, siphoning off funds by the dominant shareholder, and the inactivity of other officers and directors"). No such claims are made here, and mere say-so by the SEC is not enough. *See Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, 2011 WL 1142916, at *6 (S.D.N.Y. Mar. 22, 2011) ("[D]ismissal of an alter ego claim at the pleading stage is appropriate where the pleadings are devoid of any specific facts or circumstances supporting . . . alter ego liability.").

As to Rainberry, the control allegations are similarly deficient. The SEC asserts Mr. Sun "wholly own[s] and control[s] Rainberry" (¶ 16), but even if that were correct, sole ownership does not establish alter ego liability. *See Empire United*, 557 F. App'x at 46 (status as sole shareholder, lack of directors, and absence of other officers fails to establish alter ego liability).

The problem with treating the "Sun Defendants" as an undifferentiated mass for all claims is also obvious. For example, what actions did Rainberry or BitTorrent Foundation take with respect to unregistered offerings of "TRX" or to substantially assist claimed anti-touting violations? Also unexplained is what role Rainberry supposedly played in airdrops, contests, or giveaways. *Compare*, *e.g.*, ¶ 105 (noting the BitTorrent Foundation would be making BTT airdrops) *with* ¶ 109 (alleging the "Sun Defendants" made the airdrops). *See Verschleiser v. Frydman*, 2023 WL 5835031, at *11 (S.D.N.Y. Sept. 7, 2023) (complaint must identify which defendant participated in which acts; as each can only be liable for its own actions). Instead, Defendants are left to speculate just what it is that any one of them is alleged to have done.

### III.     THE U.S. SECURITIES LAWS DO NOT APPLY TO THE ALLEGED CONDUCT

Even if one could get past the jurisdictional defects and improper group pleading, the

claims still fail because the SEC alleges transactions that are "predominantly foreign" and thus

barred by *Morrison*, 561 U.S. at 255-57.

### A.     The SEC Fails To Allege Domestic Transactions Satisfying *Morrison*

"It is a longstanding principle of American law" that statutes "apply only within the

territorial jurisdiction of the United States" "unless a contrary intent appears."  *Morrison,* 561

U.S. at 255.  In the Second Circuit, courts weighing this question use a "two-step framework"

asking: (1) "whether the presumption against extraterritoriality has been rebutted by text that

provides a clear indication of an extraterritorial application" and (2) if "the presumption against

extraterritoriality has not been rebutted, . . . whether the case involves a domestic application of

the statute."  *Laydon v. Cooperatieve Rabobank U.A.*, 55 F.4th 86, 96 (2d Cir. 2022).

In *Morrison*, the Supreme Court held that the Exchange Act "contains nothing to

suggest" extraterritorial application is appropriate; rather, the law contemplates "purchases and

sales of securities **in the United States**."  561 U.S. at 262, 266.  The same "focus on domestic

transactions" is true of the Securities Act.  *Id.* at 268.  For this reason, the presumption against

extraterritoriality is not rebutted, and the SEC may only bring claims implicating domestic

application of the U.S. securities laws.  *See id*. at 265.  Consistent with *Morrison*, this requires

the SEC to allege either (1) a "transaction[] in securities listed on domestic exchanges" or (2) a

"domestic transaction[] in other securities."  *Id.* at 267.

With respect to *Morriso*n's first prong, "[a]n exchange is considered 'domestic' if it

registers as a 'national securities exchange.'"  *Anderson v. Binance*, 2022 WL 976824, at *4

(S.D.N.Y. Mar. 31, 2022) (quoting *Morrison*, 561 U.S. at 266-67), *overruled on other grounds*

by *Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024).[19]  Registration is required when "a 'facility

of [the] exchange [is] within or subject to the jurisdiction of the United States." *Id.* (quoting 15

U.S.C. § 78e).  Here, the SEC does not allege sufficient facts demonstrating that transactions in

securities took place on a registered domestic securities exchange.

      As for *Morrison*'s second prong, "to sufficiently allege the existence of a 'domestic

transaction in other securities,' plaintiffs must allege facts indicating that irrevocable liability

was incurred or that title was transferred within the United States." *Absolute Activist Value*

*Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012)).  "[R]esidency or citizenship is

irrelevant to the location of a given transaction" (*id. at* 69-70), and "does not affect whether the

transaction was foreign or domestic." *City of Pontiac Policemen's & Fireman's Ret. Sys. v. UBS*

*AG*, 752 F.3d 173, 181 (2d Cir. 2014); *see also In re Vivendi Universal, S.A. Sec. Litig.*, 765 F.

Supp. 2d 512, 532 (S.D.N.Y. 2011) (in the context of American Depositary Receipts listed in the

United States, rejecting argument that a transaction is "domestic" under *Morrison* whenever the

purchaser or seller resides in the United States), *aff'd*, 838 F.3d 223 (2d Cir. 2016).

      In *Williams*, the Second Circuit recently applied *Morrison*'s second prong to transactions

on Binance.com, which allegedly "claim[ed] to have no physical location in any geographic

jurisdiction and not be subject to the oversight of any country's regulatory authority."  96 F.4th

at 136-37.  In that circumstance, the Second Circuit found domestic transactions adequately

alleged where (1) Binance matched plaintiffs' trades on third party servers located in the United

States; and (2) plaintiffs agreed to Binance's Terms of Use, placed their orders, and sent

payments from the United States.  *Id.* at *6-7.  In an earlier case more akin to the transactions

---

[19] *Williams* did not address the lower court's finding that Binance is ***not*** a domestic exchange.  *Compare Anderson*, 2022 WL 976824, at *4 ("Binance does not meet the [ ] criteria" for a domestic exchange) *with Williams*, 96 F.4th at 136 ("Plaintiffs plausibly alleged that the transactions at issue were 'domestic transactions in other securities.'").

alleged here, Judge Kaplan applied *Morrison* to "off-domestic exchange blockchain

transactions," finding:

> In general, 'irrevocable liability' is incurred when the transaction has been verified
> by at least one individual node of the blockchain. Accordingly, the location of the
> node that verified the specific transaction at issue should control in this circuit under
> *Morrison*'s second prong as construed in *Absolute Activist*. Not only does this
> satisfy the *Absolute Activist* test, but it appears to be administrable as well because
> the location of the first node to validate a given transaction, the action which renders
> that transaction binding, appears to be identifiable.

*Block one*, 2022 WL 5294189, at *6-7.

Critically, a domestic securities transaction "is not alone sufficient to state a properly

domestic claim" under *Morrison*. *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,

763 F.3d 198, 215-16 (2d Cir. 2014) (per curiam). The SEC must also allege facts showing that

its claims are not "predominantly foreign." *Id*. This limitation is meaningful and makes sense.

If "domestic execution . . . alone suffice[s]" to establish a domestic application of our securities

laws, by extension, that would "subject to U.S. securities laws conduct that occurred in a foreign

country, concerning securities in a foreign company, traded entirely on foreign exchanges . . . a

result *Morrison* plainly did not contemplate." *Id*. at 215-16; *see also SEC v. Ripple Labs, Inc.*,

2022 WL 762966, at *13 (S.D.N.Y. Mar. 11, 2022) (applying "predominantly foreign"

requirement to SEC claims). For this reason, *Morrison's second* prong is not met with respect to

any transactions here. *See Block one*, 2022 WL 5294189, at *7 ("a transaction by transaction

approach" is appropriate under *Morrison*'s second prong). Even if "irrevocable liability" could

be shown in the United States, the transactions at issue are still "predominantly foreign."

*Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165-67 (2d Cir. 2021) (claim was

predominantly foreign and impermissibly extraterritorial despite execution of subscription

agreement in New York); *Parkcentral*, 763 F.3d at 215-16 (claim was predominantly foreign and

impermissibly extraterritorial despite U.S. transactions and promotional statements accessible in

the United States, where alleged deceptive activity occurred primarily in Germany).  Under these well-reasoned *Morrison* principles, all of the SEC's claims must be dismissed.[20]

### 1. *Morrison* Does Not Allow Claims Based On "TRX" Secondary Sales

As an initial matter, *Morrison*'s first prong is not met because the SEC ***does not*** allege secondary sales of "TRX" took place on a registered securities exchange.  *See* ¶ 56 (alleging sales took place on Bittrex).[21]  And as for *Morrison's* second prong, the SEC alleges no facts relevant to the "irrevocable liability" test under *Morrison* for those non-exchange transactions (apart from rote and conclusory recitals – ¶ 53).  To the extent the allegation is meant to cover trading in TRX (ERC-20), there is no allegation regarding which Ethereum node(s) confirmed the transactions.  *See Block one*, 2022 WL 5294189, at *7 ("the location of the node that verified the specific transaction at issue should control in this circuit under *Morrison*'s second prong").  The same is true of trading in TRX (TRON) and the TRON blockchain.  But even if some "TRX" transactions were confirmed on a domestic node, there are no facts demonstrating that the transactions were not "predominantly foreign" nonetheless under *Cavello Bay*, 986 F.3d 161

---

[20] To the extent the SEC argues that *Morrison*'s transaction-based test only applies to sales, not offers, that claim fails.  Offers are found to be domestic where a person "(1) attempt[s] or offer[s,] in the United States, 'to dispose of' securities" or "(2) solicit[s,] in the United States, 'an offer to buy' securities."  *Ripple*, 2022 WL 762966, at *12 (quoting *SEC* v. *Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011)).  Under this test, "it is the location of the offerors . . . that is relevant.  *Id.* at *13.  Yet, the AC does not allege any offer or solicitation of an offer by a defendant in the United States.  *E.g*, ¶ 56 (alleging Mr. Sun and the Tron Foundation "offered" "TRX" on Bittrex, but never identifying where the offer was made); ¶ 101 (alleging "the Sun Defendants offered" BTT in "airdrops" but failing to specify where the offer was made).  In fact, because the AC attributes the culpable conduct to an overseas foundation and foreign individual, the only plausible answer is that the offers were made *overseas*.

[21] Although the AC references various (mostly unspecified) trading platforms (*e.g.*, ¶¶ 38-40, 44-45, 52, 87, 93-95, 97, 114), the SEC fails to allege facts showing that any such platform is a "domestic exchange" much less a "registered" one.  As for Bittrex, while the SEC now asserts it was required to register as an "exchange" (¶ 38 and n.3), that assertion rests on unproven allegations in a suit by the SEC, which Bittrex (in settling) neither admitted nor denied.  *See* SEC v. Bittrex et al., Final Judgment, No. 2:23-cv-00580-RSM (W.D. Wash. Aug. 15, 2023), ECF No. 54.  Those are not ***facts*** establishing that Bittrex or any other unnamed digital asset trading platform is (or should have been) registered as a domestic exchange.  Also missing are allegations establishing that any claimed transactions on these platforms were domestic, a telling oversight, given the global nature of platform trading.  *See City of Pontiac*, 752 F.3d at 188 (trade not domestic where U.S. purchaser "places a buy order . . . for the purchase of foreign securities on a foreign exchange"); *cf. Williams*, 96 F.4th at 139 (noting *Morrison* may preclude claims "based on the happenstance that a transaction was initially processed through [U.S.] servers").

and *Parkcentral*, 763 F.3d 198.  The only thing we are told is that *some* purchasers were "investors in the United States who placed their orders on the U.S.-based crypto asset trading platform, Bittrex."  ¶ 56.  That is simply not enough.

### 2.   *Morrison* Does Not Allow Claims Based On Worldwide Contests And Giveaways Of "TRX" And BTT

The alleged contest and promotional giveaways did not occur on an exchange; so *Morrison*'s first prong is not met.  *See* ¶¶ 57-68.  Missing too are any allegations relevant to "irrevocable liability" under *Morrison*'s second prong (again apart from conclusory recitals tacked on as mere lip service – ¶ 98).  There is no allegation regarding which nodes (TRON or otherwise) validated any transaction effecting the distribution of "TRX" or BTT to a contest winner.  *See Block one*, 2022 WL 5294189, at *6-7 (location of node validating specific transaction is the relevant inquiry under *Morrison*'s second prong).  The contests are also "predominantly foreign" under *Cavello Bay*, 986 F. 3d 161 and *Parkcentral*, 763 F.3d 198.  The SEC only alleges that *one* winner of "TRX" was a "U.S. resident" and another was a "U.S. person."  ¶¶ 57-68.  Not only is that trifling, the "citizenship or residency" of the acquiror "is irrelevant to the location of a given transaction."  *Absolute Activist*, 677 F.3d at 69-70.  The U.S. nexus is even more strained with respect to BTT:  There is no allegation that any social media campaign was seen by anyone in the United States or that any person in the United States participated.  *Cf.* ¶¶ 130, 135, 140, 146, 150, 156, 161.[22]  Of course, without more, even that would not suffice to allege a domestic transaction.  *See Williams*, 96 F.4th at 139 ("Our conclusion might be different were we faced with plaintiffs seeking to apply United States securities laws based on the happenstance that a transaction was initially processed through

---

[22] As with jurisdiction, a failure to "exclude U.S. persons" is not enough.  ¶ 64.  *Morrison* does not assume domestic transactions.  *See SEC v. Tourre*, 2012 WL 5838794, at *4-6 (S.D.N.Y. Nov. 19, 2012) (dismissing complaint where "SEC allege[d] a domestic purchase of securities" but brought fraud claims based on a separate, foreign transaction).

servers located in the United States despite all parties to the transaction understanding that they were conducting business on a foreign-registered exchange.").

### 3.   *Morrison* **Does Not Allow Claims Based on Airdrops of BTT**

The alleged airdrops did not occur on an exchange; so *Morrison*'s first prong is not met. *See* ¶¶ 101-17.[23]  As with other alleged distributions, the AC is silent when it comes to actual facts establishing where "irrevocable liability" occurred.  The AC alleges only that unspecified "persons in the United States" received BTT in airdrops (in unidentified locations) and offers the same conclusory recitals.  ¶ 98, 112.  Those bare allegations are insufficient to allege a domestic transaction.  *Absolute Activist*, 677 F.3d at 69-70.  The SEC also ignores its burden to show that airdrops, admittedly undertaken by a Singaporean foundation, are not "predominantly foreign."

### B.   **The AC Also Fails The "Conduct and Effects" Test**

To the extent the SEC will argue that the Dodd-Frank legislation reinstalled a "conduct-and-effects" test for extraterritorial application for securities fraud claims under Section 10(b) and Rule 10b-5, that claim also fails.  That test requires the SEC to allege "conduct within the United States that constitutes significant steps in furtherance of the [securities fraud]" or "conduct occurring outside the United States that has a foreseeable substantial effect within the United States."  Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (codified in relevant part at 15 U.S.C. § 78aa(b)) ("Dodd-Frank").[24]

Here, the SEC does not allege wrongful conduct by any Defendant in furtherance of the

---

[23] To the extent the SEC alleges that airdrops were sent to accounts on unnamed trading platforms (*e.g.*, ¶ 107), these platforms are not alleged to be domestic for the reasons explained *supra* § III.A.

[24] Section 929P of Dodd-Frank added language to the statutory provision granting federal subject-matter jurisdiction *only* for cases brought by the SEC or the United States and *only* under Section 10(b).  *See* 15 U.S.C. § 78aa.  The Second Circuit has not addressed whether Section 929P also restored the pre-*Morrison* "conduct and effects" test for SEC claims under Section 10(b), but courts in this district have found that it does.  *See, e.g.*, *In re Optimal U.S. Litig.*, 865 F. Supp. 2d 451, 456 (S.D.N.Y. 2012).  We therefore include this analysis.  Ultimately, this is a distinction without a difference.  As shown, the Section 10(b) claims fail under either test.

supposed "wash trading scheme," much less *in the United States*. *Interbrew v. EdperBrascan Corp.*, 23 F. Supp. 2d 425, 429 (S.D.N.Y. 1998) (inquiry centers on "nature of conduct" within United States). Putting aside the self-serving characterization of the trading as knowing "wash trading,"[25] the allegations largely describe activity *abroad*. *See*, *e.g.*, ¶ 168 (accounts opened by foreign individuals); ¶ 171 ("global" meeting); ¶ 175 (trading directed by Mr. Sun (abroad) and conducted by "team of Tron Foundation employees" who are not alleged to be U.S. based).[26] That the alleged "wash trading took place on Bittrex" (¶ 165) does not transform actions taken overseas into domestic conduct. *See Euro Trade & Forfaiting, Inc. v. Vowell*, 2002 WL 500672, at *7 (S.D.N.Y. Mar. 29, 2002) (alleged wash trading on U.S. securities market insufficient where conduct causing loss occurred outside the United States).

Nor does the AC sufficiently allege overseas conduct with a foreseeable and substantial domestic effect. The "effects" test requires the SEC to plead that overseas activity had a predictable and significant impact on U.S. investors and securities traded on U.S.-registered exchanges. *See Interbrew*, 23 F. Supp. 2d at 429-30. Incidental U.S. "investor" involvement does not suffice. *See id.* (test not met where alleged effects on U.S. interests were "minimal" and "investors were neither the intended nor the actual 'victims' of [] purported scheme to defraud"); *see also Norex Petroleum*, 540 F. Supp. 2d at 446 (indirect harm to U.S. residents insufficient under "effects" test). Here, no facts show U.S. "investors" were the "intended or actual" victims

---

[25] Yet again, the SEC conveniently amends to 'disappear' a fact previously admitted, in this instance, the innocent explanation for the trading alleged. *Compare* ECF No. 1 at ¶ 169 (admitting that the trading was discussed internally as "market-making") *to* ¶ 176 (removing the market-making allegation).

[26] In passing, the AC references two specific instances when Mr. Sun was in the United States (¶ 78 – attending an industry event; ¶ 77 – filming a video in San Francisco), but neither contact has *any connection whatsoever* to any claimed fraud. *See Norex Petroleum Ltd. v. Access Indus., Inc.*, 540 F. Supp. 2d 438, 444 (S.D.N.Y. 2007) (U.S. conduct that is "preparatory and peripheral" or immaterial to completion of claimed fraud insufficient). Likewise, taking "steps" to have "TRX" listed on a global exchange based in the United States (¶¶ 39-40) is not wrongful, nor is it opening and funding U.S.-based accounts (¶¶ 4, 172). And, as noted, no relevant forum-related detail is alleged about where these supposed trades were executed and validated.

of any fraudulent "wash trading scheme," and the AC does not attempt to establish that any of the alleged activities had a direct, non-incidental effect on any U.S. market or registered exchange.  Indeed, ***there is no claim that anyone, anywhere, was harmed*** by the de minimis "TRX" trading alleged, much less in the United States (which stands to reason, *see supra* n.3, the trades account for 0.0039% and 0.0017% of the total dollar value of "TRX" traded on the days in question).  *Cf. Vowell*, 2002 WL 500672, at *9-10 (effects test not met where "no specific harm to American investors' interests is specified").  Because insufficient domestic "conduct" and "effects" are alleged in connection with the Section 10(b) "fraud" claim, this test fails too.  For this final reason, all claims must be dismissed as extraterritorial.

### C.   All Claims Fail Because "TRX" and BTT Were Not Offered Or Sold As "Investment Contracts"

In asserting that "TRX" and BTT were offered or sold as "investment contract[s]," the AC strains to bring the digital asset transactions at issue here within the ambit of the federal securities laws.  *See* ¶¶ 21, 51, 96; *see* 15 U.S.C. § 77b(a)(1).  That effort fails.  An investment contract requires "a contract, transaction or scheme whereby [1] a person invests his money [2] in a common enterprise and [3] is led to expect profits solely from the efforts of the promoter or a third party."  *Howey*, 328 U.S. at 298-99; *see also Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (listing the "three elements of the *Howey* test").  Courts applying *Howey* undertake a transaction-by-transaction analysis.  *Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11 (1982) ("Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole."); *see also Terraform*, 2023 WL 4858299, at *11 (analysis is to be undertaken for each "given transaction"); *SEC v. Ripple Labs, Inc.*, 2023 WL 4507900, at *8 (S.D.N.Y. July 13, 2023) ("[A] digital token, is not in and of itself a 'contract, transaction[,] or scheme' that embodies the

38

*Howey* requirements of an investment contract.  Rather, the Court examines the totality of circumstances surrounding Defendants' different transactions").  Here, none of the alleged transactions constitute offers or sales of investment contracts.

> ### 1.      Social Media Contests And Giveaways Do Not Satisfy *Howey*
>
> **Contest Participants Did Not "Invest Money."**   *Howey's* first prong requires an "investment of money."  328 U.S. at 301.  Although currency need not change hands, the SEC must plead that "the purchaser gave up some tangible and definable consideration."  *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 560 (1979).  *Ripple Labs* is instructive.  2023 WL 4507900.  There, Judge Torres considered Ripple's "[d]istributions [of tokens] to employees as compensation and to third parties as part of Ripple's Xpring initiative to develop new applications for XRP and the XRP Ledger."  *Id.* at *13.  The Court concluded that these distributions ***did not*** satisfy *Howey*'s first prong because "recipients . . . did not pay money or 'some tangible and definable consideration' to Ripple . . . [t]o the contrary, Ripple paid XRP to these employees and companies."  *Id.*  In a later order, Judge Torres explained that the SEC failed to demonstrate that the "development of 'use cases' for the XRP Ledger constitutes 'tangible and definable' consideration to Ripple."  *SEC v. Ripple Labs, Inc.*, 2023 WL 6445969, at *5 (S.D.N.Y. Oct. 3, 2023) (denying motion to certify interlocutory appeal).[27]

So too here, the SEC fails to plead "tangible and definable" consideration to Defendants in return for tokens given to contest and giveaway participants.  Bald assertions that Defendants benefited from "online promotion," "advertising," "publicity," and "promotional artwork" (*see,*

---

[27] *Terraform* did not disagree with this portion of the *Ripple* ruling.  *See Terraform*, 2023 WL 4858299, at *13 (noting that the opinion did not address the "investment of money" prong, which was undisputed in that case); *see also SEC v. Coinbase*, 2024 WL 1304037, at *30 (S.D.N.Y. Mar. 27, 2024) (Under *Howey*'s first prong, "the investor must risk loss," which "makes sense, for if an investor did not risk financial loss, the need for the protection of the federal securities laws would be obviated." (citing *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240 (2d Cir. 1985))).

*e.g.*, ¶¶ 62, 67, 123, 129, 134, 139, 145, 155) does not change that calculus.  No attempt is made to quantify these supposed benefits, which are neither "tangible" nor "definable."  *See Ripple Labs*, 2023 WL 6445969, at *5.  Also insufficient are claims that "social media contacts" or other "identifying information" of contestants and their friends (¶¶ 62, 126, 129, 134, 145, 155) are cognizable benefits for purposes of *Howey*.  The SEC never explains why that information (which is generally publicly available) constitutes valuable consideration.

With specific respect to certain of the BTT contests and giveaways, the AC asserts that some participants created a BitTorrent account, registered a BTT wallet, or joined BitTorrent social media channels, supposedly benefitting ***all*** Defendants through an "increas[e in] the apparent number of active BitTorrent users and BTT wallet holders" (¶ 123), or on BitTorrent's Discord or Telegram channels (¶¶ 129, 145, 149, 155).  These nebulous allegations have no tangible or definable value.  No facts indicate that any "apparent" (but undefined) increase in users boosted the reputation, was remunerative, or otherwise benefitted BitTorrent Foundation or any other Defendant.[28]  Equally deficient is the claim that participants provided "valuable consideration" "by becoming a new BitTorrent client user and growing BitTorrent's active user base."  ¶ 160.  No facts define "active users" or connect "growth" in the BitTorrent protocol's already voluminous "user base" to a concrete "exchange of value" to any of the Defendants.[29]

---

[28] The notion that "participants provided the Sun Defendants with valuable consideration" by "increasing apparent engagement with BitTorrent's social media platforms" (¶¶ 129, 134, 139, 145, 149, 155) is also not definable or tangible.  The SEC fails to explain what social media platform(s) were involved, the extent of "increase[ed] apparent engagement," or how that vague concept could even be measured, much less how that benefitted any Defendant.

[29] The "consideration" and "value" allegations here are a far cry from what sufficed in *Uselton v. Com. Lovelace Motor Freight, Inc.*, cited by the SEC at the original pre-motion hearing.  The *Uselton* court found that employee participation in a benefit plan could constitute an "exchange of value" sufficient to form an investment contract.  940 F.2d 564, 572, 574 (10th Cir. 1991).  The decision hinged entirely on the fact that employees there had to "surrender a portion of the wages due them . . . in return for the right to acquire [] stock."  *Id.* at 575.  For *Howey* purposes, relinquishing the rights to those wages was "sufficient tangible and definable consideration" to form an investment contract.  The claims here, by contrast, relying on amorphous benefits via incremental additional followers on social media, do not come close to the necessary definable "exchange of value" that *Howey* (and *Uselton*) contemplate.

Nor could more or better pleading revive this flawed theory:  giveaways do not involve the "risk of loss" that is essential to the first *Howey* prong.  *See*, *e.g.*, *Coinbase*, 2024 WL 1304037, at *30 (discussing the risk-of-loss requirement and citing *Marine Bank*, 455 U.S. at 558-59)).

**Contest Participants Did Not Reasonably Expect Profits "Solely from the Efforts of Others."**  The alleged contests and giveaways also fail *Howey*'s third prong, which requires the SEC to plead that token recipients were "led to expect profits solely from the efforts of the promoter or a third party."  328 U.S. at 299.  The SEC concedes that each alleged contest involved a measure of chance, and that most participants received no "TRX" or BTT at all.  *See* ¶¶ 58, 66, 120, 128, 133, 138, 144, 148, 154, 158.  Where "[p]rofits are a matter of luck," "[w]hat primarily affects the failure or success of the enterprise, assuming there is one, is not [Defendants'] 'essential managerial efforts,' but the luck of the draw."  *SEC v. Energy Grp. of Am., Inc.*, 459 F. Supp. 1234, 1240 (S.D.N.Y. 1978) (the offering of assistance with bids on government oil and gas lotteries does not constitute the offering of an investment contract).

Finally, many of the so-called materials allegedly promoting a reasonable expectation of profits were created, not by Defendants, but by participants in promotional contests themselves (*see, e.g.*, ¶¶ 62, 67, 123, 129, 134, 139, 145, 155).  *Howey*'s third prong requires the "efforts of others," not the efforts of contestants (the putative "investors").  *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-58 (1975) ("What distinguishes a security transaction . . . is an investment where one parts with his money in the hope of receiving profits ***from the efforts of others***.").[30]

---

[30] In this sense, the SEC tries to have it both ways.  But either the promotional materials created by token winners were not significant enough to comprise a tangible and definable benefit to Defendants (and thus *Howey*'s first prong is not met), or the materials themselves are what created the reasonable expectation of profits (and thus *Howey*'s third prong is not met).  Either way, the SEC pleads itself out of claims based on the social media contests.

### 2.      Airdrops of BTT Do Not Satisfy *Howey*

Like social media contests, airdrops of BTT do not involve an investment of money

satisfying *Howey*'s first prong.  The SEC concedes no cash consideration was required.  ¶ 102.

Instead, it argues that "acquiring and holding TRX in exchange for the opportunity to receive

BTT" constituted "valuable consideration."  ¶ 117.  Left unexplained is how "holding" "TRX"

provided "tangible and definable" consideration flowing to the so-called "Sun Defendants."  The

SEC also fails to explain how "acquiring" "TRX" constitutes consideration *to Defendants* in

connection with free airdrops of BTT.  The AC admits that "TRX" traded on secondary markets

long before the BTT airdrops (¶¶ 38-40), so purchasers could obtain TRX from parties *entirely*

*unrelated* to Defendants here.  Nowhere is it alleged that any purchaser bought "TRX" from any

of the Defendants *with an expectation* of receiving free BTT or even that anyone bought "TRX"

from Defendants and held it long enough to receive BTT.  Nor did airdrop recipients somehow

"risk loss" of their TRX in order to receive BTT.  *Cf.*, *Coinbase*, 2024 WL 1304037, at *30

(discussing the risk-of-loss requirement).

### 3.      Secondary Market Sales Do Not Satisfy *Howey*

Anonymous, secondary market sales by Defendants (including alleged "market

manipulation" sales) do not satisfy *Howey*'s third prong either.  *Cf.* ¶ 56.  In *Ripple*, Judge Torres

referred to these as "blind bid/ask" transactions and correctly held that they do not involve

investment contracts because there is no reasonable expectation of profits to be derived from

defendants' efforts, not least because purchasers cannot have known whether they were sending

their funds to defendants.  *Ripple Labs*, 2023 WL 4507900, at *22-24.  That holding makes good

sense and should be followed here.  Secondary market purchasers have no reason to believe their

capital would be used by Defendants to increase the value of "TRX" or BTT.  *Id.*; *see also SEC*

*v. LBRY, Inc.*, No. 21-cv-260, ECF No. 105 at 34:14-16 (D.N.H. Jan. 30, 2023) (declining to extend holding to include secondary sales); *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966) (mere speculative motive "on the part of the purchaser or seller does not evidence the existence of an 'investment contract'").[31]

## IV.    THE CLAIMS ARE INADEQUATELY PLEADED

The claims also fail for a number of additional, substantive reasons.

### A.    The Market Manipulation Allegations Are Insufficient And Illogical

Market manipulation claims are subject to Rule 9(b) where, as here, they are based on purported deception.  *In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *4-5 (S.D.N.Y. June 28, 2007) (discussing application of Rule 9(b) in market manipulation cases); *In re Nat. Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005) (alleged deceptive behavior creating perception of increased liquidity subject to Rule 9(b)).  To state a claim for market manipulation under subsection 9(a)(1), the SEC must plead particularized facts showing "(1) a wash sale or matched orders in a security, (2) done with scienter and (3) for the purpose of creating a false or misleading appearance of active trading in that security."  *SEC v. Competitive Techs., Inc.*, 2005 WL 1719725, at *6 (D. Conn. July 21, 2005).  Under subsection 9(a)(2), the SEC needs to plead specific facts showing "(1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security,

---

[31]Although in *Terraform*, Judge Rakoff "reject[ed]" the holding in *Ripple* to the extent *Ripple* "dr[ew] a distinction between these coins based on their manner of sale, such that coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not," 2023 WL 4858299, at *15, *Terraform* presented a very different scenario than what is alleged here.  Judge Rakoff based his decision on the allegation in *Terraform* that "defendants said that sales from purchases of *all* crypto-assets – no matter where the coins were purchased – would be fed back into the Terraform blockchain and would generate additional profits for *all* crypto-asset holders."  *Id.* (emphasis original)*; see also Coinbase*, 2024 WL 1304037, at *25 (secondary market purchases could meet third *Howey* prong where "developers advertise[d] the fact that capital raised through [secondary] retail sales of tokes will continue to be re-invested in the protocol").  While the SEC selectively quotes and mischaracterizes statements from the 2017 TRON Whitepaper (¶ 35) and other of Defendants' statements to mount a similar argument, that effort fails.  No such similar, concrete factual allegations are identified here.

(2) carried out with scienter and (3) for the purpose of inducing the security's sale or purchase by others."  *SEC v. Hwang*, 2023 WL 6124041, at \*11 (S.D.N.Y. Sept. 19, 2023).

The AC does not plead a claim in either case.  The vast majority of the so-called "wash trades" of "TRX" are not alleged with any specificity.  *See* ¶¶ 178, 181.  The SEC also fails to allege that ***any*** alleged trade raised or depressed the price of "TRX" under § 9(a)(2).  To the extent any detail is provided, the 69 transactions on October 1, 2018 amounted to 0.0039% of the value worldwide of "TRX" traded that day; the 67 transactions on October 7, 2018 just 0.0017% of all "TRX" value traded that day.[32]  Such negligible amounts could not plausibly have been designed to affect the price of "TRX."  *Cf.*  15 U.S.C. § 78i(a)(2).  Indeed, under the theory pursued here, every high-frequency long-short equity or bond trader on Wall Street is liable for wash trading.

Further, claims under § 9(a)(1)-(2) fail because the trades were not done for any improper purpose, but rather to provide market-making (as the Complaint previously acknowledged and as the AC still implicitly reflects).  ¶¶ 176-77.  Market-making to provide liquidity is a valid, legitimate, and legal undertaking.  *See ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) (discussing benefits of high-volume short selling, including liquidity and enhancement of pricing efficiency).  Such services are as essential to properly functioning digital currency markets (which often experience periods of illiquidity) as in the capital markets.  Rank speculation that the trades must have been made "to artificially inflate [] trading volume" (¶ 162), or "induc[e] the purchase or sale" of "TRX" (¶ 166), or to make it easier for Mr. Sun or the Tron Foundation to sell (*id*.), are not specific facts supporting this claim.  It is also illogical. Increasing daily trading in the small amounts alleged ($4,869 and $2,988 respectively, on

---

[32] *See supra* n.3, Ex. 1 (value of trades alleged on October 1 was roughly $4,869 out of more than $126 million, and on October 7, approximately $2,988 out of more than $174 million).  ¶¶ 180, 182.

October 1 and 7), would have had **no impact whatsoever** on "TRX" trading volumes and would do nothing to "induce" purchases or sales. The Court should not credit the SEC's baseless claims to the contrary. *See Dhir v. Carlyle Grp. Emp. Co.*, 2017 WL 4402566, at *8 (S.D.N.Y. Sept. 29, 2017) (dismissing complaint relying on "circumstantial, internally contradictory evidence of a harebrained, short-sighted conspiracy that defies logic"); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600 (S.D.N.Y. 2016) (dismissing on scienter grounds where "the scheme that the [complaint] imagines lacks a coherent rational objective"); *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 449 (S.D.N.Y. 2005) (scienter allegations "insufficient for a fundamental reason—the alleged scheme could not possibly have succeeded"). And, if anything, the limited time frame in which two of the accounts traded (a mere 23 days at the outset of the TRX-USD trading pair, ostensibly on Bittrex's new U.S. platform (¶¶ 42, 181, 182)), and in amounts ranging from just $15 to $91 dollars, is much more consistent with initial market making and liquidity than the SEC's purported "wash trading" scheme.[33]

B.    **Aiding And Abetting Disclosure Violations Is Not Adequately Alleged**

The SEC fails to allege that any of the Defendants aided or abetted violations of the anti-touting provisions of the Securities Act based on claimed cryptocurrency transfers to a handful of celebrities. Under Section 17(b), the "duty to disclose promotional payments lies with the parties that receive the payments," not the alleged payor. *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1272-73 (11th Cir. 2016); *see also Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 103 (2d Cir. 2022) ("[O]nly an article's maker, not its benefactor, has a duty to disclose that it was paid for."); *Stephens v. Uranium Energy Corp.*, 2016 WL 3855860, at *14 (S.D. Tex. July

---

[33] Given that platform trades are blind, and there is no way to pick or pre-determine your counterparty in a transaction, the SEC fails to allege how a Defendant could intentionally select to trade with a related account, as required to sustain the market manipulation theory.

15, 2016) ("there is no duty imposed by [Section 17(b)] on the issuer").  To avoid this well-settled law, the SEC alleges Defendants merely "aided and abetted" Section 17(b) violations.  That effort fails.

To state a claim for aiding and abetting, the SEC must allege "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation."  *SEC v. Sason*, 433 F. Supp. 3d 496, 513 (S.D.N.Y. 2020); *see also Ponce v. SEC*, 345 F.3d 722, 734 (9th Cir. 2003) (specific factual allegations of actual knowledge and substantial assistance required).

At the outset, there is no primary violation here.  Section 17(b) makes promoters liable for improperly touting **securities**.  *See* 15 U.S.C. § 77q(b).[34]  For the reasons discussed, *supra* § III.C, the TRX and BTT tokens at issue were not offered or sold as securities.  Nor is it alleged that any of the Defendants are "issuers, underwriters, or dealers" in securities, as the statute requires, so even if celebrities had been paid by any Defendant to promote "TRX," that would not state a primary violation.  The AC also does not adequately plead any Defendant's knowledge of disclosure violations.  As for Mr. Sun, he seemed aware that "celebrities have tweeted about #Tron" and disclosed that he "offered them #TRX #WIN to try out more features on #TRON just like I have also given #BTC and other cryptocurrencies to many other celebrities to introduce them to blockchain."  *See* ¶ 194, Ex. 12 (Tweet).  But that just suggests that Mr. Sun understood celebrities received tokens to try out Tron's features, not that he knew that they were

---

[34] Section 17(b) makes it unlawful for a person to "publish, give publicity to . . . or communicat[e]" about a "security for a consideration received or to be received, . . . directly or indirectly, ***from an issuer, underwriter, or dealer***" without disclosing the payment.  15 U.S.C. § 77q(b).

paid for doing so.[35]  Notably, the claimed "promotions" came to an abrupt stop once Mr. Sun

allegedly became aware of claims that celebrities may have been paid.  *See* ¶ 194 (no celebrity

tweets post-date Mr. Sun's February 16, 2021 tweet addressing alleged payments).  The only

inference this raises is that Mr. Sun may have helped put an end to any "paid campaign," rather

than "aiding and abetting" one.

Nor does the SEC adequately allege that any other Defendant knew of paid celebrity

promotions.  Conclusory claims that Mr. Sun, acting "on behalf of the Tron Foundation,

BitTorrent Foundation, and Rainberry," "arranged" celebrity payments through an (unspecified)

Rainberry employee (¶ 188) or provided or approved language for celebrity social media posts

(¶¶ 189, 191-92) are too vague to credit.  And there is no basis to impute an unnamed Rainberry

employee's knowledge to Rainberry or any other entity or person.  No facts (as opposed to the

SEC's say-so) suggest that the Tron Foundation or BitTorrent Foundation were privy to or

responsible for payments to any celebrities.  *See* ¶¶ 187-95.

Finally, facts supporting substantial assistance in disclosure violations are not adequately

alleged.  Vaguely claiming that Mr. Sun (supposedly on behalf of all Defendants) "approved"

and "funded" payments is not enough.  As for the claim that he supposedly "instructed"

celebrities "not to disclose" being paid, where are the facts backing up that claim?  How and

when was it communicated, or conceivably enforced, if so?  *See* ¶ 194.  *See Decker v. Massey-

Ferguson, Ltd.*, 681 F.2d 111, 119 (2d Cir. 1982) ("[C]onclusory allegations that defendants

aided and abetted or conspired are not enough").  Absent concrete facts explaining how anything

---

[35] While ostensibly based on the contention that the tweets gave a "misleading impression that celebrities were independently interested in ***investing in*** TRX and/or BTT" (¶ 190), many of the ***actual*** tweets belie that claim, instead describing the speed and ease of ***using*** the TRON blockchain, not the value of the tokens or "investments." *See, e.g.*, ¶ 191 ("fast blockchain"); ¶ 192 ("[p]eople should use only $TRX cause it's fast").  The SEC ignores the disconnect.  Using Visa to pay is fast; Simone Biles promoting that fact does not make it a security.

alleged reflects substantial assistance in disclosure violations, the aiding and abetting claim must be dismissed.

### C.     The SEC Does Not Adequately Allege Fraud With Particularity

The securities fraud counts are subject to Rule 9(b)'s heightened pleading requirements. *SEC v. Wey*, 246 F. Supp. 3d 894, 910 (S.D.N.Y. 2017) ("[A] complaint alleging securities fraud must satisfy Rule 9(b) . . .  which requires that 'the circumstances constituting fraud . . . be stated with particularity").  Here, the AC does not attempt to identify the factual basis for the fraud claims, leaving Defendants and the Court to guess.  That failure alone compels dismissal.  *See id.* at 911 (complaint failed to satisfy Rule 9(b) where SEC failed to specify the alleged misstatement and when it was made).  Compounding the unacceptable guesswork, the AC never clearly articulate its theory of fraud.  Count Four purports to assert a claim under Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, which requires that Defendants:  "'(1) made a material misrepresentation or a material omission . . .  or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.'"  *Id.* at 909.  Count Two asserts fraud under Securities Act Sections 17(a)(1) and (a)(3), the elements of which are "essentially the same," although negligence is sufficient under (a)(3).  *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); *see also Aaron v. SEC*, 446 U.S. 680, 697 (1980).

To the extent the SEC's fraud theory is misstatement-based under Rule 10b-5, no material misrepresentation or omission is alleged.  *Joseph Victori Wines Inc. v. Vina Santana Carolina, S.A.*, 933 F. Supp. 347, 356 (S.D.N.Y. 1996) (Under Rule 9(b), plaintiff must allege "precisely what material misstatements were made, the time and place of each misstatement, the speaker, the content, the [way] the statement was misleading, and what the defendants obtained as a result of the fraud.").  To the extent the SEC's theory is based on the so-called "wash trading scheme" that is not a well-pleaded predicate for fraud either.  Scheme liability requires

particularized facts indicating Defendants "'(1) committed a manipulative or deceptive act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter.'" *Wey*, 246 F. Supp. 3d at 915-16.  For the reasons discussed, given the negligible trading alleged, the SEC fails to adequately plead intentionally manipulative or deceptive trading, much less that it furthered an overarching scheme to defraud.  *See supra* § V.A.  Rather, the trades were market-making and not for an improper purpose and the AC offers no actual facts to suggest otherwise (¶ 176), undercutting any claim of fraud.

The Second and Fourth Claims for Relief should be dismissed in their entirety.

## V.   DEFENDANTS LACKED FAIR NOTICE OF THE SEC'S CLAIMS

Finally, due process requires dismissal of this case.  A law that fails to "'give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited'" violates due process.  *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).  In assessing fair notice, courts consider "whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices" as well as "the interpretation of the statute given by those charged with enforcing it."  *Cunney v. Bd. of Trustees of Vill. of Grand View*, 660 F.3d 612, 621 (2d Cir. 2011).  While courts in this district have found notice sufficient in digital asset cases, those circumstances are not analogous to what the SEC pursues here – a far reaching right to regulate everything from social media contests and giveaways to free airdrops to tweets and trading taking place outside the United States and not directed here.  The offerings at issue here predate the SEC's complaint in *Ripple*, the first non-ICO-based enforcement action concerning digital assets.  *See* ¶¶ 57-68, 82-83, 87-95, 97; *see generally* SEC Enforcement Website.  That is not fair notice.  *See Bittner v. United States*, 598 U.S. 85, 102-03 (2023) (noting "a serious fair-notice problem" with enforcing penalties where the only notice of government's interpretation of the

statute was "aggressive[] enforce[ment]" during the same period as defendant's misconduct).

The regulation of digital assets may be a global issue with global ramifications.  That is not an

open invitation for the SEC to exercise dominion over digital assets wherever they are found.

## **CONCLUSION**

The Court should dismiss all claims against all Defendants.[36]  The SEC's novel view that

virtually all past and future tokens reaching a U.S. person are within its regulatory sights works a

major expansion of the SEC's previously understood role and should be rejected by this Court.

Dated: May 30, 2024                                 Respectfully submitted,

                                                                    FENWICK & WEST LLP

                                                    By:   _/s/ Jennifer C. Bretan_
                                                                    Jennifer C. Bretan

                                                                    Dean S. Kristy
                                                                    Michael S. Dicke (*admitted pro hac vice*)
                                                                    Jennifer C. Bretan (*admitted pro hac vice*)
                                                                    Casey O'Neill
                                                                    555 California Street, 12th Floor
                                                                    San Francisco, CA  94104
                                                                    Telephone: 415.875.2300
                                                                    dkristy@fenwick.com
                                                                    mdicke@fenwick.com
                                                                    jbretan@fenwick.com
                                                                    coneill@fenwick.com

                                                                    Rebecca Matsumura (*admitted pro hac vice*)
                                                                    401 Union Street, 5th Floor
                                                                    Seattle, WA 98101
                                                                    Telephone:  206.389.4510
                                                                    rmatsumura@fenwick.com

                                                                    *Attorneys for Defendants Tron Foundation*
                                                                    *Limited, BitTorrent Foundation Ltd.,*
                                                                    *Justin Sun, and Rainberry, Inc.*

---

[36] Having previewed Defendants' arguments, but failing to cure basic defects in the AC, dismissal should now be with prejudice.  *See Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 309 n.8 (2d Cir. 2022) (affirming dismissal with prejudice where plaintiff previously amended after defendant moved to dismiss and "failed to demonstrate how any attempt to re-plead would not be futile").