UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

v.

JUSTIN SUN, TRON FOUNDATION LIMITED,
BITTORRENT FOUNDATION LTD.,
RAINBERRY, INC., AUSTIN MAHONE, and
DEANDRE CORTEZ WAY,

        Defendants.

No. 1:23-cv-02433-ER

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 2

   A.   The Sun Defendants and the Tron Ecosystem .................................................. 2

   B.   Sun and the Tron Foundation Marketed TRX as an Investment Before Its ICO ............... 4

   C.   After the ICO, Sun and the Tron Foundation Continued Targeting U.S. Investors While Promoting TRX as an Investment in Tron and Working to Create a Secondary Market ... 6

   D.   Sun and the Tron Foundation Engaged in Unregistered Offers and Sales of TRX ............ 7

       1.   Offers and Sales of TRX on Bittrex ................................................................... 8

       2.   Offers and Sales of TRX in the Emoji Contest ................................................. 8

       3.   Offers and Sales of TRX in the niTRON Sharing Campaign ............................ 9

   E.   Sun Acquired Rainberry, Incorporated It Into the Tron Ecosystem, and Began Promoting BTT as an Investment in Tron .................................................................... 9

   F.   After the IEO, the Sun Defendants Continued Promoting BTT as an Investment in Tron and Working to Create a Secondary Market ................................................ 11

   G.   The Sun Defendants Engaged in Unregistered Offers and Sales of BTT ....................... 12

       1.   Offers and Sales of BTT in Airdrops ............................................................. 12

       2.   Offers and Sales of BTT in Other Distributions ........................................... 13

   H.   The Sun Defendants Engaged in Manipulative Trading of TRX on Bittrex ................... 13

   I.   The Sun Defendants Orchestrated a Celebrity Touting Campaign, and Sun Lied to Conceal It .................................................................................................... 14

ARGUMENT ............................................................................................................ 16

I.    THIS COURT HAS PERSONAL JURISDICTION OVER SUN, THE TRON FOUNDATION, AND THE BITTORRENT FOUNDATION ........................................... 16

   A.   The Foreign Defendants Purposefully Availed Themselves of, and Took Actions Directed Toward, the United States ............................................................................. 17

       1.   Rainberry's Contacts with the United States Are Imputable to Sun ............................ 17

       2.   Apart from Rainberry, Sun, the Tron Foundation, and the BitTorrent Foundation Had Extensive Contacts with the United States ...................................................... 17

       3.   Sun's Contacts with the United States Are Imputable to His Alter Egos, the Tron Foundation and the BitTorrent Foundation ....................................................... 20

   B.   The SEC's Claims Arise Out of or Relate to the Foreign Defendants' Contacts with the United States .............................................................................................. 21

   C.   Exercising Personal Jurisdiction Over the Foreign Defendants Is Reasonable ............... 22

   D.   The Foreign Defendants' Jurisdictional Arguments Are Unpersuasive .......................... 23

II.    VENUE IS PROPER IN THIS DISTRICT AND THIS CASE SHOULD NOT BE TRANSFERRED .......................................................................................................... 25

III.   TRX AND BTT WERE OFFERED AND SOLD AS INVESTMENT CONTRACTS AND THUS WERE SECURITIES ............................................................................................ 26

    A.   The Securities Act and the *Howey* Test ......................................................... 26

    B.   The Sun Defendants' *Howey* Arguments Fail ................................................. 27

        1.   The Alleged Sales by the Sun Defendants—the Issuers of TRX—Directly on Trading Platforms Satisfy *Howey* ............................................................... 28

        2.   The BTT Airdrops Alleged Here Satisfy *Howey*'s First Prong ..................... 29

        3.   The Alleged Distributions Via Social Media Promotions Meet *Howey* ........ 30

IV.   THE SUN DEFENDANTS' CONDUCT IS WITHIN THE TERRITORIAL REACH OF THE FEDERAL SECURITIES LAWS ................................................................... 32

    A.   The SEC's Fraud Claims Are Governed by the Conduct or Effects Test, and Those Claims Pass the Test ................................................................................ 33

    B.   As to the Non-Fraud Claims, the SEC Alleges Domestic Violations of the Registration Provisions of the Securities Act ................................................. 36

        1.   The Sun Defendants Targeted U.S. Investors with Unregistered Offers of TRX and BTT ....................................................................................................... 36

        2.   The Sun Defendants Made Domestic Sales of TRX and BTT ...................... 38

V.    THE SEC'S CLAIMS ARE PLED SUFFICIENTLY ......................................... 40

    A.   The Amended Complaint Does Not Use Impermissible Group Pleading ....... 41

    B.   The Amended Complaint Sufficiently Alleges Market Manipulation ............. 43

    C.   The Amended Complaint Sufficiently Alleges Aiding and Abetting Touting Violations 45

    D.   The Amended Complaint Sufficiently Alleges Other Securities Fraud ........... 47

VI.   THE SUN DEFENDANTS HAD FAIR NOTICE OF THE SEC'S CLAIMS .................... 48

CONCLUSION .................................................................................................................. 50

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Abitron Austria GmbH v. Hetronic Int'l Inc.*,
    600 U.S. 412 (2023)...................................................................... 32, 33, 36

*Bittner v. United States*,
    598 U.S. 85 (2023)................................................................................. 49

*Cavello Bay Reinsurance Ltd. v. Shubin Stein*,
    986 F.3d 161 (2d Cir. 2021)................................................................ 39, 40

*Conflict Int'l, Inc. v. Komorek*,
    2024 WL 1347577 (Mar. 29, 2024)........................................................ 50

*De Jesus v. Sears, Roebuck & Co.*,
    87 F.3d 65 (2d Cir. 1996) ...................................................................... 43

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013)..................................................................... 16

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
    844 F.3d 79 (2d Cir. 2016).................................................................... 17

*Euro Trade & Forfaiting, Inc., v. Vowell*,
    2002 WL 500672 (S.D.N.Y. Mar. 29, 2002) ................................................ 35

*Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*,
    147 F.3d 118 (2d Cir. 1998),
    *abrogated on other grounds*, *Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)........................................................................... 36, 37

*In re Platinum and Palladium Antitrust Litig.*,
    61 F.4th 242 (2d Cir. 2023) .................................................................. 42

*In re Ripple Labs, Inc. Litig.*,
    2024 WL 3074379 (N.D. Cal. June 20, 2024) ............................................. 29

*Interbrew v. EdperBrascan Corp.*,
    23 F. Supp. 2d 425 (S.D.N.Y. 1998)....................................................... 35

*Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*,
    797 F.3d 160 (2d Cir. 2015)............................................................... 41, 42

*Meng-Lin Liu v. Siemens A.G.*,
    978 F. Supp. 2d 325 (S.D.N.Y. 2013),
    *aff'd*, 763 F.3d 175 (2d Cir. 2014) ......................................................... 34

*Nielsen v. Rabin*,
746 F.3d 58 (2d Cir. 2014) ............................................................................................ 2

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
540 F. Supp. 2d 438 (S.D.N.Y. 2007) ...................................................................... 35, 36

*Parkcentral Glob. HUB Ltd. v. Porsche Auto. Holdings SE*,
763 F.3d 198 (2d Cir. 2014) ........................................................................................ 40

*Reves v. Ernst & Young*,
494 U.S. 56 (1990) ...................................................................................................... 26

*SEC v. Aimsi Techs., Inc.*,
650 F. Supp. 2d 296 (S.D.N.Y. 2009) ......................................................................... 21

*SEC v. Alpert*,
2018 WL 1156012 (S.D.N.Y. Mar. 2, 2018) ............................................................... 40

*SEC v. Balina*,
2024 WL 2332965 (W.D. Tex. May 22, 2024) .............................................. 36, 37, 38, 40

*SEC v. Cavanagh*,
445 F.3d 105 (2d Cir. 2006) ........................................................................................ 26

*SEC v. Coinbase, Inc.*,
2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) ........................................................ *passim*

*SEC v. Competitive Techs., Inc.*,
2005 WL 1719725 (D. Conn. July 21, 2005) .......................................................... 43, 44

*SEC v. Contrarian Press, LLC*,
2019 WL 1172268 (S.D.N.Y. Mar. 13, 2019) ..................................................... 45, 46, 47

*SEC v. Friedland*,
2019 WL 688054 (D. Colo. Feb. 19, 2019) .................................................................. 46

*SEC v. Genesis Glob. Cap., LLC*,
2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024) ......................................................... *passim*

*SEC v. Goldman Sachs & Co.*,
790 F. Supp. 2d 147 (S.D.N.Y. 2011) .......................................................................... 38

*SEC v. Gorsek*,
222 F. Supp. 2d 1099 (C.D. Ill. 2001) ......................................................................... 46

*SEC v. Gruss*,
859 F. Supp. 2d 653 (S.D.N.Y. 2012) .......................................................................... 34

*SEC v. Honig*,
   2021 WL 276155 (S.D.N.Y. Jan. 27, 2021) ............................................................... *passim*

*SEC v. Kik Interactive Inc.*,
   492 F. Supp. 3d 169 (S.D.N.Y. 2020) ................................................................. 32, 48, 49

*SEC v. Milton*,
   2022 WL 3156180 (S.D.N.Y. Aug. 8, 2022) ............................................................ 25, 26

*SEC v. Mintz*,
   2024 WL 1173096 (D.N.J. Mar. 18, 2024) ..................................................................... 42

*SEC v. Montle*,
   65 F. App'x 749 (2d Cir. 2003) ............................................................................... *passim*

*SEC v. Morrone*,
   997 F.3d 52 (1st Cir. 2021) ............................................................................................ 33

*SEC v. PlexCorps*,
   2018 WL 4299983 (E.D.N.Y. Aug. 9, 2018) ............................................................ *passim*

*SEC v. Ripple Labs, Inc.*,
   2022 WL 762966 (S.D.N.Y. Mar. 11, 2022) ................................................................. 38

*SEC v. Ripple Labs, Inc.*,
   2023 WL 6445969 (S.D.N.Y. Oct. 13, 2023) ................................................................ 28

*SEC v. Ripple Labs, Inc.*,
   682 F. Supp. 3d 308 (S.D.N.Y. 2023) ..................................................................... 28, 31

*SEC v. Scoville*,
   913 F.3d 1204 (10th Cir. 2019) .................................................................................... 33

*SEC v. Sharef*,
   924 F. Supp. 2d 539 (S.D.N.Y. 2013) ..................................................................... 24, 25

*SEC v. Straub*,
   921 F. Supp. 2d 244 (S.D.N.Y. 2013) ....................................................... 20, 22, 23, 43

*SEC v. Stubos*,
   634 F. Supp. 3d 174 (S.D.N.Y. 2022) ..................................................................... *passim*

*SEC v. Sugarman*,
   2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) .............................................................. 48

*SEC v. Telegram Grp. Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020) ..................................................................... 27, 29

*SEC v. Terraform Labs Pte Ltd.*,
    2022 WL 2066414 (2d Cir. June 8, 2022) ................................................................ *passim*

*SEC v. Terraform Labs Pte. Ltd.*,
    684 F. Supp. 3d 170 (S.D.N.Y. 2023) ...................................................................... *passim*

*SEC v. U.S. Envt'l, Inc.*,
    82 F. Supp. 2d 237 (S.D.N.Y. 2000) ...................................................................... 41, 44, 45

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) .................................................................................................... 27

*SEC v. Williky*,
    942 F.3d 389 (7th Cir. 2019) ...................................................................................... 13

*SEC v. Xia*,
    2022 WL 17539124 (E.D.N.Y. Dec. 8, 2022) .............................................................. 28

*Spanski Enters., Inc. v. Telewizja Polska, S.A.*,
    883 F.3d 904 (D.C. Cir. 2018) .................................................................................... 33

*Tcherepnin v. Knight*,
    389 U.S. 332 (1967) .................................................................................................... 27

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*,
    916 F.3d 143 (2d Cir. 2019) ........................................................................................ 16

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*,
    241 F.3d 135 (2d Cir. 2001) ........................................................................................ 18

*United States v. Leonard*,
    529 F.3d 83 (2d Cir. 2008) .......................................................................................... 31

*United States v. Zaslavskiy*,
    2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ............................................................ 49

*Uselton v. Commercial Lovelace Motor Freight, Inc.*,
    940 F.2d 564 (10th Cir. 1991) .............................................................................. 29, 30, 31

*WesternGeco LLC v. ION Geophysical Corp.*,
    585 U.S. 407 (2018) .................................................................................................... 33

*Williams v. Binance*,
    96 F.4th 129 (2d Cir. 2024) ........................................................................................ 39

*Williams v. Block one*,
    2022 WL 5294189 (S.D.N.Y. Aug. 15, 2022) .............................................................. 39

## Statutes

15 U.S.C. § 77b .................................................................................................... 27, 36, 46

15 U.S.C. § 77e ........................................................................................................ 26, 36

15 U.S.C. § 77q ............................................................................................................. 40

15 U.S.C. § 77v .............................................................................................................. 22

15 U.S.C. § 78aa ....................................................................................................... 22, 33

## Rules

Fed. R. Evid. 201(b) ........................................................................................................ 2

## Regulations

17 C.F.R. § 230.901.3 .................................................................................................. 37

17 C.F.R. § 230.902 ..................................................................................................... 37

17 C.F.R. § 230.903 ..................................................................................................... 37

## Other Authorities

*Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:
The DAO,*
Release No. 81207, 2017 WL 7184670 (July 25, 2017) ................................................. 48

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum in opposition to the motion to dismiss the Amended Complaint filed by Defendants Justin Sun ("Sun"), Tron Foundation Limited ("Tron Foundation"), BitTorrent Foundation Ltd. ("BitTorrent Foundation"), and Rainberry, Inc. ("Rainberry") (together, the "Sun Defendants"). *See* ECF Nos. 61 to 63.

## INTRODUCTION

This case arises from Sun's orchestration of the unregistered offer and sale, manipulative trading, and unlawful touting of crypto asset securities. Working through several entities that he owns and controls—the Tron Foundation, the BitTorrent Foundation, and Rainberry—Sun engineered the unregistered offer and sale of two crypto asset securities called TRX and BTT, which were marketed and distributed to investors in the United States and elsewhere. Sun also arranged to have TRX listed on a trading platform based in the United States called Bittrex, and he directed the manipulative wash trading of TRX on that U.S.-based platform, with assistance from personnel at the Tron Foundation, the BitTorrent Foundation, and Rainberry. Additionally, Sun—again with assistance from the Tron Foundation, the BitTorrent Foundation, and Rainberry—directed a publicity campaign that involved paying celebrities in the United States to tout TRX and BTT on social media without disclosing that they had been paid for their promotional efforts. Finally, to conceal the truth about the publicity campaign, Sun falsely stated that "[i]f any celebrities are paid to promote TRON, we require them to disclose," and Sun broadcast that lie to his millions of Twitter followers, including those in the United States.

Because of the foregoing conduct, the SEC brought this case against the Sun Defendants and others, asserting claims for unregistered securities offerings, various types of securities fraud,

and aiding and abetting the celebrities' touting violations.[1]   Now, seeking to escape the consequences of their actions, the Sun Defendants move to dismiss the Amended Complaint, arguing lack of personal jurisdiction as to Sun, the Tron Foundation, and the BitTorrent Foundation (but not Rainberry), and failure to state a claim as to all the Sun Defendants.

The Sun Defendants' arguments for dismissal are meritless.  Their personal jurisdiction argument is foreclosed by precedent, including *SEC v. Terraform Labs Pte Ltd.*, 2022 WL 2066414, at *3 (2d Cir. June 8, 2022) ("*Terraform I*").  And their arguments on the merits—which ignore or contort the allegations of the Amended Complaint and controlling law—fare no better.

For purposes of a motion to dismiss, "the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor." *SEC v. Honig*, 2021 WL 276155, at *5 (S.D.N.Y. Jan. 27, 2021) (citing *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014)).  Under that standard, all claims alleged in the Amended Complaint are sufficient, and the motion to dismiss should be denied in its entirety.[2]

## FACTUAL BACKGROUND

The Amended Complaint (ECF No. 59) alleges the following.

### A.    The Sun Defendants and the Tron Ecosystem

Sun is a Chinese national and crypto asset entrepreneur, who lives in Singapore or Hong Kong.  ECF No. 59 ¶ 13.  By 2017, Sun began publicly promoting the Tron "ecosystem"—a group

---

[1]    Regarding the celebrities who touted TRX and/or BTT, six of them settled with the SEC before this case was filed.  *See* SEC Press Release No. 2023-59, Mar. 22, 2023, https://www.sec.gov/news/press-release/2023-59.  One of them who was named as a defendant in this action, Austin Mahone, settled after this case was filed.  *See* ECF Nos. 32, 33.  A final celebrity charged in this case, DeAndre Cortez Way, is in default, *see* ECF No. 36, and the SEC intends to seek a default judgment against him.

[2]    With their motion to dismiss, the Sun Defendants filed a declaration and 12 Exhibits (ECF No. 63), which they claim are appropriate for judicial notice.  The SEC does not object to Exhibits 1-4, 6, 8, and 10-12 because those documents were referenced in the Amended Complaint or show historical crypto asset prices.  But Exhibits 5, 7, and 9 were not referenced in the Amended Complaint and are not appropriate for judicial notice.  *See* Fed. R. Evid. 201(b).  In any event, even if the Court considers all 12 Exhibits, the motion to dismiss should still be denied.

of blockchain protocols, software code, and crypto assets that Sun controlled.  *Id.* ¶ 28.  Sun and others often referred to the Tron ecosystem simply as "Tron."  *Id.*  (Likewise, as used herein, "Tron" means the Tron ecosystem.)

The Tron Foundation was founded by Sun in 2017 as a Singapore company.  *Id.* ¶ 14.  From that time to the present, Sun has owned and controlled the Tron Foundation.  *Id.*  The Tron Foundation is one of several entities through which Sun managed the development and marketing of the Tron ecosystem and conducted the TRX and BTT offerings.  *Id.*

The BitTorrent Foundation—which sometimes conducted business as "BitTorrent"—was founded by Sun in 2018 as a Singapore company.  *Id.* ¶ 15.  From that time to the present, Sun has owned and controlled the BitTorrent Foundation.  *Id.*  The BitTorrent Foundation is an entity through which Sun conducted the BTT offerings and, with Rainberry, managed the development and marketing of the BitTorrent protocol.  *Id.*

Rainberry—which also conducted business as "BitTorrent"—is a California corporation owned and controlled by Sun.  *Id.* ¶ 16.  The corporation was founded in 2004 and operated as BitTorrent, Inc. until June 2018, when it was acquired by Sun and renamed Rainberry.  *Id.*  From Sun's acquisition to the present, Sun has wholly owned and controlled Rainberry.  *Id.*

At all relevant times, Sun owned, controlled, and dominated the actions and dealings of the Tron Foundation, the BitTorrent Foundation, and Rainberry.  *Id.* ¶ 13.  As such, those entities were Sun's alter egos.  *Id.*  Moreover, through Sun's actions, he blurred the distinctions among those entities.  *Id.*  For example, in July 2018, Sun announced that "BitTorrent and TRON will combine forces, with the TRON US team merging with the BitTorrent team."  *Id.* ¶ 70; *see also id.* ¶¶ 71-73.  Similarly, during public appearances in San Francisco in January 2019—where Sun promoted Tron, TRX, and BTT—Sun displayed the Tron logo, the Tron name, and the BitTorrent name.  *Id.*

¶ 13; *see also id*. ¶¶ 77-78.  Thus, based on Sun's actions and statements, a reasonable investor would see Sun as the face of Tron, TRX, and BTT, and draw little, if any, distinction among the Tron Foundation, the BitTorrent Foundation, and Rainberry.  *Id*. ¶ 13.

During Sun's work on behalf of the Tron Foundation, the BitTorrent Foundation, and/or Rainberry, he travelled extensively to the United States in connection with the promotion, offer, and sale of TRX and BTT.  *Id*. ¶ 11.  Sun spent more than 80 days in the U.S. in 2017, more than 120 days in the U.S. in 2018, and approximately 180 days in the U.S. in 2019.  *Id*.  Rainberry also rented an apartment where Sun stayed on some of his business trips to the U.S. in 2019.  *Id*.

**B.     Sun and the Tron Foundation Marketed TRX as an Investment Before Its ICO**

To promote the Tron ecosystem, in August 2017, Sun and the Tron Foundation posted a whitepaper ("TRX Whitepaper") on the internet.  *Id*. ¶ 29.  Sun and the Tron Foundation controlled and had ultimate authority over the statements in this whitepaper, which was aimed at the investing public, including investors in the United States.  *Id*. ¶ 28.

The TRX Whitepaper described TRX, a crypto asset, as the "Official Token of TRON."  *Id*. ¶ 31.  The whitepaper stated that "[t]hose who wish to enter" the Tron ecosystem "must buy" TRX.  *Id*.  An investor would purchase TRX with fiat currency or another crypto asset.  *Id*.

The TRX Whitepaper promoted an upcoming so-called initial coin offering ("ICO") of TRX that would include 40 percent of the 100 billion total TRX supply.  *Id*. ¶ 32.  According to the whitepaper, the remaining 60 percent of TRX supply would be allocated as follows: 35 percent to the "TRON Foundation and the ecosystem," 15 percent to be sold in a private offering, and 10 percent to another company that Sun owned and controlled.  *Id*.

In the TRX Whitepaper, Sun and the Tron Foundation described a "Realization Path" for the Tron ecosystem that would take "8 to 10 years," and in which investors' contributions would

be used to further build out and enhance the Tron ecosystem.  *Id.* ¶ 33.  The TRX Whitepaper also indicated that investors' fortunes were tied together, stating, "[a]ll TRON participants will benefit from its prosperity."  *Id.*

Additionally, the TRX Whitepaper promoted the profit potential for investors in TRX, which would be realized over time.  *Id.* ¶ 34.  For example, it stated: purchasers of TRX could "share [in] *dividend growth*"; Tron's ecosystem was designed for TRX "*holders* who [are] optimistic about TRON on a *long-term basis*"; "those who hold and lock [TRX] for [the] long[-term] *will be rewarded*"; "*[l]ong-term investment*" was "critical;" "stakeholders enjoy … *sustainable growth*"; and "*[l]ong-term holding of stakeholders* [would] be the benchmark in the ecosystem and better lead the development of the ecology."  *Id.*[3]

The TRX Whitepaper also promoted the executive team whose efforts would lead to TRX's success.  *Id.* ¶ 35.  The whitepaper listed Sun as the "Founder and Chief Executive Officer" and highlighted his prior experience working for a crypto asset company, stating that the "*market value of [the company] has exceeded ten billion US dollars*."  *Id.*  The whitepaper also stated that the Tron team "will spare no efforts to realize the development goal proposed in the white paper and expand the growth" of the Tron ecosystem.  *Id.*

From August through September 2017, Sun and the Tron Foundation conducted the ICO of TRX, offering and selling TRX to numerous purchasers who paid crypto assets in exchange for TRX.  *Id.* ¶ 37.[4]  In the ICO, TRX was distributed as described in the TRX Whitepaper.  *Id.*  Thus,

---

[3]     With respect to the citations and quotations herein, unless otherwise stated, all emphasis has been added and all internal citations have been omitted.

[4]     Although the Sun Defendants make various statements about the TRX ICO in their motion papers (*see, e.g.*, ECF No. 62 at 2 (noting the SEC does not allege the crypto assets were offered or sold "initially" to U.S. residents)), those statements are largely irrelevant because the Amended Complaint does not charge the TRX ICO as an unregistered offer or sale.  But the SEC does allege that later offerings of TRX (after the ICO) violated the registration provisions of the federal securities laws.

after the ICO, Sun owned and controlled at least 45 percent of the total TRX supply through the Tron Foundation and another company that he owned.  *Id.*

### C.   After the ICO, Sun and the Tron Foundation Continued Targeting U.S. Investors While Promoting TRX as an Investment in Tron and Working to Create a Secondary Market

In 2018, Bittrex was a crypto asset trading platform incorporated in Delaware, with its principal place of business in Seattle, Washington.  *Id.* ¶ 38.  In January 2018, Sun sent an email (from his Tron email address) to Bittrex, attaching several documents to make TRX available on Bittrex for trading.  *Id.* ¶ 39.  The documents attached to Sun's email included the Bittrex Token Application and Listing Agreement, which was between Bittrex and the Tron Foundation and signed by Sun as the Tron Foundation's "Founder & CEO."  *Id.*  Bittrex accepted the agreement and, on March 1, 2018, announced on Twitter that TRX was "available for trading."  *Id.* ¶ 40.

Thereafter, Sun and the Tron Foundation continued promoting TRX as an investment in Tron.  *Id.* ¶ 41.  On March 17, 2018, Sun and the Tron Foundation posted on Medium, a U.S.-based online publishing platform, a link to an article titled "*4 Reasons to Invest in Tron*, Before the Main Net Launch."  *Id.*  The article stated that ongoing efforts by Sun and the Tron Foundation "will *boost the value of TRX*" and that investors "should *invest now, while [they] still can*."  *Id.*  The article further stated that "[b]uying TRX now, while its [sic] cheap, could lead to *serious returns* after the Tron Main Net launches and investors rush to fill their bags."  *Id.*

Sun and the Tron Foundation also managed the supply of TRX to ensure price appreciation for the benefit of TRX investors.  *Id.* ¶ 47.  For example, on June 26, 2018, Sun tweeted that "#TRON completed Coin Burn of 1 billion #TRX."  *Id.*  The tweet linked to a Tron Foundation post on Medium, explaining that "'Coin burn' refers to removing tokens from the total supply" and "helps to control inflation and reward[s] token holders," because reducing the supply of TRX would typically increase the value of TRX in the market.  *Id.*

Sun and the Tron Foundation specifically targeted investors in the United States. *Id.* ¶ 42. On September 18, 2018, the Tron Foundation tweeted, "[y]ou can now buy $TRX directly with USD on @BittrexExchange." *Id.* And that tweet linked to a Global Coin Report post stating, "[t]his is the first time that Tron has been paired with the USD in the United States." *Id.* That same day, Sun tweeted, "#TRX already can be traded on @BittrexExchange, $USD markets, $USD/ $TRX. First #TRX fiat trading pair in US. Go #TRON." *Id.* ¶ 43.

On December 15, 2019, Sun retweeted a post, which stated that investors in the United States could trade TRX "pretty much everywhere, especially with a VPN." *Id.* ¶ 44. Sun's retweet announced, "[w]e will make $TRX available for all [United States flag emoji] users! More options are on the way!" *Id.* Sun and the Tron Foundation worked with crypto asset trading platforms to make TRX available for trading by U.S. investors, who could, at one point, trade TRX on at least four U.S.-based platforms. *Id.*

**D.      Sun and the Tron Foundation Engaged in Unregistered Offers and Sales of TRX**

TRX was offered and sold as a security, specifically as an investment contract. *Id.* ¶ 51. All TRX purchasers—whether they tendered fiat currency, crypto assets, or other things of value to obtain TRX—invested in a common enterprise with Sun and the Tron Foundation, who at all times retained significant TRX holdings. *Id.* Because the value of TRX rose or fell together for all TRX holders, they profited or suffered losses in amounts proportionate to their holdings. *Id.*

TRX purchasers and holders also reasonably expected that their prospective profits would come from Sun and the Tron Foundation's entrepreneurial and managerial efforts to develop, maintain, and grow the Tron ecosystem, make TRX available for trading on crypto asset trading platforms, and promote TRX to potential investors to increase its secondary market price for all holders. *Id.* ¶ 52. Indeed, TRX purchasers and holders reasonably expected that the value of their

investment would largely rise or fall based on Sun and the Tron Foundation's efforts to increase TRX's value.  *Id*.

From March 2018 through February 2019, Sun and the Tron Foundation offered and sold TRX, without registration, in three principal ways.  *Id*. ¶ 54.  No registration statement was filed with the SEC or in effect with respect to any of these offers and sales of TRX, and no exemption from registration was available for any of these offers and sales.  *Id*. ¶ 55.  Thus, these offers and sales of TRX violated the offer and sale registration provisions of the federal securities laws.  *Id*.

### 1. Offers and Sales of TRX on Bittrex

After the TRX ICO, from March 2018 through February 2019, Sun and the Tron Foundation offered and sold approximately 542.6 million TRX to investors, including investors in the United States who placed their orders on Bittrex, the U.S.-based crypto asset trading platform. *Id*. ¶ 56.  During this time, multiple investors located in this District—specifically, in New York City—purchased TRX through Bittrex.  *Id*.  These unregistered offers and sales of TRX generated net proceeds of more than $31.9 million for Sun and the Tron Foundation.  *Id*.

### 2. Offers and Sales of TRX in the Emoji Contest

In August 2018, Sun and the Tron Foundation offered and sold TRX through an online so-called "emoji contest" in which Sun and the Tron Foundation transferred TRX to certain contest participants in exchange for them completing specific tasks promoting TRX or Tron.  *Id*. ¶ 57. Participants had to "tell a story about Tron with emojis" in Twitter or Facebook posts.  *Id*.  Then, participants with the most likes or shares on social media would be given TRX.  *Id*. ¶ 58.  By undertaking these tasks, participants provided Sun and the Tron Foundation with valuable consideration—online promotion and publicity for the Tron ecosystem—in exchange for TRX. *Id*. ¶ 62.  In total, Sun and the Tron Foundation distributed 50,000 TRX to individuals who

marketed TRX and Tron, and at least one person who received TRX resided in this District. *Id.* ¶¶ 63-64.

### 3.     Offers and Sales of TRX in the niTRON Sharing Campaign

In December 2018, Sun and the Tron Foundation offered and sold another 28,588 TRX through an online program that, like the "Emoji Contest," required participants to promote Tron and TRX by retweeting and commenting on the Tron Foundation's tweet announcing the contest and to include the hashtag "#niTRON." *Id.* ¶ 65.  In this campaign, the second and third prize winners would receive certain amounts of TRX, and the first prize winners would receive tickets to attend the 2019 "niTron Summit," a Tron-sponsored event in San Francisco, in which Tron and TRX would be further promoted. *Id.* ¶ 66.  By entering this contest, participants provided Sun and the Tron Foundation with valuable consideration—promotion of the Tron Foundation and the niTRON summit on Twitter—in exchange for an opportunity to receive TRX and attend a Tron event. *Id* ¶ 67.  At least one participant who received TRX was a U.S. person. *Id.* ¶ 68.

### E.     Sun Acquired Rainberry, Incorporated It Into the Tron Ecosystem, and Began Promoting BTT as an Investment in Tron

In June 2018, Sun purchased BitTorrent, Inc., a company based in San Francisco. *Id.* ¶ 69. Sun changed the company's name to Rainberry, although Sun and Rainberry personnel often continued publicly referring to the company as BitTorrent. *Id.*  In July 2018, Sun announced that "BitTorrent" would "become part of the TRON ecosystem," and Rainberry's operations and employees thus became intertwined with the Tron Foundation. *Id.* ¶¶ 70-73.  Sun then used Rainberry and the BitTorrent Foundation, which he formed in October 2018, to offer and sell TRX and the new BitTorrent Token, which had the trading symbol "BTT." *Id.* ¶ 69.

In early January 2019, Sun traveled to Rainberry's office in San Francisco, where he and Rainberry's Head of Product and Engineering broadcasted a livestream on the internet to promote

Tron, TRX, and BTT.  *Id*. ¶ 77.  In the livestream, both men appeared on camera, displaying the BitTorrent and Tron names and logos.  *Id*.  During the livestream, Sun explained that BTT would benefit TRX holders because "the current Tron community" would be allocated with BTT, meaning that TRX holders would be "entitled" to receive "the BTT airdrop."  *Id*.  Sun also stated that BTT would use the "Tron network," so BTT would attract numerous BitTorrent users and grow the Tron ecosystem.  *Id*.  Rainberry's Head of Product explained that BTT was created in part "to address this giant potential market without having to give all those people TRX, in order to protect the existing TRX holders *without diluting [TRX's value] by giving out lots of TRX*."  *Id*.

On January 17 and 18, 2019, Sun again was in San Francisco, this time for the niTron Summit, a two-day event before a live audience to promote Tron, TRX, and BTT.  *Id*. ¶ 78.  At the event, Sun appeared on stage wearing clothes displaying the Tron and BitTorrent names.  *Id*.  Sun showed the audience a video highlighting the "market cap history" of TRX and illustrating its rising market capitalization "in Millions USD" among the "Top 100 Cryptos by Market Cap."  *Id*.  Sun told the audience that, "today, I think we are number 9" in market capitalization, and in 2019, TRX was "aiming to become at least number 4."  *Id*.  Sun stated that TRX was "climbing the ladder of the most valuable crypto currency."  *Id*.  Additionally, Sun promoted the upcoming "public sale" of BTT and the "airdrops" of BTT to "TRX holders."  *Id*.  Sun added that BTT would use the Tron "infrastructure" and thus "promote the integration and synergy between the [sic] Tron and BitTorrent" in the Tron ecosystem.  *Id*.

Sun also posted to BitTorrent's website a new whitepaper ("BTT Whitepaper") to promote BTT to investors.  *Id*. ¶ 79.  This whitepaper discussed the upcoming initial offering of BTT and how the 990 billion supply of BTT would be allocated in offers and sales.  *Id*. ¶ 81.  The allocation included certain percentages for the public, certain percentages for airdrops, and approximately 60

percent for the BitTorrent team, the BitTorrent Foundation, the Tron Foundation, and the BitTorrent ecosystem.  *Id.*

In late January 2019, the Sun Defendants offered and sold BTT for the first time through a so-called initial exchange offering ("IEO"), a form of conducting an initial distribution of crypto assets by selling them to the public on a crypto asset trading platform.  *Id.* ¶ 82.[5]  All the BTT offered in the IEO was sold in less than 15 minutes.  *Id.* ¶ 84.  Around this time, Sun tweeted: "For those [who] didn't get #BTT in the public sale, stay tuned for the #TRX airdrop!  Own[ing] $TRX will secure your chance to get $BTT! #TRON #BitTorrent."  *Id.* ¶ 85.

### F.   After the IEO, the Sun Defendants Continued Promoting BTT as an Investment in Tron and Working to Create a Secondary Market

After the BTT IEO, the Sun Defendants secured listings for BTT on various trading platforms, including Bittrex, and continued promoting BTT as an investment in Tron and their efforts to make BTT more valuable.  *Id.* ¶¶ 87-88.  In late January 2019, Sun tweeted about BTT that he had "ke[pt] the initial sale price low" to "benefit the community and reward them with *decent return*!"  *Id.* ¶ 88.  Similarly, in early March 2019, in a public online chat, Sun stated that he chose to offer new BTT tokens, rather than more TRX, to avoid "diluting the value of TRX." *Id.* ¶ 89.  Sun also emphasized that his goal was to "*increase[e] the value of TRX and BTT.*"  *Id.*

In May 2019, Sun tweeted about BTT's "price increase over the last 24 hours."  *Id.* ¶ 91. That same month, the BitTorrent Twitter account posted a link to a video by an investor with information about "how to buy #BTT in the U.S."  *Id.* ¶ 95.  Similarly, in July 2019, the BitTorrent Twitter account promoted BTT's "ROI," or return on investment.  *Id.* ¶ 92.  Not surprisingly, investors in the U.S. purchased BTT.  *Id.* ¶ 95.

---

[5]      Like the ICO of TRX, the Amended Complaint does not charge the IEO of BTT as an unregistered offer or sale under Section 5 of the Securities Act of 1933.  But the Amended Complaint does allege federal securities law violations based on later offers, sales, and purchases of BTT.

### G.     The Sun Defendants Engaged in Unregistered Offers and Sales of BTT

BTT was offered and sold as a security, specifically as an investment contract.  *Id*. ¶ 96. The mechanics of purchasing BTT were similar to those for purchasing TRX, and investors expected profits from the Sun Defendants' continued efforts to develop the Tron ecosystem, including the BitTorrent protocol, and make it more valuable.  *Id*. ¶¶ 96-97.

From approximately February 2019 through October 2021, the Sun Defendants variously offered and sold BTT in unregistered securities transactions.  *Id*. ¶ 99.  No registration statement was filed with the SEC or in effect with respect to, and no exemption from registration was available for, any of these offers and sales of BTT.  *Id*. ¶ 100.  Thus, these offers and sales of BTT violated the offer and sale registration provisions of the federal securities laws.  *Id*.

### 1.     Offers and Sales of BTT in Airdrops

From February 2019 through June 2020, the Sun Defendants offered and sold BTT through monthly "airdrops" to TRX holders.  *Id*. ¶ 101.  The term "airdrop" typically refers to the distribution of crypto assets to a class of recipients, purportedly without requiring them to pay additional consideration for the asset.  *Id*. ¶ 102.  But with respect to BTT, recipients had to purchase and hold TRX to receive the BTT airdrop.  *Id*.  Anyone who purchased and held TRX received BTT regardless of their location or country of citizenship, including in the U.S.  *Id*.

By acquiring and holding TRX tokens in exchange for the opportunity to receive BTT through airdrops, the airdrop recipients provided the Sun Defendants with valuable consideration beyond the cash or crypto assets used to purchase TRX, including (i) increased demand for TRX, (ii) further growth in TRX trading volume and liquidity on the secondary market, (iii) upward pressure on TRX's secondary market price, (iv) promotion of BTT and the BitTorrent platform to TRX's existing base of engaged crypto asset investors, and (v) the rapid development of a secondary market for BTT.  *Id*. ¶ 117.

By June 2020, the Sun Defendants completed 16 rounds of airdrops to TRX holders, totaling nearly 26 billion BTT. *Id.* ¶ 111. Investors in the U.S. were included in the BTT airdrops and the Sun Defendants sent BTT to persons within the U.S. via airdrops. *Id.* ¶ 112.

### 2. Offers and Sales of BTT in Other Distributions

From around December 2019 through October 2021, the Sun Defendants offered and sold BTT through eight online distributions styled as contests. *Id.* ¶¶ 118-61. For all of these programs, in order to receive BTT, participants had to perform certain tasks online or through social media that, in various ways, promoted BTT and the Tron ecosystem and expanded the number of people who were exposed to that ecosystem. *Id.* ¶¶ 119, 127, 133, 138, 143, 148, 153, 159. By performing the required tasks, participants provided the Sun Defendants with valuable consideration, including advertising and publicity for BTT and the Tron ecosystem to a growing audience. *Id.* ¶¶ 123, 129, 134, 139, 145, 149, 155, 160. And through these programs, the Sun Defendants distributed hundreds of millions of BTT to numerous participants. *Id.* ¶¶ 121, 128, 132, 138, 144, 148, 154, 158. The Sun Defendants did not take any steps to exclude U.S. persons from receiving BTT in these programs. *Id.* ¶¶ 124, 130, 135, 140, 146, 150, 156, 161.[6]

### H. The Sun Defendants Engaged in Manipulative Trading of TRX on Bittrex

From February 2018 through February 2019, Sun led a team of at least three Tron Foundation employees and two Rainberry employees in a scheme to artificially inflate the trading volume of TRX through wash trading between accounts controlled by the BitTorrent Foundation, Tron Foundation and Rainberry employees, and ultimately Sun. *Id.* ¶ 162.[7] The wash trading

---

[6]       At the motion to dismiss stage, the Court may plausibly infer that U.S. purchasers in fact received BTT in these distributions given the Amended Complaint's allegations about, among other things, the global nature of the promotions and distributions, the past inclusion of U.S. investors in prior BTT distributions, and the lack of any restrictions on who could participate in the "contests" or receive BTT in the distributions.

[7]       Wash trading generally refers to "trades that occur without a change in beneficial ownership." *SEC v. Williky*, 942 F.3d 389, 391 (7th Cir. 2019). Wash trading is fraudulent because it creates a "false perception of market activity that does not reflect the true supply and demand for the securities." *Id.*

created the false and misleading appearance of legitimate, active TRX trading to induce the purchase or sale of TRX by others (who were not aware of the wash trading) and to make it easier for Sun and the Tron Foundation to sell TRX while keeping its price stable. *Id.* ¶ 166. Sun's team conducted the wash trading of TRX on U.S.-based Bittrex. *Id.* ¶¶ 164, 179.

In February and March 2018, to carry out the scheme, Sun directed Tron Foundation employees to open four nominee accounts on Bittrex that were used to trade. *Id.* ¶¶ 167-70, 173. At least one of the accounts was opened using an individual's personal information without the individual's knowledge. *Id.* ¶ 174. In September 2018, Sun attended a meeting with Rainberry's CFO, where Sun approved a wire transfer of $10,000 to be used for wash trading. *Id.* ¶ 171. The Rainberry CFO also approved the transfer, and it was done through a U.S.-based bank. *Id.* ¶ 172.

Sun directed and was aware of his team's wash trading. *Id.* ¶ 164. Sun controlled the digital wallets and TRX tokens used to wash trade; he directed the Tron Foundation employees who executed the trades; and those employees kept Sun informed of their trading activities. *Id.* ¶¶ 175-77. Sun also provided his own supply of TRX to facilitate the wash trading. *Id.* ¶ 178.

Between April 2018 and February 2019, Sun's team, acting at his direction, conducted about 615,000 wash trades of TRX using the four accounts that they opened. *Id.* ¶¶ 179, 181. None of these TRX trades involved any change in beneficial ownership or had any legitimate economic purpose. *Id.* ¶ 185.

### I.   The Sun Defendants Orchestrated a Celebrity Touting Campaign, and Sun Lied to Conceal It

Beginning around January 2021, Sun—on behalf of the Tron Foundation, the BitTorrent Foundation, and Rainberry—began paying celebrities in the United States, including Defendants Mahone and Way, to promote TRX and BTT on social media. *Id.* ¶ 187. Each of the celebrities

who touted TRX or BTT had at least one million followers on their social media accounts, including followers in the United States.  *Id*.

Sun, or a Rainberry employee assisting him, provided the language for each celebrity to post online about TRX or BTT.  *Id*. ¶ 189.  And Sun approved the payments to the celebrities, funding those payments himself.  *Id*. ¶ 188.  Sun and the Rainberry employee also told the celebrities not to disclose that they were paid to tout.  *Id*.  Once the celebrities promoted TRX or BTT on their social media accounts, Sun amplified those posts by commenting on them or retweeting them on Sun's own Twitter account, which had more than three million followers, including followers in the United States.  *Id*. ¶ 189.

In January and February 2021, multiple celebrities in the U.S., including Mahone and Way, publicly promoted TRX and/or BTT on their social media accounts in exchange for payment from Sun.  *Id*. ¶¶ 191-93.  The celebrities' touts, however, did not disclose that the celebrities had been paid to promote TRX and BTT or the amounts of their payments.  *Id*.

To conceal the truth about the celebrity touting campaign from the investing public, Sun lied about paying celebrities to tout.  *Id*. ¶ 194.  On February 16, 2021, Sun tweeted: "There have been rumors lately of third party celebrities being paid to promote #TRON.  #TRON Foundation is not involved in these activities.  Nor is the foundation aware of the actors behind this."  *Id*.  About one minute later, Sun tweeted: "If any celebrities are paid to promote TRON, we require them to disclose."  *Id*.  Those tweets by Sun were false.  *Id*. ¶ 195.  In fact, as Sun knew, celebrities were paid to tout TRX and BTT; Sun or others working for him provided the language for the touts; Sun funded payments to the celebrities for the touts; and the celebrities did not disclose the fact that they were paid to tout TRX or BTT or the amounts of their payments.  *Id*.

## ARGUMENT

### I.   THIS COURT HAS PERSONAL JURISDICTION OVER SUN, THE TRON FOUNDATION, AND THE BITTORRENT FOUNDATION

Three of the Sun Defendants—Sun, the Tron Foundation, and the BitTorrent Foundation—claim that the Court lacks personal jurisdiction over them.  *See* ECF No. 62 at 11-27.  But their arguments are unsound and should be rejected.

"'Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction.'"  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).  Where personal jurisdiction is contested by motion, a court must "'assume[] the truth of the plaintiff's factual allegations for purposes of the motion,'" and "'construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor.'"  *Id.* at 85; *see also SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 185 (S.D.N.Y. 2023) ("*Terraform II*") (same).

To exercise specific personal jurisdiction over a non-resident, "three conditions must be satisfied":  (1) the non-resident "'must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State'"; (2) "'the plaintiff's claim must arise out of or relate to'" the non-resident's forum conduct; and (3) "'the exercise of jurisdiction must be reasonable under the circumstances.'"  *Terraform I*, 2022 WL 2066414, at *3 (quoting *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019)).  Regarding violations of the federal securities laws, the forum for minimum contacts purposes is "the entire United States," not any particular state.  *SEC v. Stubos*, 634 F. Supp. 3d 174, 186 (S.D.N.Y. 2022); *Terraform II*, 684 F. Supp. 3d at 185 n.3 (same).  Here, accepting the allegations of the Amended Complaint as true, the Court has personal jurisdiction over Sun, the Tron Foundation, and the BitTorrent Foundation.

A.     **The Foreign Defendants Purposefully Availed Themselves of, and Took Actions Directed Toward, the United States**

The first prong of the personal jurisdiction test considers a defendant's purposeful actions within or directed toward the United States. *Terraform I*, 2022 WL 2066414, at *3. As shown below, Sun, the Tron Foundation and the BitTorrent Foundation undertook many such actions.

1.     **Rainberry's Contacts with the United States Are Imputable to Sun**

According to the Second Circuit, a company's "contacts with the U.S." may be "imputed," for purposes of personal jurisdiction, to a person who "exercised extensive control" over the company. *Terraform I*, 2022 WL 2066414, at *3 n.2 (quoting *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 98 (2d Cir. 2016)).

Rainberry is a corporation based in California. ECF No. 59 at ¶ 16. Rainberry has such extensive contacts with the United States that it cannot and "does not challenge [personal] jurisdiction." ECF No. 62 at 27. The Amended Complaint alleges that Sun wholly owns, controls, and dominates the actions of Rainberry—Sun even has Rainberry rent an apartment in San Francisco for him to stay in during business trips. ECF No. 59 ¶¶ 11, 13, 16. Construing the Amended Complaint in the light most favorable to the SEC, Sun exercises extensive control over Rainberry. Accordingly, Rainberry's contacts with the U.S. should be imputed to Sun. *See Terraform I*, 2022 WL 2066414, at *3 n.2; *EMI Christian Music*, 844 F.3d at 98.

2.     **Apart from Rainberry, Sun, the Tron Foundation, and the BitTorrent Foundation Had Extensive Contacts with the United States**

Sun, the Tron Foundation, and the BitTorrent Foundation also had extensive contacts with the U.S. beyond Sun's contacts through Rainberry. "The SEC is not powerless to prosecute those who violate the securities laws of the United States from abroad." *Stubos*, 634 F. Supp. 3d at 188. And "[i]t is well established that a defendant can 'purposefully avail itself of a forum by directing its agents or distributors to take action there.'" *Id*. Additionally, courts consider "the *totality* of

17

Defendants' contacts with the forum." *SEC v. PlexCorps*, 2018 WL 4299983, at *19 (E.D.N.Y. Aug. 9, 2018) (personal jurisdiction existed over non-U.S. resident who traveled to U.S. and promoted, offered, and sold crypto assets to U.S. investors) (emphasis in original).

Here, Sun, the Tron Foundation, and the BitTorrent Foundation took numerous actions within and aimed at the United States.  First, in early 2018, Sun and the Tron Foundation entered into a Token Application Listing Agreement with U.S.-based Bittrex to have TRX listed on Bittrex's U.S.-based trading platform.  ECF No. 59 ¶¶ 38-40.  Entering into an "agreement[] with [a] U.S.-based entit[y] to facilitate the trad[ing]" of crypto assets on a "U.S.-based trading platform" is sufficient to establish personal jurisdiction over Sun and the Tron Foundation. *Terraform I*, 2022 WL 2066414, at *3; *see also U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 152 (2d Cir. 2001) (party "'purposely availed itself' of the United States forum by negotiating and forming a contract with an American corporation").  Indeed, alleging that a defendant "'form[ed] a contract with a [U.S.] corporation' is normally enough, by itself, to support jurisdiction." *Terraform II*, 684 F. Supp. 3d at 187.

Second, during Sun's trips to the United States, and using internet communications sent to the U.S., Sun, the Tron Foundation, and the BitTorrent Foundation promoted TRX and BTT to U.S. investors.  The Second Circuit recently held that foreign defendants "purposefully availed themselves of the U.S. by promoting the digital assets at issue in the SEC's investigation to U.S.-based consumers and investors." *Terraform I*, 2022 WL 2066414, at *3.  The Amended Complaint here alleges numerous examples of that same conduct by Sun and the other Sun Defendants. *See* ECF No. 59 ¶¶ 11-13, 28, 40-44, 48-50, 70, 77-78, 85, 88-92, 95, 187-96.  But Sun did not just promote TRX and BTT to U.S. investors from overseas using the internet.  Rather, "in the course of his work on behalf of the Tron Foundation, the BitTorrent Foundation, and/or Rainberry, Sun

travelled extensively to the United States during the time that TRX and BTT were promoted, offered and sold," spending *more than 300 days in the United States* in 2018 and 2019, when TRX and BTT were first offered and sold. *Id*. ¶ 11. During his trips to the U.S. in January 2019, Sun broadcasted a livestream from Rainberry's office in San Francisco and participated in a two-day event before a live audience "to promote the Tron ecosystem, TRX, and BTT." *Id*. ¶¶ 77-78. During those U.S. appearances, Sun displayed Tron and BitTorrent logos, showing investors that he represented those entities. *Id*. Sun's trips to the U.S. to promote the Tron ecosystem, TRX, and BTT further support personal jurisdiction over him, the Tron Foundation, and the BitTorrent Foundation. *See PlexCorps*, 2018 WL 4299983, at \*19 (defendants' trip to Boston "to support the PlexCoin project" was "the quintessential contact supporting personal jurisdiction").

Third, Sun directed the manipulative wash trading of TRX on the Bittrex trading platform, which was based in the U.S. *See* ECF No. 59 ¶¶ 162-64. To carry out the wash trading scheme, Sun led a team of Tron Foundation and Rainberry employees who, at Sun's direction, "artificially inflate[d] the trading volume of TRX through wash trading between accounts controlled by the BitTorrent Foundation, Tron and Rainberry employees, and ultimately Sun." *Id*. ¶ 162; *see also id*. ¶¶ 165-86. This wash trading conducted on a U.S.-based trading platform also independently supports personal jurisdiction over Sun, the Tron Foundation, and the BitTorrent Foundation. *See Stubos*, 634 F. Supp. 3d at 187 (personal jurisdiction existed over foreign defendant who "engaged in manipulative trading" of securities "using the services of the U.S. OTC Markets to create the false appearance of active trading").

Fourth, Sun—on behalf of the Tron Foundation, the BitTorrent Foundation, and Rainberry—paid "celebrities located in the United States, including Defendants Mahone and Way, among others, to promote TRX and BTT on social media." ECF No. 59 ¶ 187; *see also id*. ¶¶ 17,

18, 188-98.  Each celebrity who Sun paid to tout TRX and/or BTT "had at least one million followers on their social media accounts, including followers in the United States." *Id*. at 187. This conduct, too, supports personal jurisdiction over Sun, the Tron Foundation, and the BitTorrent Foundation.  *See Stubos*, 634 F. Supp. 3d at 187 (personal jurisdiction existed over foreign defendant who "pa[id] U.S. promoters" of securities "in furtherance of his scheme"); *PlexCorps*, 2018 WL 4299983, at *16 (use of Facebook accounts to reach "potential United States investors constitute[d] notable contacts" for personal jurisdiction).

Finally, Sun lied to conceal the truth about the celebrity touting and broadcast those lies to his millions of Twitter followers, including followers in the United States.  *See* ECF No. 59 ¶¶ 194-95*; see also id*. ¶ 189 (Sun had millions of followers on Twitter, including followers in the U.S.).  That conduct further confirms the Court's personal jurisdiction over Sun.  *See PlexCorps*, 2018 WL 4299983, at *15 (personal jurisdiction existed over defendants who "purposely disseminated fraudulent messages to Facebook users in the United States"); *see also SEC v. Straub*, 921 F. Supp. 2d 244, 255 (S.D.N.Y. 2013) (personal jurisdiction existed over foreign defendants who engaged in conduct that violated the federal securities laws "and was thus necessarily directed toward the United States, even if not principally directed there").

In sum, the "totality" of the Amended Complaint, taken as true, "portrays a compelling picture of direct involvement with the United States, and of purposeful creation of effects in the United States," by the Sun Defendants.  *PlexCorps*, 2018 WL 4299983, at *19.

### 3.  Sun's Contacts with the United States Are Imputable to His Alter Egos, the Tron Foundation and the BitTorrent Foundation

"If personal jurisdiction exists over an individual, personal jurisdiction exists also over his or her corporate alter ego."  *SEC v. Montle*, 65 F. App'x 749, 752 (2d Cir. 2003).  The corporate form may be disregarded where a company "primarily transacts the business of the dominating

interest rather than its own." *Id*. Additionally, "[e]stablishing the exercise of personal jurisdiction over an alleged alter ego requires application of a less stringent standard than that necessary to pierce the corporate veil for purposes of liability." *SEC v. Aimsi Techs., Inc.*, 650 F. Supp. 2d 296, 301 (S.D.N.Y. 2009). Thus, a court "may use its equitable powers to pierce the corporate veil to prevent fraud and injustice." *Id*. at 302.

The Amended Complaint alleges that Sun owned, controlled, and dominated the actions and dealings of the Tron Foundation and the BitTorrent Foundation, and thus those entities were Sun's alter egos. ECF No. 59 ¶¶ 2, 13-15.[8] The Court has personal jurisdiction over Sun for the reasons outlined above, and so it also has jurisdiction over Sun's alter egos, the Tron Foundation and the BitTorrent Foundation. *See Montle*, 65 F. App'x at 752-53 (personal jurisdiction over individual led to personal jurisdiction over alter ego he "owned and controlled"); *Aimsi Techs.*, 650 F. Supp. 2d at 301-02 (disregarding distinction between individual and entities he "owned and controlled" in order "to prevent fraud and injustice").

### B.   The SEC's Claims Arise Out of or Relate to the Foreign Defendants' Contacts with the United States

The second prong of the personal jurisdiction test considers whether the SEC's claims "arise out of or relate to" the foreign defendants conduct within or aimed at the United States. *Terraform I*, 2022 WL 2066414, at *3. This prong is readily satisfied.

The SEC's first claim for relief alleges violations of the registration provisions of the Securities Act of 1933 ("Securities Act") by the Sun Defendants, arising from certain unregistered offers and sales of TRX and BTT. ECF No. 59 ¶¶ 197-99. The second, third, and fourth claims for relief allege violations of certain antifraud provisions of the Securities Act and the Securities

---

[8]      As explained above, this Court has personal jurisdiction over the Tron Foundation and the BitTorrent Foundation based on their actions directed towards the United States regardless of whether they are Sun's alter egos.

Exchange Act of 1934 ("Exchange Act") by the Sun Defendants, arising from the scheme to wash trade TRX and Sun's lies about the celebrity touting campaign.  *Id*. ¶¶ 200-08.  And the sixth claim for relief alleges aiding and abetting touting violations of the Securities Act by the Sun Defendants, arising from the celebrities' promotion of TRX and BTT.  *Id*. ¶¶ 212-15.  As noted above, all these claims relate to the Sun Defendants' contacts with the United States, including their listing agreement with a U.S. crypto asset trading platform, their trips to the U.S. and other communications to target U.S. investors, their manipulative trading on a U.S. trading platform, and their offers and sales of securities to U.S. investors.

### C.    Exercising Personal Jurisdiction Over the Foreign Defendants Is Reasonable

The final prong of the personal jurisdiction analysis asks whether the exercise of personal jurisdiction is "reasonable under the circumstances."  *Terraform I*, 2022 WL 2066414, at *3.  Relevant precedent shows this is a low bar that the SEC clears here.

Courts typically consider several factors in determining whether personal jurisdiction is reasonable.[9]  But the "reasonableness inquiry is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process[10] because of the strong federal interests involved."  *Stubos*, 634 F. Supp. 3d at 187; *accord PlexCorps*, 2018 WL 4299983, at *20 (the "'strong federal interests' in pursuing securities cases" is "so compelling that … the reasonableness analysis is 'largely academic'").  Although courts consider reasonableness "as a constitutional floor to protect litigants from truly undue burdens, few … have ever declined jurisdiction, on fairness grounds in [securities] cases."  *PlexCorps*, 2018 WL 4299983, at *19.

---

[9]    Those factors are: (1) the burden that exercising jurisdiction would impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in efficient resolution of the controversy; and (5) the interest of the states in furthering substantive social policies.  *See Stubos*, 634 F. Supp. 3d at 186-87; *Straub*, 921 F. Supp. 2d at 258.

[10]    The Securities Act and Exchange Act both authorize nationwide service of process.  *See* Securities Act § 22(a), 15 U.S.C. § 77v(a); Exchange Act § 27(a), 15 U.S.C. § 78aa(a).

That a defendant may reside overseas, or "prefer to litigate this case in a different country," does not make personal jurisdiction here unreasonable. *Stubos*, 634 F. Supp. 3d at 188; *see also PlexCorps*, 2018 WL 4299983, at \*20; *Straub*, 921 F. Supp. 2d at 259.

Here, the SEC has a strong federal interest in pursuing Sun, the Tron Foundation, and the BitTorrent Foundation and ensuring that they are held accountable for violating the federal securities laws. Thus, personal jurisdiction over those defendants is reasonable, as their "conduct was 'purposefully directed toward residents of [the U.S.], and th[is] suit arose from and related directly to those [forum] contacts.'" *Terraform I*, 2022 WL 2066414, at \*3.

### D.    The Foreign Defendants' Jurisdictional Arguments Are Unpersuasive

Although Sun, the Tron Foundation, and the BitTorrent Foundation cast about trying to avoid personal jurisdiction, *see* ECF No. 62 at 11-27, their arguments are not persuasive. First, they argue that the TRX ICO and BTT IEO were not offered or sold to U.S. purchasers, so the SEC must rely on "secondary" market transactions on a U.S.-based platform and other distributions to investors in the U.S. and elsewhere. ECF No. 62 at 11. While the SEC does seek to impose liability based on offers and sales of TRX and BTT that occurred after the first offerings of TRX and BTT, that does not negate the Sun Defendants' conduct aimed at the United States— which is what matters for personal jurisdiction. And recent decisions involving crypto assets show that offers or sales by an issuer on trading platforms are actionable under the federal securities laws. *See SEC v. Coinbase, Inc.*, 2024 WL 1304037, at \*23 (S.D.N.Y. Mar. 27, 2024); *Terraform II*, 684 F. Supp. 3d at 197-98.

Second, the Sun Defendants use the wrong analytical framework. In *Terraform I*, a recent SEC case involving crypto asset securities and foreign defendants, the Second Circuit made clear that the personal jurisdiction analysis employs the three-part test described and applied above. *See*

2022 WL 2066414, at *3.[11]  Rather than follow that framework, the Sun Defendants argue for a

claim-by-claim test not used in relevant SEC enforcement cases.  ECF No. 62 at 12-26.

Third, the Sun Defendants mischaracterize many allegations of the Amended Complaint.

But those efforts should not succeed because, at this stage, the Amended Complaint's factual

allegations must be taken as true.  *Honig*, 2021 WL 276155, at *5.  For example:

- The Sun Defendants allege that, "[w]ith respect to unregistered offerings, the [Amended Complaint] alleges only incidental U.S. contacts and does nothing to connect those contacts to actions by Mr. Sun."  ECF No. 62 at 19.  But the SEC alleges, among other things, that Sun signed an agreement with U.S.-based Bittrex to get TRX listed on Bittrex's U.S.-based platform (ECF No. 59 ¶ 39); and that TRX was offered and sold on Bittrex in unregistered transactions and was sold by the Sun Defendants to U.S. investors (*id*. ¶¶ 55-56); and that Sun traveled to the U.S. to promote the offer and sale of TRX and BTT (*id*. ¶¶ 77-78).

- The Sun Defendants also claim that Sun did not commit fraud "during his alleged time in the United States."  ECF No. 62 at 21.  That is a red herring.  Sun directed a team that engaged in fraudulent wash trading of TRX on the Bittrex platform, which was based in the U.S.  ECF No. 59 ¶ 164.  And "a defendant can 'purposefully avail itself of a forum by directing its agents … to take action there.'"  *Stubos*, 634 F. Supp. 3d at 188.  There is no jurisdictional requirement for a defendant to physically "step foot in the United States" while directing unlawful conduct into the forum.  *Id*.

- As to the celebrity touting campaign, the Sun Defendants assert "there is no allegation that any of this took place in the United States."  ECF No. 62 at 23 (emphasis omitted).  But the SEC alleges that celebrities who Sun paid to tout TRX and BTT lived in the U.S.  *See* ECF No. 59 ¶¶ 17-18, 187, 191-93.

Finally, the Sun Defendants cite cases that are inapposite or distinguishable.  Despite their

lengthy jurisdictional argument, the Sun Defendants cite *only three* SEC enforcement cases in that

argument—*Terraform I*, *Terraform II*, and *SEC v. Sharef*, 924 F. Supp. 2d 539 (S.D.N.Y. 2013).

But the *Terraform* opinions affirmed personal jurisdiction over foreign defendants and support this

---

[11]    Courts sometimes focus on the purposeful availment and reasonableness prongs—and gloss over the arising out of prong—where it is obvious that the SEC's claims arise from the defendant's actions.  *See, e.g., Montle*, 65 F. App'x at 752 (to establish personal jurisdiction, the SEC "need only show" "'minimum contacts' with the United States, and that the assertion of jurisdiction is 'reasonable'"); *Stubos*, 634 F. Supp. 3d at 186 (the personal jurisdiction analysis under the Exchange Act "'has two related components:  the 'minimum contacts inquiry' and the 'reasonableness' inquiry"); *PlexCorps*, 2018 WL 4299983, at *8 (same).

Court doing the same here.  *Sharef* is distinguishable because it involved alleged Foreign Corrupt Practices Act violations against a defendant whose contacts with the U.S. were too attenuated—he "neither authorized the bribe, nor directed the cover up, much less played any role in the falsified filings" with the SEC.  924 F. Supp. 2d at 547.  Here, in contrast, Sun marketed TRX and BTT in the U.S. (ECF No. 59 ¶¶ 11, 40-44, 77-78), directed a wash trading scheme on a U.S.-based trading platform (*id.* ¶¶ 162-86), and paid celebrities in the U.S. to tout securities (*id.* ¶¶ 187-96).  So, *Sharef* is not on point here.

## II.   VENUE IS PROPER IN THIS DISTRICT AND THIS CASE SHOULD NOT BE TRANSFERRED

Rainberry argues that "*if* it is the *only remaining defendant*," then this case should be transferred to the Northern District of California, where Rainberry is located.  ECF No. 62 at 27-28.  That request to transfer venue should be denied.  First, as discussed above, Rainberry should *not* be the only remaining defendant, so the transfer request is based on a faulty premise.

Next, Rainberry again mischaracterizes the Amended Complaint, asserting that "the SEC 'has not shown that any of the operative facts arose in the Southern District of New York.'"  *Id.* at 28.  But the SEC alleges that "multiple investors located in this District—specifically, in New York City—purchased TRX through Bittrex" in unregistered offerings.  ECF No. 59 ¶ 56.  Additionally, at least one resident of this District received TRX through another unregistered offering.  *Id.* ¶ 64.  Plus, the touting tweets by Mahone and Way, and Sun's false tweets to conceal the celebrity touting campaign, were sent to Twitter users in this District and elsewhere.  *Id.* ¶¶ 12, 191, 193-95.  These contacts show that venue is proper in this District because "any nontrivial act in the forum district which helps accomplish a securities law violation is sufficient to establish venue." *SEC v. Milton*, 2022 WL 3156180, at *6 (S.D.N.Y. Aug. 8, 2022).

Finally, "courts must give substantial deference to the plaintiff's choice of venue," and that choice "will hold unless the defendant makes a clear and convincing showing that the balance of convenience favors his choice." *Id*. at *7. Although Rainberry cites the factors that inform the transfer decision, its purported analysis of those factors—one conclusory sentence—is *not* clear and convincing. *See* ECF No. 62 at 28. In short, Rainberry's location in California is not sufficient to overcome the SEC's choice of venue. *See Milton*, 2022 WL 3156180, at *9 (recognizing "deference due" to SEC's choice of forum and declining to transfer venue to states where defendant's office or home were located).

## III. TRX AND BTT WERE OFFERED AND SOLD AS INVESTMENT CONTRACTS AND THUS WERE SECURITIES

Trying to evade the federal securities laws, the Sun Defendants argue that TRX and BTT were not offered or sold as "investment contracts," and thus were not "securities." ECF No. 62 at 38-43. The Sun Defendants are wrong.

### A.    The Securities Act and the *Howey* Test

Section 5 of the Securities Act, 15 U.S.C. § 77e, "makes it unlawful for any person to sell a security in interstate commerce without filing a registration statement," unless an exemption applies. *SEC v. Genesis Glob. Cap., LLC*, 2024 WL 1116877, at *4 (S.D.N.Y. Mar. 13, 2024); *accord SEC v. Cavanagh*, 445 F.3d 105, 111 (2d Cir. 2006). In the Securities Act, to protect investors, "Congress 'enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment.'" *Genesis*, 2024 WL 1116877, at *4 (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990)). "'Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called.'" *Id*. at *5 (emphasis in original).

Section 2(a)(1) of the Securities Act defines "security" to include, among other things, an "investment contract."  *Id*.; *see* 15 U.S.C. § 77b(a)(1).  In *SEC v. W.J. Howey Co*., 328 U.S. 293 (1946), the Supreme Court held that an investment contract "means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts" of others.  *Id*. at 298-99.  Thus, the so-called *Howey* test requires "(i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others."  *Genesis*, 2024 WL 1116877, at *5.

As this Court observed, the "definition of investment contract 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'"  *Id*. (quoting *SEC v. Telegram Grp. Inc*., 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020), and *Howey*, 328 U.S. at 299).  Additionally, in conducting the *Howey* test, "form should be disregarded for substance and the emphasis should be on economic reality."  *Genesis*, 2024 WL 1116877, at *5 (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)).

### B.    The Sun Defendants' *Howey* Arguments Fail

The Amended Complaint alleges that TRX and BTT were offered and sold as investment contracts and thus securities.  *See, e.g.*, ECF No. 59 ¶¶ 51, 96.  The Sun Defendants advance three narrow arguments about why the offerings here supposedly fail the *Howey* test.  *See* ECF No. 62 at 38-43.[12]  As shown below, it is the Sun Defendants' arguments that flunk.

---

[12]    The Sun Defendants challenge only certain elements of the *Howey* test—specifically, the first and third prongs of the test—as applied to certain offerings alleged in the Amended Complaint.  *See* ECF No. 62 at 38-43.  This brief addresses the elements that the Sun Defendants challenge and rebuts their arguments.

1.     **The Alleged Sales by the Sun Defendants—the Issuers of TRX—
Directly on Trading Platforms Satisfy *Howey***

The Amended Complaint alleges that Sun and the Tron Foundation offered and sold

hundreds of millions of TRX to investors, including investors in the U.S., in primary offerings on

the U.S.-based Bittrex platform.   ECF No. 59 ¶ 56.   The Sun Defendants claim that those

transactions fail the *Howey* test because they were "secondary market sales."  ECF No. 62 at 42.

Their argument is based on *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308 (S.D.N.Y. 2023), in

which Judge Torres concluded that the "blind bid/ask transactions" at issue in that case did not

pass "the third *Howey* prong."   *Id.* at 328.   But as Judge Torres explained, the decision in *Ripple*

was made at the summary judgment stage based on the "totality of circumstances" in the summary

judgment record, including the dissemination of other materials and differing terms of the

particular contracts of sale at issue in that case.   *Id.* at 330; *see also SEC v. Ripple Labs, Inc.*, 2023

WL 6445969, at *3-4 (S.D.N.Y. Oct. 13, 2023) (explaining ruling was limited "to the unique facts

and circumstances of th[at] case," and based in part on supposed differing marketing materials but

"did not hold that offers and sales on a digital asset exchange cannot create a reasonable

expectation of profits based on the efforts of others").

The Amended Complaint, by contrast, alleges that *all* investors received the same

marketing communications and other public statements by promoters and issuers.   On a motion to

dismiss, there is no factual basis upon which to distinguish the reasonable expectations of profits

from one investor to the next.   *See SEC v. Xia*, 2022 WL 17539124, at *20 (E.D.N.Y. Dec. 8,

2022) ("the inquiry under *Howey* is objective, and the investors' subjective motivations are

categorically immaterial").   Similarly, in *Terraform II*, Judge Rakoff squarely "reject[ed]" *Ripple*'s

distinction between offers and sales by the issuer that occurred on or off a trading platform.   684

F. Supp. 3d at 197.   As Judge Rakoff explained:

*Howey* makes no such distinction between purchasers. And it makes good sense that it did not. That a purchaser bought the coins directly from the defendants or, instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts.

*Id.*; *see also Coinbase*, 2024 WL 1304037, at *23 (agreeing with *Terraform II* that the federal securities laws do not draw distinctions based on the manner or location of sale); *In re Ripple Labs, Inc. Litig.*, 2024 WL 3074379, at *8-10 (N.D. Cal. June 20, 2024) (same, citing *Terraform II* and *Coinbase*). Consistent with *Howey*, *Terraform II*, and *Coinbase*, this Court should reject the Sun Defendants' attempt to exclude sales from the definition of an investment contract simply because they occurred on a trading platform rather than elsewhere.

### 2.    The BTT Airdrops Alleged Here Satisfy *Howey*'s First Prong

The Sun Defendants argue that airdrops of BTT did not involve an investment of money or risk of loss under "*Howey*'s first prong." ECF No. 62 at 42. That argument misconstrues the Amended Complaint and relevant law.

Regarding *Howey*'s investment of money prong, "it is well established that cash is not the only form of contribution or investment that will create an investment contract. Instead, the 'investment' may take the form of 'goods and services' … or some other 'exchange of value.'" *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991). Here, the airdrops of BTT were not sent to random people; they were only sent to "TRX holders." ECF No. 59 ¶ 101. Investors thus "had to purchase and hold TRX to be eligible for airdrops of BTT." *Id.* ¶ 102. Purchasing TRX—with fiat currency or another crypto asset—is an "exchange of value." *Uselton*, 940 F.2d at 574; *see also Telegram*, 448 F. Supp. 3d at 368-69 (purchasers "invested money by providing dollars or euros in exchange for the future delivery of Grams"). Also, by purchasing and holding TRX, investors provided the Sun Defendants with valuable consideration, including (i) increased demand for TRX, (ii) increased TRX trading volume and

liquidity, (iii) upward pressure on TRX's price, (iv) promotion of BTT to TRX investors, and (v) the development of a secondary market for BTT trading. ECF No. 59 ¶ 117. This, too, constitutes an "exchange of value." *Uselton*, 940 F.2d at 574.

And contrary to the Sun Defendants' suggestion, investors seeking airdrops were subject to a risk of loss. For example, they risked loss if the value of TRX and/or BTT decreased, or if the Tron ecosystem did not develop as planned or failed altogether. *See Coinbase*, 2024 WL 1304037, at *31 ("broader risks—including failures by Coinbase or of the underlying protocol—are also inherent in the investments … and are thus sufficient to demonstrate a risk of loss").

### 3.      The Alleged Distributions Via Social Media Promotions Meet *Howey*

Regarding the offers and sales of TRX and BTT based on various social media distributions (ECF No. 59 ¶¶ 57-68, 118-61), the Sun Defendants claim they did not involve an investment of money under "*Howey*'s first prong" or a reasonable expectation of profits from the efforts of others under "*Howey*'s third prong." ECF No. 62 at 39-41. Not so.

***Contest Participants Invested Money***.   Again, the necessary investment of money may take the form of (1) "cash," (2) "goods and services," or (3) any other "exchange of value." *Uselton*, 940 F.2d at 574. Here, for each of the contests to receive TRX or BTT, the Sun Defendants dictated that participants had to perform specific tasks—typically involving promotion of the Tron ecosystem, TRX, or BTT online or on social media. ECF No. 59 ¶¶ 119, 127, 133, 138, 143, 148, 153, 159. Importantly, TRX and BTT were *not* distributed to people who did not perform these tasks; the tokens were provided *only* to people who provided the services that the Sun Defendants requested. By performing those specific tasks, participants provided "valuable consideration" in the form of advertising and publicity for Tron, TRX, and BTT. *Id*. ¶¶ 123, 129, 134, 139, 145, 149, 155, 160. Construing the Amended Complaint in the light most favorable to the SEC, *Howey*'s first prong is satisfied. *See Uselton*, 940 F.2d at 574.

The Sun Defendants' argument to the contrary, *see* ECF No. 62 at 39, is based on *Ripple*, where Judge Torres concluded that certain distributions did not satisfy *Howey*'s investment of money prong because the recipients "did not pay money or 'some tangible and definable consideration' to Ripple."  682 F. Supp. 3d at 330.  Here, in contrast, the contest participants provided the exact definable consideration—certain tasks performed online or on social media—that the Sun Defendants requested.  Additionally, contrary to the Sun Defendants' suggestion, *see* ECF No. 62 at 39-40, there is no requirement to precisely "quantify" the monetary value of the consideration provided.  *See Uselton*, 940 F.2d at 574-75.[13]

**Contest Participants Expected Profits from the Efforts of Others**.  Although *Howey*'s third prong refers to an expectation of profits "solely" from the efforts of others, "the word 'solely' should not be construed as a literal limitation."  *Genesis*, 2024 WL 1116877, at *8 (quoting *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008)).  "Instead, the court asks 'whether, under all the circumstances, the scheme was being promoted primarily as an investment ….'"  *Id*.  "This is an objective test that examines 'what purchasers were led to expect by the promoter.'"  *Id*.

Here, the Sun Defendants made numerous public statements promoting TRX and BTT as investments with the potential for profits.  *See, e.g.*, ECF No. 59 ¶¶ 34, 41-42, 47-49, 77-78, 88-92.  Thus, it is at least plausible—if not inescapable—to infer that participants undertook these contest efforts because they wanted to receive TRX and BTT with the reasonable expectation of enjoying profits as the tokens rose in value.  *See Genesis*, 2024 WL 1116877, at *8 (complaint sufficiently alleged an expectation of profits where defendants marketed their program "as an investment opportunity and publicly touted investors' ability to earn returns"); *SEC v. Kik*

---

[13]     As to the Sun Defendants' claim that there was no "risk of loss," ECF No. 62 at 41, that is incorrect. Participants who provided services in exchange for winning TRX or BTT bore the risk that the tokens received would lose value or that the Tron ecosystem might fail to develop.  *See Coinbase*, 2024 WL 1304037, at *31.

*Interactive Inc.*, 492 F. Supp. 3d 169, 179-80 (S.D.N.Y. 2020) (expectation of profits prong was satisfied where defendant touted Kin's profit-making potential in public statements).

Additionally, the potential profits derived from the increase in value of TRX and BTT were based on the Sun Defendants' efforts to make the Tron ecosystem successful, not on the contest participants' own efforts.  *See* ECF No. 59 ¶¶ 33, 41, 46, 47-49, 70, 77-78, 88-89.  In other words, the Sun Defendants provided the "undeniably significant" managerial and entrepreneurial efforts needed to build the Tron ecosystem and make it successful.  *See Coinbase*, 2024 WL 1304037, at *32.  The efforts of those who participated in the promotions certainly had value to Tron but were not the "undeniably significant" efforts under *Howey*.  *Id.*  Thus, the Amended Complaint adequately alleges that "investors were depending on [the Sun Defendants'] efforts to generate profits."  *Genesis*, 2024 WL 1116877, at *9; *see also Kik*, 492 F. Supp. 3d at 180 (finding that growth of investment "would rely heavily on Kik's entrepreneurial and managerial efforts").

## IV.   THE SUN DEFENDANTS' CONDUCT IS WITHIN THE TERRITORIAL REACH OF THE FEDERAL SECURITIES LAWS

The Sun Defendants also claim that their conduct falls outside the territorial reach of the federal securities laws, asserting that the SEC has not alleged domestic unregistered offers or sales of securities and, as to the fraud claims, that the SEC has not alleged sufficient "conduct or effects" within the United States.  ECF No. 62 at 31-38.  But the Amended Complaint alleges domestic violations of the anti-fraud and the registration provisions.  Thus, the Court should not dismiss any claim on territoriality grounds.

Courts presume that, absent a clearly expressed congressional intent to the contrary, federal laws have only domestic application and cannot be applied extraterritorially.  *See Abitron Austria GmbH v. Hetronic Int'l Inc.*, 600 U.S. 412, 417-18 (2023).  Extraterritoriality is a two-step inquiry: (1) whether the presumption against extraterritorial application has been rebutted and, if not, (2)

whether the case involves a domestic application of the statute.  *Id.*  A court may begin its analysis at step two if the plaintiff has alleged only domestic violations.  *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413-14 (2018).  Step two assesses whether "the conduct relevant to the statute's focus occurred in the United States"; if so, the case involves a permissible domestic application even if other conduct occurred abroad.  *Id.* at 414; *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 913 (D.C. Cir. 2018) (same).

The SEC's fraud claims are domestic under the statutory provisions governing those claims.  As to the non-fraud claims, the SEC has alleged domestic violations under step two because the conduct relevant to the statute's focus—the offer and sale of unregistered securities and the promotion of securities without proper disclosure—occurred in the United States.

### A. The SEC's Fraud Claims Are Governed by the Conduct or Effects Test, and Those Claims Pass the Test

Congress explicitly authorized federal courts to exercise jurisdiction over SEC actions alleging violations of the antifraud provisions of the federal securities laws involving: "(1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors, or (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States."  15 U.S.C. § 78aa(b) ("Dodd-Frank").

As courts have consistently acknowledged since the 2010 enactment of this statutory provision, "Congress … affirmatively and unmistakably indicated that the antifraud provisions of the federal securities acts apply extraterritorially when the statutory conduct-and-effects test is met."  *SEC v. Scoville*, 913 F.3d 1204, 1218 (10th Cir. 2019) (cleaned up); *accord SEC v. Morrone*, 997 F.3d 52, 60 n.7 (1st Cir. 2021).  This provision "permits the SEC to bring enforcement actions for certain conduct or transactions outside the United States."  *Meng-Lin Liu v. Siemens A.G.*, 978

F. Supp. 2d 325, 328 (S.D.N.Y. 2013), *aff'd*, 763 F.3d 175 (2d Cir. 2014); *see also SEC v. Gruss*, 859 F. Supp. 2d 653, 664 (S.D.N.Y. 2012) (SEC can bring actions "extraterritorially in certain cases").  The Sun Defendants do not contest that this statutory language applies here and should guide the Court's analysis.  *See* ECF No. 62 at 36 n.24.

Although the statute is disjunctive and requires the SEC to allege only conduct *or* effects within the United States, the Amended Complaint alleges both.  Significant steps in furtherance of the wash trading scheme occurred here: the wash trading occurred on Bittrex, a U.S. trading platform (ECF No. 59 ¶ 164); the wash trading occurred, in part, in the accounts of two U.S.-based Rainberry employees (*id*. ¶¶ 170, 173); and money from one of Rainberry's U.S. bank accounts was transferred to one of the U.S. employees to fund the wash trading (*id*. ¶ 172).  The wash trading scheme also had a foreseeable substantial effect in the United States because it manipulated the U.S. securities markets by creating for U.S. investors and others, who traded on Bittrex, the false appearance of increased trading volume, and it artificially kept the price of TRX stable as Sun and the Tron Foundation sold their tokens.  *Id.* ¶¶ 165-66.[14]

The Sun Defendants' attempts to show that the wash trading scheme did not involve significant steps or substantial foreseeable effects within the United States fail.  First, they wrongly argue that the SEC does not allege wrongful conduct by any defendant.  In fact, the Amended Complaint alleges that Sun directed employees of the Tron Foundation and Rainberry to conduct the illegal trading, partly in accounts controlled by the BitTorrent Foundation, and partly in an account funded by Rainberry with the approval of Rainberry's CFO.  *Id.* ¶¶ 162, 171-72, 184. They then try to minimize the fact that their illegal trading—the heart of their scheme—occurred in part on Bittrex, and therefore in the United States, with an artful citation to *Euro Trade &*

---

[14]      The Sun Defendants make no extraterritoriality argument regarding Sun's material misrepresentations that TRX did not pay for celebrity promotions.  *See* ECF No. 59 ¶¶ 194-196.

*Forfaiting, Inc., v. Vowell*, 2002 WL 500672 (S.D.N.Y. Mar. 29, 2002), but that case is readily distinguishable.  There, the defendant allegedly engaged in wash trading in the United States to increase the share price of a U.S. company, but the "actual fraud" was "the pledge and payment" of shares at an artificially inflated price, and that transaction occurred abroad and involved only foreign parties.  *Id.* at *7.  The court held that the wash trading was "merely preparatory" to the conduct that caused the plaintiff's losses.  *Id.*  Here, the Sun Defendants' wash trading was not preparatory to their actual fraud or violative conduct; it was the actual fraud and the violation. Alternatively, the Sun Defendants' wash trading "ma[de] it easier for Sun and the Tron Foundation to sell TRX while keeping its price stable," ECF No. 59 ¶ 166, and those sales (at artificially high prices) included sales to U.S. investors on Bittrex. *Id.* ¶ 56.  Either way, the "actual fraud" occurred in the United States.

The Sun Defendants next argue that under the "effects" test, the SEC has not alleged that U.S. investors were the intended victims of their wash trading and emphasize that the SEC has not claimed that any investors were actually harmed.  ECF No. 62 at 37-38.  But the Amended Complaint alleges just that—the Sun Defendants manipulated the market for TRX with their wash trading and then sold into that market to U.S. investors.  ECF No. 59 ¶¶ 166, 56.  Again, the cases they cite do not help their cause.  In *Interbrew v. EdperBrascan Corp.*, 23 F. Supp. 2d 425 (S.D.N.Y. 1998), a Belgian plaintiff alleged fraud by a Canadian defendant in connection with the purchase of a Canadian corporation, whose stock traded on a Canadian stock exchange. *Id.* at 429. U.S. investors were not the victims of that fraud, and so the court held that the "effects" test was not met.  In *Norex Petroleum Ltd. v. Access Indus., Inc.*, 540 F. Supp. 2d 438 (S.D.N.Y. 2007), the court held that the "effects" test was not met where the plaintiff alleged that the defendant harmed "corporations in which U.S. entities may have at times invested, by means of suppressed

competition, diverted profits or the takeover of affiliates," as opposed to harming U.S. investors directly. *Id.* at 446. Neither case involved a market manipulation that directly harmed U.S. investors by artificially inflating trading volume and propping up the price those investors paid in the manipulated market. *See* ECF No. 59 ¶¶ 56, 166.

> **B.** **As to the Non-Fraud Claims, the SEC Alleges Domestic Violations of the Registration Provisions of the Securities Act**

>> **1.** **The Sun Defendants Targeted U.S. Investors with Unregistered Offers of TRX and BTT**

To determine whether "conduct relevant to the statute's focus occurred in the United States," as required in step two of the territoriality inquiry, the Court must first ascertain the "focus" of the statute. *Abitron*, 600 U.S. at 418. The focus of a statute is the "object of the [statute's] solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." *Id.* (cleaned up).

Section 5 of the Securities Act proscribes using domestic instrumentalities to make an unregistered *offer* of securities, which does not require a completed transaction. 15 U.S.C. § 77e(a), (c). "Offer" is defined broadly: "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." *Id.* § 77b(a)(3).

The aim of Section 5 is "to protect United States investors and United States financial markets from the offer of unregistered securities." *SEC v. Balina*, 2024 WL 2332965, at *6 (W.D. Tex. May 22, 2024); *accord Genesis*, 2024 WL 1116877, at *4. It intends "to assure full and fair disclosure in connection with the public distribution of securities" in the United States "to prevent the offer of securities *in the United States securities market* without accompanying standardized disclosures to aid investors." *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 126 (2d Cir. 1998), *abrogated on other grounds*, *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010). The Second Circuit has explained that "in keeping with

Congress's purpose, the registration provisions should apply to those offers of unregistered securities that tend to have the effect of creating a market for unregistered securities *in the United States*." *Id.* Thus, the statute's focus (as to offers) is the offer of securities in the U.S. securities market, and that conduct is "domestic" if directed to the U.S.—*i.e.*, to U.S. investors. *Balina*, 2024 WL 2332965, at *6.[15]

Here, the Sun Defendants targeted U.S. investors with unregistered offers of TRX. On September 18, 2018, the Tron Foundation tweeted, "[y]ou can now buy $TRX directly with USD on @BittrexExchange." *Id*. ¶ 42. That tweet linked to a Global Coin Report post stating, "[T]his is the first time that Tron has been paired with the USD in the United States." *Id.* That same day, Sun tweeted, "#TRX already can be traded on @BittrexExchange, $USD markets, $USD/ $TRX. First #TRX fiat trading pair in US. Go #TRON. Go #TRONICS. #TRON to the future." *Id.* ¶ 43. And in December 2019, Sun retweeted a post from another individual, stating that investors in the United States could trade TRX "pretty much everywhere, especially with a VPN." *Id*. ¶ 44. Sun's retweet announced, "[w]e will make $TRX available for all [United States flag emoji] users! More options are on the way!" *Id.*

The Sun Defendants also targeted U.S. investors with their unregistered offers of BTT. On January 5, 2019, Sun posted a livestream to YouTube in which he encouraged U.S. investors to "use the bitcoin … or any cryptocurrency to buy the BTT in the future," despite apparent restrictions on U.S. investors' participation in the BTT IEO. *Id*. ¶ 95. On May 11, 2021, the

---

[15]     To avoid applying this statutory language extraterritorially, the SEC has explained that "offer" and "sale" as used in Section 5 excludes offerings that are exclusively foreign. *See* Regulation S, Rule 901, 17 C.F.R. § 230.901.3. This includes situations where no offers are made to "a person in the United States." *Id.* § 230.902(h)(1) (defining "offshore transaction"); *id.* § 230.903(a) (requiring "offshore transactions," and that "no directed selling efforts are made in the United States by the issuer" or anyone associated with it). Thus, Regulation S reflects the judicial presumption against extraterritoriality, while preserving the interests of U.S. investors consistent with Section 5's broad statutory language.

@BitTorrent Twitter account posted a link to a video with information "for those who doesn't [sic] know how to buy #BTT in the U.S." *Id.* After cultivating a domestic market for TRX and BTT, the Sun Defendants then made offers and sales into that market. *Id.* ¶¶ 55-68, 100-61. Such domestic conduct is actionable under the federal securities laws.

The Sun Defendants dedicate only one footnote to the question of whether their offers were domestic. Citing *SEC v. Ripple Labs, Inc.*, 2022 WL 762966, at *12 (S.D.N.Y. Mar. 11, 2022) and *SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011), they contend that only the location of the offeror is relevant and that the Amended Complaint is silent on that point. ECF No. 62 at 34 n.20. That argument ignores that the Amended Complaint alleges Sun was physically present in the United States promoting TRX on behalf of the Tron Foundation for approximately 300 days in 2018 and 2019, the period in which he and the Tron Foundation were offering and selling TRX to investors, including multiple events in San Francisco in January 2019. ECF No. 56 ¶¶ 11, 77-78. And Rainberry, an offeror of BTT, was at all times located in California. *Id.* ¶ 16. In any event, the court in *Balina* rejected the notion that only the location of the offeror determines the domesticity of an offer because it disagreed that the focus of the statute is only on the offeror. *See Balina*, 2024 WL 2332965, at *6. The registration provisions of the Securities Act protect the integrity of the U.S. markets, and the physical location of an offeror targeting U.S. investors is largely irrelevant to that purpose. *Id.*

### 2.     The Sun Defendants Made Domestic Sales of TRX and BTT

Section 5 also applies to the Sun Defendants conduct because they made domestic unregistered sales of securities. *See Balina*, 2024 WL 2332965, at *6 (engaging in separate domesticity analyses for "offers" and "sales"). The parties agree that the transactional test articulated in *Morrison* applies to the Sun Defendants' sales of TRX and BTT.

The Amended Complaint expressly alleges domestic sales of TRX and BTT because it alleges that United States investors bought these securities while in the United States. *See* ECF No. 59 ¶¶ 53, 56, 64, 68, 98, 112. Under *Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024), these allegations sufficiently allege that a transaction is domestic. *Id.* at 140. In *Binance*, the Second Circuit explained that a securities transaction can occur in more than one place and that one of those places is where the purchaser is physically located when he "irrevocably" commits to a transaction, often by placing a purchase order and transferring payment. *Id.* at 139-40. The Amended Complaint clearly satisfies this requirement.

The Sun Defendants try to dismiss these allegations as "rote and conclusory," and they acknowledge but ignore the holding of *Binance*. ECF No. 62 at 32. They argue that the Court should adopt the test set forth in *Williams v. Block one*, 2022 WL 5294189, at *6 (S.D.N.Y. Aug. 15, 2022), which relied in relevant part on the district court opinion that *Binance reversed* to claim that the physical location of a purchaser when he irrevocably commits is not determinative. *See id.* at *6 and n.64. *Block one* looked only to where orders were matched or confirmed, but *Binance* makes clear that while matching may be *one way* to establish where a transaction occurred, others include the physical location of the purchaser, which has been sufficiently alleged here, or sales on a crypto asset trading platform located in the United States—in this case, Bittrex. *See Binance*, 96 F.4th at 139-40 (trades on platform that eschewed jurisdiction in any location).

Finally, the Sun Defendants argue that all transactions alleged are so "predominantly foreign" that U.S. law should not apply to them. ECF No. 62 at 33-34 (citing *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 163 (2d Cir. 2021); *Parkcentral Glob. HUB Ltd.*

*v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215-16 (2d Cir. 2014)).[16]  Neither of those cases is similar to this one, where the Sun Defendants directly transacted with investors who irrevocably committed to purchasing TRX and BTT while in the U.S.  *Parkcentral* involved swap agreements that were entered into in the United States, but 1) those transactions did not actually involve the purchase, sale or exchange of securities, 2) the (foreign) defendants were not a party to those transactions, and 3) the underlying security traded on a foreign exchange.  *See Parkcentral*, 763 F.3d at 202-06.  None of those facts pertains here.  *Cavello Bay* involved only foreign parties, *see* 986 F.3d at 167, and the Second Circuit held that applying U.S. law to their private transaction would not "enhance confidence in U.S. securities markets or protect U.S. investors," so it concluded the transactions were so predominantly foreign that U.S. law should not apply.  *Id.* Here, the opposite is true here.  Applying the federal securities laws to the Sun Defendants' unregistered offers and sales would protect the U.S. markets and U.S. investors, and no precedent supports declining to do so on the facts alleged in the Amended Complaint.[17]

## V.    THE SEC'S CLAIMS ARE PLED SUFFICIENTLY

The SEC's non-fraud claims are governed by Federal Rule of Civil Procedure 8(a) and require only a "short and plain statement of the claim[s]" showing that they are facially plausible, whereas the fraud claims are governed by Rule 9(b) and must be pled "with particularity."  *SEC v. Alpert*, 2018 WL 1156012, at *2 (S.D.N.Y. Mar. 2, 2018).  These standards, taken together, require

---

[16]      In *Parkcentral*, the Second Circuit held that a domestic transaction is "necessary but not necessarily sufficient to make § 10(b) applicable."  *Id.* at 216.  Multiple courts outside the Second Circuit have declined to adopt this holding, reasoning that it is contrary to *Morrison*.  *See Balina*, 2024 WL 2332965, at *8 (collecting cases).  In any event, as explained above, the Sun Defendants' sales to U.S. investors were not predominantly foreign.

[17]      The Sun Defendants make no specific extraterritoriality argument regarding the SEC's claim that they aided and abetted touting violations of Section 17(b) of the Securities Act.  Thus, their only territoriality argument regarding the touting claims is that the SEC has not alleged domestic securities transactions.  But a violation of Section 17(b) is complete when the security is promoted without disclosure of compensation received for that promotion; no securities transaction need occur.  *See* 15 U.S.C. § 77q(b).  The transactional test that the Sun Defendants advocate does not apply to violations of Section 17(b).  *See Balina*, 2024 WL 2332965, at *6.

the SEC to plead allegations that "support a plausible inference that it is more likely than not that a securities law violation has been committed." *Honig*, 2021 WL 276155, at *5. For purposes of assessing plausibility, "the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor." *Id*.

The Sun Defendants contend that certain claims in the Amended Complaint are not sufficiently alleged under the relevant pleading standards. ECF No. 62 at 28-30, 43-49.[18] But construing the Amended Complaint in the SEC's favor, the SEC's claims are adequately pled and the Sun Defendants' arguments are without merit.

### A.    The Amended Complaint Does Not Use Impermissible Group Pleading

In a sweeping argument, the Sun Defendants claim that the SEC's use of the phrase "Sun Defendants" constitutes "impermissible group pleading," warranting dismissal of all claims. *Id*. at 28-29. Yet the phrase Sun Defendants is simply a shorthand way to distinguish Sun and the entities he owned and controlled (the Tron Foundation, the BitTorrent Foundation, and Rainberry) from the other Defendants (Mahone and Way). There is no prohibition on using a word or phrase, like "Sun Defendants," to refer to related defendants so long as the complaint "inform[s] each defendant of the nature of [its] participation" in the claims alleged. *Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 171-72 (2d Cir. 2015) (complaint pled fraud with particularity even though it referred to "three Wachovia entities who acted together," collectively, as "Wachovia"); *see also SEC v. U.S. Env't'l, Inc.*, 82 F. Supp. 2d 237, 241 (S.D.N.Y. 2000) (rejecting group pleading argument where defendant could "ascertain what part he is alleged to have played in the stock manipulation").

---

[18]    Beyond several broad arguments directed at all claims, as to pleading requirements the Sun Defendants specifically challenge Counts 2 and 4 (securities fraud), 3 (market manipulation), and 6 (aiding and abetting touting violations). *See* ECF No. 62 at 43-49. They do not mount a pleading challenge to Count 1 (registration violations).

Moreover, the purported group pleading argument is especially weak here, where the Amended Complaint does not use a generic term, like "Defendants," to lump together multiple unrelated people or entities.  Instead, the lynchpin of the Sun Defendants is Sun himself, and the other Sun Defendants' liability flows from Sun's actions.  As another court explained in similar circumstances, the group pleading argument fails where an individual defendant "is alleged to be at the center of the scheme, and [an entity] is alleged to be liable for [the individual's] conduct because [he] acted in furtherance of the fraud on the entity's behalf."  *SEC v. Mintz*, 2024 WL 1173096, at *17 (D.N.J. Mar. 18, 2024).  And that is especially so here, where Sun's own actions (*see* ECF No. 59 ¶¶ 13, 77-78) blurred the distinctions among the entities that he owned, controlled, and acted through.  *See Lorely Fin.*, 797 F.3d at 173 (rejecting group pleading argument where related defendants' actions created a "lack of transparency in identifying which entity was communicating to prospective investors").[19]

Additionally, despite the Sun Defendants' assertion, *see* ECF No. 62 at 29, the SEC's allegations that the Tron Foundation, the BitTorrent Foundation, and Rainberry were Sun's alter egos are sufficient.[20]  Alter ego status may be found where an entity "primarily transacts the business of the dominating interest rather than its own."  *Montle*, 65 F. App'x at 752; *see also id*. at 752-53 (entity was alter ego where it was "completely owned and controlled" by an individual and it exclusively transacted the business of his dominating interest).  Here, the SEC alleges that Sun owned, controlled, and dominated the interests of the Tron Foundation, the BitTorrent

---

[19]    The Sun Defendants cite several cases for the proposition that a complaint may not simply "lump defendants together for pleading purposes."  ECF No. 62 at 28-29.  But that proposition does not help the Sun Defendants because, as explained herein, and the conduct alleged against each defendant is readily discernable.

[20]    The Sun Defendants claim the alter ego issue should be evaluated under Singapore law.  ECF No. 62 at 29.  But this case arises under federal law and "federal common law governs alter-ego theories 'when a federal interest is implicated in the decision of whether to pierce the corporate veil.'"  *In re Platinum and Palladium Antitrust Litig.*, 61 F.4th 242, 275 n.11 (2d Cir. 2023).  There is a strong federal interest here in holding all the Sun Defendants accountable for violating the federal securities laws.

Foundation, and Rainberry.  ECF No. 59 ¶ 13.  Sun founded the Tron Foundation and BitTorrent Foundation, owned and controlled them, and used them develop Tron and conduct the offerings of TRX and BTT.  *Id*. ¶¶ 14-15.  Similarly, Sun bought Rainberry, owned and controlled it, and used it to conduct the offerings of BTT.  *Id*. ¶¶ 16, 69.  Sun also used these entities to conduct his wash trading scheme, *see id*. ¶¶ 162-86, and his celebrity touting campaign, *see id*. ¶¶ 187-93.  At this stage, these allegations show alter ego status.  *See Montle*, 65 F. App'x at 752-53.[21]

In short, each Sun Defendant's liability arises from the same fact pattern alleged in the Amended Complaint, with Sun at the heart of it all.  Because the Sun Defendants "were aware of the same set of underlying facts, and … it was this common set of facts" that gave rise to their liability, there is no "impermissible use of 'group pleading.'"  *Straub*, 921 F. Supp. 2d at 267.

## B.  The Amended Complaint Sufficiently Alleges Market Manipulation

The Sun Defendants challenge the SEC's market manipulation claims (Count 3) under Exchange Act Sections 9(a)(1) and 9(a)(2) as being "insufficient and illogical."  ECF No. 62 at 43. They are neither.

As a case cited by the Sun Defendants explains, the elements of a claim under Section 9(a)(1) are "(1) a wash sale or matched orders in a security, (2) done with scienter and (3) for the purpose of creating a false or misleading appearance of active trading in that security."  *SEC v. Competitive Techs., Inc.*, 2005 WL 1719725, at *6 (D. Conn. July 21, 2005) (quoting *SEC v. Malenfant*, 784 F. Supp. 141, 144 (S.D.N.Y. 1992)).  Similarly, the elements of a claim under

---

[21] The Sun Defendants attempt to dispute that Sun controlled the other Sun Defendants (ECF No. 62 at 29), but the cases they cite show why the SEC's control allegations are sufficient.  For example, in their lead case, *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65 (2d Cir. 1996), plaintiffs brought a RICO case and claimed that Sears, Roebuck & Co. (a large company) controlled the actions of Allstate Insurance Company (another large company).  *Id*. at 69.  But plaintiffs alleged no specific facts to show Sears' "actual domination" of Allstate, so the RICO claim against Sears was dismissed.  *Id*. at 69-70.  Here, in contrast, the SEC does not allege that one massive company controls another; it alleges that one person (Sun) dominated the actions of three entities that he wholly owned and controlled, and the factual allegations highlighted above substantiate the SEC's claim.

Section 9(a)(2) are "(1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter and (3) for the purpose of inducing the security's sale or purchase by others." *Id*.[22]

Here, each element is sufficiently alleged. Regarding Section 9(a)(1), the Amended Complaint alleges (1) wash trading in TRX (ECF No. 59 ¶¶ 162-64, 166-85), (2) done intentionally or recklessly (*id*. ¶¶ 162, 164, 166, 167-85), and (3) for the purpose of creating "the false and misleading appearance of legitimate, active TRX trading" (*id*. ¶ 166). Likewise, regarding Section 9(a)(2), the Amended Complaint alleges (1) a series of transactions in TRX creating actual or apparent trading in that security to inflate trading volume and keep the price stable (*id*. ¶¶ 162, 166, 178-85), (2) carried out intentionally or recklessly (*id*. ¶¶ 162, 164, 166, 167-85), and (3) for the purpose of "inducing the purchase or sale of TRX by others and making it easier for Sun and the Tron Foundation to sell TRX" at a more favorable price (*id*. ¶ 166).[23]

The Sun Defendants' assertions that the wash trading was "not done for any improper purpose" and only occurred in "small amounts" (ECF No. 62 at 44) may be disposed of quickly. First, as alleged, the wash trading scheme was done intentionally or recklessly to artificially inflate trading volume; it involved the opening and use of nominee accounts to facilitate the trading

---

[22]    Market manipulation also is actionable under Securities Act § 17(a) and Exchange Act § 10(b) and Rule 10b-5 where the SEC alleges "[1] what manipulative acts were performed, [2] which defendants performed them, [3] when the manipulative acts were performed, and [4] what effect the scheme had on the market for the securities at issue." *U.S. Envt'l*, 82 F. Supp. 2d at 240 & n.2 (brackets added). The SEC alleges each element here. The manipulative acts were wash trades that did not involve any change of beneficial ownership; Sun directed the trading, which was carried out by personnel from the Tron Foundation, the BitTorrent Foundation, and Rainberry; the trading scheme occurred from February 2018 through February 2019; and the scheme artificially inflated the trading volume of TRX. *See* ECF No. 59 ¶¶ 162-86. Thus, the Sun Defendants' wash trading scheme triggers liability under Counts 2 and 4, in addition to Count 3.

[23]    The Sun Defendants' assertion that the wash trades of TRX "are not alleged with any specificity" (ECF No. 62 at 44) is puzzling to say the least. In fact, the Amended Complaint provides illustrative examples of the wash trades with granular specificity. *See* ECF No. 59 ¶¶ 180, 182. Likewise, the Sun Defendants' claim that the wash trades did not affect TRX's "price" for purposes of Section 9(a)(2), ECF No. 62 at 44, ring hollow because the statute is violated by transactions aimed at "creating actual or apparent trading in [a] security *or* raising or depressing the price." *Competitive Techs*., 2005 WL 1719725, at *6. So, wash trades to artificially inflate trading volume (ECF No. 59 ¶ 162) are sufficient. In any event, the SEC also alleged that wash trading affected TRX's price. *Id*. ¶ 166.

(additional deceptive conduct); and it did not involve any change in beneficial ownership. *See* ECF No. 59 ¶¶ 162, 166-85. At this stage, the SEC's allegations must be accepted as true. *See Honig*, 2021 WL 276155, at *5. The Sun Defendants may argue about the purpose behind their actions at summary judgment or trial, but for now they cannot simply override the Amended Complaint's allegations with their own alternate narrative.

Second, the federal securities laws do not allow "small amounts" of fraudulent wash trading, and the Sun Defendants cite no case to support such an exception. ECF No. 62 at 44-45. Additionally, the October 1 and 7, 2018, wash trades that the Sun Defendants seek to minimize (*see id*.) are simply "example[s]" of the wash trading, not a comprehensive listing of every wash trade that occurred. ECF No. 59 ¶¶ 180, 182. *See U.S. Env't'l*, 82 F. Supp. 2d at 240 (denying motion to dismiss market manipulation claim where SEC alleged "detailed descriptions of a few sample trades" and "alleg[ed] more broadly that [defendant] executed 'wash sales' and 'matched orders' … during a particular time frame, with the effect of inflating the market price"). So, the market manipulation claims are sufficiently alleged.

### C.   The Amended Complaint Sufficiently Alleges Aiding and Abetting Touting Violations

The Sun Defendants' arguments regarding the aiding and abetting touting violations (Count 6) ignore the allegations of the Amended Complaint and relevant law. *See* ECF No. 62 at 45-48. This is a non-fraud claim, not subject to Rule 9(b), and it is adequately alleged.

To allege a charge of aiding and abetting a securities law violation, the SEC must plead (1) a securities law violation by the primary party, (2) knowledge of this violation by the aider and abettor, and (3) substantial assistance by the aider and abettor in achievement of the primary violation. *SEC v. Contrarian Press, LLC*, 2019 WL 1172268, at *9 (S.D.N.Y. Mar. 13, 2019). Substantial assistance involves showing "that the defendant in some way associated himself with

the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed." *Id.*

Here, the SEC alleges primary violations of the touting provision of Section 17(b) of the Securities Act, 15 U.S.C. § 77q(b), by Mahone and Way.  ECF No. 59 ¶¶ 209-11.  To be liable under Section 17(b), a person must (1) publish or circulate using means of interstate commerce, (2) a notice or communication that describes a security, (3) for consideration received, (4) without disclosure of the consideration received and the amount.  *Contrarian Press*, 2019 WL 1172268, at *4 (citing *SEC v. Gorsek*, 222 F. Supp. 2d 1099, 1105 (C.D. Ill. 2001)).  The Amended Complaint alleges that Mahone and Way (1) published or circulated on the internet, (2) tweets about TRX and BTT (securities), (3) they were paid for those tweets, and (4) they did not disclose that they were paid or the amounts of their payments.  ECF No. 59 ¶¶ 191, 193.  Those allegations establish primary violations of Section 17(b).  *See Contrarian Press*, 2019 WL 1172268, at *5; *SEC v. Friedland*, 2019 WL 688054, at *3 (D. Colo. Feb. 19, 2019).[24]

Additionally, the Sun Defendants knew—through Sun—of the primary touting violations by Mahone and Way, and they assisted Mahone and Way in their violations, because the Sun Defendants provided the information for the celebrities' tweets promoting TRX and BTT and the payments for those tweets.  ECF No. 59 ¶¶ 187-89, 191-93.  Thus, the Sun Defendants aided and abetted the touting violations of Section 17(b).  *See Contrarian Press*, 2019 WL 1172268, at *9.

The Sun Defendants' strained argument that Sun actually "put an end" to the touting campaign, rather than masterminded it (ECF No. 62 at 47), is flatly at odds with the SEC's

---

[24]    The Sun Defendants claim there was no primary violation of Section 17(b) because TRX and BTT were not offered and sold as securities (ECF No. 62 at 46), but that argument fails for the reasons in section III above.  They also argue that there was no primary violation because the Sun Defendants were not "issuers, underwriters, or dealers" of securities.  ECF No. 62 at 46.  But an "issuer" includes "every person who issues or proposes to issue any security," 15 U.S.C. § 77b(4), and the SEC alleges that the Sun Defendants illegally issued TRX and BTT in unregistered offerings (ECF No. 59 ¶¶ 51-68, 96-61), so that argument misses the mark.

allegations (ECF No. 59 ¶¶ 187-96).  Such assertions cannot be credited on a motion to dismiss where the SEC's allegations are deemed true.  *See Contrarian Press*, 2019 WL 1172268, at *3.

### D.        The Amended Complaint Sufficiently Alleges Other Securities Fraud

The Sun Defendants also assert (as to Counts 2 and 4) that the Amended Complaint "does not attempt to identify the factual basis for the fraud claims, leaving Defendants and the Court to guess."  ECF No. 62 at 48.  Contrary to that argument, however, the Amended Complaint alleges two types of fraud.  First, it alleges a manipulative wash trading scheme by the Sun Defendants. *See* ECF No. 59 ¶¶ 4, 162-86.  As shown above, the wash trading triggers liability under Exchange Act Sections 9(a)(1) and (a)(2) (Count 3); Securities Act Section 17(a) (Count 2); and Exchange Act Section 10(b) and Rule 10b-5 (Count 4).  *See supra* section V.B and n.22.

Second, the Amended Complaint alleges material misrepresentations by Sun.  *See* ECF No. 59 ¶¶ 6, 194-96.  To plead fraudulent misrepresentations in violation of Exchange Act Section 10(b) and Rule 10b-5, the SEC must show that a defendant (1) made a material misstatement or omission, (2) with scienter, and (3) in connection with the purchase or sale of securities.  *Honig*, 2021 WL 276155, at *5.  Materiality is shown "by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  *Id*. at *8. Scienter may be alleged by showing "conscious misbehavior or recklessness."  *Id*. at *10.

The SEC alleges each element against Sun.  On February 16, 2021, Sun made misstatements on Twitter when he falsely tweeted that the Tron Foundation was "not involved in" or "aware of" paying celebrities to tout, and "[i]f any celebrities are paid to promote TRON, we require them to disclose."  ECF No. 59 ¶ 194.  Sun's misstatements were material because a "reasonable investor considering whether to buy or sell TRX or BTT would have deemed it important to know that celebrities were paid to promote TRX and BTT," but Sun's false statements concealed those facts from the investing public.  *Id*. ¶ 196.  Further, Sun knew his tweets were

false because he provided the language for the celebrities' touts, he provided the payments for those touts, and he knew the celebrities did not disclose that they were paid or the amounts.  *Id.* ¶ 195; *see also id.* ¶¶ 187-93.  And Sun's tweets were in connection with the purchase or sale of securities because they concealed the paid touting of TRX and BTT, when those securities were being purchased and sold by investors.  *See, e.g.*, *SEC v. Sugarman*, 2020 WL 5819848, at *8 (S.D.N.Y. Sept. 30, 2020) (following "a broad reading of the phrase 'in connection with the purchase or sale of any security,'" such that "'it is enough that the fraud alleged coincide with a securities transaction—whether by the plaintiff or someone else'").[25]

## VI.   THE SUN DEFENDANTS HAD FAIR NOTICE OF THE SEC'S CLAIMS

Finally, the Sun Defendants argue that they lacked fair notice their conduct was prohibited.  ECF No. 62 at 49-50.  But the Supreme Court provided that notice decades ago in *Howey*, where it "set out the test for evaluating a potential investment contract."  *Genesis*, 2024 WL 1116877, at *5.  "*Howey* provides a clearly expressed test for determining what constitutes an investment contract, and an extensive body of case law provides guidance on how to apply that test to a variety of factual scenarios."  *Kik*, 492 F. Supp. 3d at 183.  That is all that the Constitution requires.

If more were needed—and it is not—before the Sun Defendants engaged in the violations here, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, advising "those who would use … distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets in that report involved investment contracts and thus securities.  Release No. 81207, 2017 WL 7184670, at *1, 7 (July 25, 2017) ("DAO Report"); *see* ECF No. 59 ¶ 27.  The DAO Report provided additional

---

[25]     The Sun Defendants insist that "no material misrepresentation or omission is alleged."  ECF No. 62 at 48.  But the Amended Complaint explicitly alleges material misstatements by Sun.  *See* ECF No. 59 ¶¶ 6, 194-96.

notice to market participants that transactions in crypto assets may implicate the federal securities laws.  *See Coinbase*, 2024 WL 1304037, at *16 & n.8; *United States v. Zaslavskiy*, 2018 WL 4346339, at *6 (E.D.N.Y. Sept. 11, 2018).  Thus, "the abundance of caselaw interpreting and applying *Howey* at all levels of the judiciary, as well as related guidance issued by the SEC as to the scope of its regulatory authority and enforcement power, provide all the notice that is constitutionally required."  *Zaslavskiy*, 2018 WL 4346339, at *9.  To the extent the Sun Defendants' claim they lacked granular notice that their specific conduct was illegal, no such notice is required.  *See Kik*, 492 F. Supp. 3d at 183 ("the law does not require the Government to reach out and warn all potential violators on an individual or industry level").

Moreover, the Sun Defendants' efforts to distinguish this case from those where courts found fair notice that crypto asset transactions may implicate the securities laws are unavailing.  That "the offerings at issue here predate the SEC's complaint in *Ripple*" (ECF No. 62 at 49) is irrelevant; they do not predate *Howey*, the DAO Report, or many SEC enforcement actions filed before *Ripple*.[26]  And while the Sun Defendants suggest they lacked fair notice of a "far reaching right to regulate everything" (*id.*), the Amended Complaint is more modest.  It simply alleges that the Sun Defendants' crypto asset transactions were illegal securities transactions.

Finally, the Sun Defendants' reliance on *Bittner v. United States*, 598 U.S. 85 (2023), is misplaced.  The fair-notice problem in *Bittner* was not that "the only notice of [the] government's interpretation of the statute" was enforcement "during the same period as [the] defendant's misconduct."  ECF No. 62 at 49-50.  Rather, the fair-notice problem was that "the government ha[d] repeatedly issued guidance to the public at odds with the interpretation it … ask[ed] [the court] to adopt."  *Bittner*, 598 U.S. 85 at 97.  Here, however, the SEC has not announced an

---

[26]     *See, e.g.*, *Kik*, 492 F. Supp. 3d 169; *Zaslavskiy*, 2018 WL 4346339; *PlexCorps*, 2018 WL 4299983.

interpretation of the federal securities laws at odds with the one it advances in this case.  *See Terraform II*, 684 F. Supp. 3d at 192 ("[T]he SEC is not announcing a new policy in this case, but merely enforcing its previously stated view that certain crypto-assets can be regulated as securities if they meet the characteristics of an 'investment contract' under the *Howey* case.").  And even accepting the Sun Defendants' reading of *Bittner*, for the reasons explained above, enforcement was *not* "the only notice of [the] government's interpretation of the statute … during the same period as defendant[s'] misconduct."  ECF No. 62 at 49-50.

## CONCLUSION

Accordingly, the motion to dismiss the Amended Complaint should be denied.[27]

Dated:  June 28, 2024

Respectfully submitted,

/s/ Timothy K. Halloran
Timothy K. Halloran (admitted *pro hac vice*)
Adam B. Gottlieb
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
Tel: 202-551-4414 (Halloran)
Email: hallorant@sec.gov
*Counsel for the SEC*

---

[27]     If the Court finds that any of the SEC's claims should be dismissed, then the SEC respectfully requests leave to file an amended complaint pursuant to Federal Rule of Civil Procedure 15(a)(2).  *See Conflict Int'l, Inc. v. Komorek*, 2024 WL 1347577, at *18 (Mar. 29, 2024) (granting leave to amend); *Honig*, 2021 WL 276155, at *1 (Court allowed SEC to file a "Second Amended Complaint").