UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 1:23-cv-02433 |
| Plaintiff, | Hon. Edgardo Ramos |
| v. | |
| JUSTIN SUN, TRON FOUNDATION LIMITED, BITTORRENT FOUNDATION LTD., RAINBERRY, INC., AUSTIN MAHONE, and DEANDRE CORTEZ WAY, | |
| Defendants. | |

**REPLY BRIEF IN SUPPORT OF TRON FOUNDATION LIMITED, BITTORRENT FOUNDATION LTD., JUSTIN SUN, AND RAINBERRY, INC.'S MOTION TO DISMISS AMENDED COMPLAINT**

Dean S. Kristy
Michael S. Dicke (*admitted pro hac vice*)
Jennifer C. Bretan (*admitted pro hac vice*)
Casey O'Neill
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:    415.875.2300
Facsimile: 415.281.1350

Rebecca T. Matsumura (*admitted pro hac vice*)
FENWICK & WEST LLP
401 Union Street, 5th Floor
Seattle, WA 98101
Telephone: 206.389.4510
Facsimile: 206.389.4511

*Attorneys for Defendants Tron Foundation
Limited, BitTorrent Foundation Ltd.,
Justin Sun, and Rainberry, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ............................................................................................................2

I.    PERSONAL JURISDICTION OVER THE FOREIGN DEFENDANTS IS
ABSENT ..........................................................................................................2

    A.    The SEC Concedes There Is No General Personal Jurisdiction ............................2

    B.    Cases Brought By The SEC Are Not Exempt From The Constitutional
Requirements Of Personal Jurisdiction ....................................................................2

    C.    This Case Does Not Present The Exceptional Circumstances Where
Courts Impute Contacts From An Individual To Formally Separate
Entities ....................................................................................................................4

    D.    There Is No Basis To Impute The U.S. Entity Contacts To Mr. Sun Either ............7

    E.    The Alleged U.S. Contacts Do Not Suffice To Support Any Of The
Claims Against The Foreign Defendants ....................................................................9

           1.    The Bittrex Listing Application Does Not Support Specific
Personal Jurisdiction Over the Foreign Defendants....................................9

           2.    U.S. Travel Does Not Support Specific Personal Jurisdiction..................10

           3.    "Internet Communications Sent To The U.S." Do Not Support
Specific Personal Jurisdiction Over The Foreign Defendants ..................12

           4.    Claimed "Wash Trading" Does Not Support Specific Jurisdiction ..........13

    F.    Exercising Jurisdiction Over The Foreign Defendants Is Also
Unreasonable..........................................................................................................14

    G.    If This Action Survives As To Rainberry, It Should Be Transferred ...................15

II.    ALL CLAIMS FAIL DUE TO IMPERMISSIBLE GROUP PLEADING ......................15

III.    THE CLAIMS REMAIN IMPERMISSIBLY EXTRATERRITORIAL .........................16

    A.    The Opposition Confirms The SEC Does Not Allege Domestic
Transactions ..........................................................................................................16

    B.    The AC Also Fails The "Conduct and Effects" Test .............................................18

    C.    All Claims Fail Because No Investment Contract Is Alleged..............................19

1.  Social Media Contests and Giveaways Do Not Satisfy *Howey* ................19

2.  Airdrops of BTT Do Not Satisfy *Howey* ....................................................21

3.  Secondary Market Sales Do Not Satisfy *Howey* ........................................22

IV.  THE REMAINING CLAIMS ARE INADEQUATELY PLEADED .............................23

A.  The Market Manipulation Allegations Are Insufficient and Illogical .................23

B.  No One Aided Or Abetted Disclosure Violations...................................................24

C.  The Fraudulent Misstatement Claim Fails............................................................24

V.  DEFENDANTS LACKED FAIR NOTICE OF THE SEC'S CLAIMS .........................25

CONCLUSION ...................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*79th Group, Inc. v. Moore*,
  2024 WL 36992 (S.D.N.Y. Jan. 3, 2024) ...............................................................11

*Absolute Activist Master Value Fund, Ltd. v. Ficeto*,
  2013 WL 1286170 (S.D.N.Y. Mar. 28, 2013) ........................................................11

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
  529 F. Supp. 3d 111 (S.D.N.Y. 2021)...................................................................3, 4

*Alwie Handoyo v. Tjong Very Sumito*,
  [2013] SGCA 44 (Aug. 6, 2013)...............................................................................5

*Am. Lecithin Co. v. Rebmann*,
  2017 WL 4402535 (S.D.N.Y. Sept. 30, 2017).....................................................5, 7

*Arzu v. Am. Airlines, Inc.*,
  690 F. Supp. 3d 242 (S.D.N.Y. 2023).......................................................................2

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).....................................................................................24

*Best Van Lines, Inc. v. Walker*,
  490 F.3d 239 (2d Cir. 2007).....................................................................................12

*Bur-Tex Hosiery, Inc. v. World Tech Toys, Inc.*,
  2024 WL 989841 (S.D.N.Y. Mar. 7, 2024) .............................................................6

*Cavello Bay Reinsurance Ltd. v. Shubin Stein*,
  986 F.3d 161 (2d Cir. 2021)....................................................................................18

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018*)*......................................................................................3

*DH Servs., LLC v. Positive Impact, Inc.*,
  2014 WL 496875 (S.D.N.Y. Feb. 5, 2014)..............................................................12

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
  844 F.3d 79 (2d Cir. 2016).......................................................................................8

*Euro Trade & Forfaiting, Inc. v. Vowell*,
  2002 WL 500672 (S.D.N.Y. Mar. 29, 2002) .........................................................19

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ........................................................................13

*Gillis v. QRX Pharma Ltd.*,
 197 F. Supp. 3d 557 (S.D.N.Y. 2016) ..................................................................................23

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
 564 U.S. 915 (2011) ...........................................................................................................4, 11

*HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*,
 2021 WL 918556 (S.D.N.Y. Mar. 10, 2021) ...........................................................................6

*Int'l Bhd. of Teamsters v. Daniel*,
 439 U.S. 551 (1979) ................................................................................................................20

*Ir., Ltd. v. Compagnie des Bauxites de Guinee*,
 456 U.S. 694 (1982) ..................................................................................................................3

*J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*,
 131 F. Supp. 2d 544 (S.D.N.Y. 2001) .....................................................................................6

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*,
 2017 WL 1113080 (S.D.N.Y. Mar. 10, 2017) .......................................................................14

*Long Side Ventures LLC v. Hempacco Co.*,
 2023 WL 6386888 (S.D.N.Y. Sept. 29, 2023) ...................................................................4, 6, 7

*Medina v. Bauer*,
 2004 WL 136636 (S.D.N.Y. Jan. 27, 2004) ..........................................................................16

*Nesbeth v. New York City Mgmt. LLC*,
 2019 WL 110953 (S.D.N.Y. Jan. 4, 2019) ............................................................................15

*NetApp, Inc. v. Nimble Storage, Inc.*,
 2015 WL 400251 (N.D. Cal. Jan. 29, 2015) ............................................................................7

*Newman Cap. LLC v. Private Cap. Grp., Inc.*,
 2024 WL 2115311 (S.D.N.Y. May 10, 2024) ..........................................................................5

*OOO v. Empire United Lines Co.*,
 557 F. App'x 40 (2d Cir. 2014) ...............................................................................................9

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
 763 F.3d 198 (2d Cir. 2014) ...................................................................................................18

*In re Platinum and Palladium Antitrust Litig.*,
 61 F.4th 242 (2d Cir. 2023) ......................................................................................................5

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
    784 F. App'x 4 (2d Cir. 2019) ........................................................14

*Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*,
    898 F. Supp. 2d 673 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 16 (2d Cir. 2013)........................25

*Reliance First Cap., LLC v. Mid Am. Mortg., Inc.*,
    2019 WL 2504039 (E.D.N.Y. June 17, 2019) ........................................13

*Reynolds v. Binance Holdings Ltd.*,
    481 F. Supp. 3d 997 (N.D. Cal. 2020) ..............................................6, 7

*SEC v. Balina*,
    2024 WL 2332965 (W.D. Tex. May 22, 2024) ......................................16

*SEC v. Binance Holdings Ltd.*,
    2024 WL 3225974 (D.D.C. June 28, 2024).......................................*passim*

*SEC v. Coinbase, Inc.*,
    2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) ...................................21, 22

*SEC v. Energy Grp. Of Am., Inc.*,
    459 F. Supp. 1234 (S.D.N.Y. 1978)....................................................19

*SEC v. Gastauer*,
    93 F.4th 1 (1st Cir. 2024)..................................................................4

*SEC v. Hill Int'l, Inc.*,
    2020 WL 2029591 (S.D.N.Y. Apr. 28, 2020) ......................................15

*SEC v. LBRY, Inc.*,
    No. 21-cv-260, ECF No. 105 (D.N.H. Jan. 30, 2023) ............................22

*SEC v. Lyndon*,
    27 F. Supp. 3d 1062 (D. Haw. 2014) ..................................................4

*SEC v. Mintz*,
    2014 WL 1173096 (D.N.J. Mar. 18, 2024)..........................................16

*SEC v. Monarch Funding Corp.*,
    192 F.3d 295 (2d Cir. 1999)............................................................25

*SEC v. Montle*,
    65 F. App'x 749 (2d Cir. 2003) .....................................................3, 16

*SEC v. PlexCorps*,
    2018 WL 4299983 (E.D.N.Y. Aug. 9, 2018)...........................3, 11, 13, 14

*SEC v. Ripple Labs, Inc.*,
 2022 WL 762966 (S.D.N.Y. Mar. 11, 2022) ............................................................16, 17, 22

*SEC v. Ripple Labs, Inc.*,
 2023 WL 4507900 (S.D.N.Y. July 13, 2023) ....................................................................21, 22

*SEC v. Syron*,
 934 F. Supp. 2d 609 (S.D.N.Y. 2013).......................................................................................1

*SEC v. Terraform Labs Pte Ltd.*,
 2022 WL 2066414 (2d Cir. June 8, 2022) ....................................................................... *passim*

*SEC v. Terraform Labs Pte Ltd.*,
 684 F. Supp. 3d 170 (S.D.N.Y. 2023).................................................................................9, 22

*SEC v. U.S. Env't, Inc.*,
 82 F. Supp. 2d 237 (S.D.N.Y. 2000).......................................................................................23

*Sunward Elecs., Inc. v. McDonald*,
 362 F.3d 17 (2d Cir. 2004).........................................................................................................4

*Tera Grp., Inc. v. Citigroup, Inc.*,
 2018 WL 4732426 (S.D.N.Y. Sept. 28, 2018)...........................................................................7

*U.S. ex rel. Perry v. Hooker Creek Asphalt & Paving, LLC*,
 565 F. App'x 669 (9th Cir. 2014) ...........................................................................................23

*U.S. ex rel. TZAC, Inc. v. Christian Aid*,
 2021 WL 2354985 (S.D.N.Y. June 9, 2021) ...........................................................................11

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
 241 F.3d 135 (2d Cir. 2001)................................................................................................9, 10

*Uselton v. Com. Lovelace Motor Freight, Inc.*,
 940 F.2d 564 (10th Cir. 1991) ..........................................................................................20, 21

*Williams v. Binance*,
 96 F.4th 129 (2d Cir. 2024) .....................................................................................................17

*Zurich Am. Life Ins. Co. v. Nagel*,
 571 F. Supp. 3d 168 (S.D.N.Y. 2021)......................................................................................11

## Other Authorities

Fed. R. Civ. P. 9(b) ...........................................................................................................23, 25

Fed. R. Civ. P. 12(b)(2)..............................................................................................................5

## <u>PRELIMINARY STATEMENT</u>[1]

This flawed case does not belong in any court, much less a U.S. court. Faced with the need for detailed, defendant-by-defendant, claim-by-claim, jurisdictional analysis, the SEC offers only a superficial response. In place of substance, it repeatedly avers that it may proceed unencumbered by such burdens, insisting that this Court should reject long established precedent and rely instead on a handful of recent enforcement actions against differently situated crypto companies. There is no such free pass. Nothing about the SEC, or the crypto industry, changes the requirement that there must be personal jurisdiction over *each* defendant, and that specific personal jurisdiction must be pleaded on a claim-by-claim basis. And while much of the SEC's argument for jurisdiction over the foreign defendants rests on a supposed disregard of corporate form, the SEC does not even attempt to address the factors relevant to that inquiry, all of which it has the burden of proving under controlling law.

But even if the exercise of personal jurisdiction over the foreign defendants were permissible, the AC suffers from dispositive defects for which the Opposition has no answer. The Opposition does nothing to clarify which allegations apply to which defendants, instead continuing to rely on impermissible group pleading (no matter what name the SEC uses to lump everyone together). Nor does the Opposition address the AC's failure to allege a single domestic securities transaction or offer anything to rehabilitate its failure to plead the required elements of the claims. Reiterating the AC's conclusory assertions is no substitute for the necessary factual allegations. And, having failed to address a substantial number of dispositive arguments raised in defendants' motion to dismiss (ECF No. 62, "Motion") the Opposition concedes them. *See SEC v. Syron*, 934 F. Supp. 2d 609, 631 (S.D.N.Y. 2013) (SEC's failure to address points in

---

[1] Terms are as defined in the Motion. Except as otherwise noted, internal quotations and citations are omitted, and emphasis is added.

opposition effectively concedes them).[2]

On top of glossing over dispositive points, the SEC's position is truly remarkable. It asks this Court to pierce the corporate veil of two entities organized under the laws of another nation and bring a foreign national to this Court (and impose extreme remedies on him) based largely on SEC say-so and wholly conclusory allegations. The SEC should not be permitted to broadly tag everything a "securities offering" (without the requisite factual showing), no matter where and irrespective of context, and hope mere labels and conclusions are enough. Dismissal is warranted, and since the SEC has already amended once, it should be with prejudice.[3]

## ARGUMENT

## I.    PERSONAL JURISDICTION OVER THE FOREIGN DEFENDANTS IS ABSENT

### A.    The SEC Concedes There Is No General Personal Jurisdiction

The SEC makes no attempt to argue that there is general personal jurisdiction over the foreign defendants. *Cf.* Opp. at 16-25; *see* Mot. at 13. Thus, the SEC concedes the point. *See Arzu v. Am. Airlines, Inc.*, 690 F. Supp. 3d 242, 249 (S.D.N.Y. 2023) (plaintiff deemed to have abandoned general personal jurisdiction claim when it failed to dispute defendant's argument).

### B.    Cases Brought By The SEC Are Not Exempt From The Constitutional Requirements Of Personal Jurisdiction

Despite correctly stating the standard for specific personal jurisdiction (the "claim must arise out of or relate to the non-resident's forum conduct"), Opp. at 16, the SEC makes the puzzling (and incorrect) assertion that this "claim-by-claim test [is] not used in relevant SEC enforcement cases" to assess specific jurisdiction. Opp. at 23-24. As support for this novel view, the SEC cites a decision to enforce an SEC subpoena over a foreign national in a digital

---

[2] The SEC objects to Exhibits 5, 7, and 9, but all three remain properly considered. *See* Mot. at 6 n.9, 7 n.10.

[3] The SEC conducted an extensive pre-suit investigation and amended *after* receiving Defendant's initial motion to dismiss. If the SEC was able to state a claim, surely it would have done so by now.

asset case. *Id*.; and *see* Opp. at 2 (citing *SEC v. Terraform Labs Pte Ltd.*, 2022 WL 2066414, at

*3 (2d Cir. June 8, 2022) ("*Terraform I*") and describing it as precedent foreclosing defendants'

personal jurisdiction arguments).  By definition, *Terraform I* (a Summary Order) is ***not***

***precedent***.  *See* IOP 32.1.1 ("Rulings by summary order do not have precedential effect.").  Nor

did that case address, let alone hold, that courts assess personal jurisdiction differently in SEC

actions.  A subpoena enforcement action, *Terraform I* raised no substantive claims.  Thus, it is

unsurprising that the court there did not require a claim-by-claim analysis.[4]

In any event, controlling Second Circuit authority requires this court to evaluate specific

contacts, for each defendant, for each claim asserted. *See Charles Schwab Corp. v. Bank of Am.*

*Corp.*, 883 F.3d 68, 83 (2d Cir. 2018*)* ("A plaintiff 'must establish the court's jurisdiction with

respect to each claim asserted . . . '") (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17,

24 (2d Cir. 2004)); *see also In re Aegean Marine Petroleum Network, Inc. Sec. Litig*., 529 F.

Supp. 3d 111, 135 (S.D.N.Y. 2021) (same).  In *Aegean Marine*, for example, the court evaluated

contacts for each cause of action, finding that certain conduct failed to support jurisdiction for

fraudulent scheme claims, but sufficed for insider trading.  *Id*. at 139.  Requiring this analysis as

a prerequisite to establishing jurisdiction also makes sense.  The claim-by-claim analysis follows

directly from the fact that personal jurisdiction is, in part, a due process protection.  *Ins. Corp. of*

*Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("The requirement that

a court have personal jurisdiction flows . . . from the Due Process Clause.").

---

[4] The argument that, in SEC actions, a court may simply "gloss over" the required showing (Opp. at 24 n.11) does not withstand scrutiny.  In *SEC v. Montle*, 65 F. App'x 749, 752 (2d Cir. 2003), the SEC sought to enjoin the sale of a yacht, purchased and offered for sale in the U.S. by a U.S. relief defendant.  *SEC v. Stubos* involved a pump-and-dump scheme by a foreign defendant of U.S. stock on U.S. OTC Markets and sold to U.S. purchasers through a U.S. entity using U.S. promoters.  634 F. Supp. 3d 174, 187 (S.D.N.Y. 2022).  In other words, undisputed securities claims arising from actions directed here.  And in *SEC v. PlexCorps*, 2018 WL 4299983, at *4 (E.D.N.Y. Aug. 9, 2018), the defendant traveled to the U.S. and, while here, registered U.S. customer-facing websites, email, and payment accounts for an ICO targeting U.S. investors.  Far from eliminating the need to show that claims arise from the conduct directed here, the decisions detail extensive U.S. contacts by defendants connected to specific claims. No similar facts are offered here, and the decisions do not suggest a different standard for SEC actions.

Another "novel theory" of personal jurisdiction advanced by the SEC was recently rejected. In *SEC v. Gastauer*, 93 F.4th 1, 13 (1st Cir. 2024), the First Circuit reversed a district court for accepting the SEC's imputation theory of specific personal jurisdiction over an overseas recipient of alleged ill-gotten funds, despite insufficient U.S. contacts. *Id.* at 9. As the court emphasized, there is no short-cut to jurisdictional restraints, "no matter how . . . morally compelling the [SEC's] claims." *Id.* at 9. There is no "SEC exception."

In practical effect, crediting the SEC's argument would collapse general and specific personal jurisdiction. While general personal jurisdiction considers forum contacts holistically to determine whether a litigant is "at home" and subject to any and all claims (which the SEC does not argue applies to the foreign defendants here), specific personal jurisdiction "is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). For this reason, it is entirely plausible that a plaintiff will state sufficient jurisdictional contacts to support one claim, but not another. *See, e.g.*, *SEC v. Lyndon*, 27 F. Supp. 3d 1062, 1069 (D. Haw. 2014) (personal jurisdiction over defendant must be established with respect to ***each*** claim); *Aegean Marine*, 529 F. Supp. 3d at 135; *Sunward*, 362 F.3d at 24 ("plaintiff must establish the court's jurisdiction with respect to each claim asserted").

### C.     This Case Does Not Present The Exceptional Circumstances Where Courts Impute Contacts From An Individual To Formally Separate Entities

The Opposition's argument that Mr. Sun's contacts can be imputed to the overseas entities based on an "alter ego" theory is no answer. Opp at 20-21, 42-43. That theory is available only in exceptional circumstances on showings not made here. *See Long Side Ventures LLC v. Hempacco Co.*, 2023 WL 6386888, at *8 (S.D.N.Y. Sept. 29, 2023) ("In considering whether an individual and a corporate entity are alter-egos [for personal jurisdiction purposes]

'[i]t is well settled that . . . courts are reluctant to disregard the corporate entity.'").

Notwithstanding the SEC's claim otherwise, the Second Circuit has not resolved whether the law of the country of incorporation or federal common law governs the alter ego test for personal jurisdiction.[5]  In any event, the AC fails no matter what standard applies.  Singapore law asks whether the owner "made no distinction between himself" and the subject entity.  *Alwie Handoyo v. Tjong Very Sumito*, [2013] SGCA 44 at ¶ 99 (Aug. 6, 2013), *available at* https://www.elitigation.sg/gd/s/2013 SGCA 44.  Similarly, in this District, on a Rule 12(b)(2) motion, courts consider a number of factors in evaluating whether "a corporation's owner exercises total and exclusive domination of the corporation," *Platinum and Palladium*, 61 F.4th at 276, including:  "(1) the absence of corporate formalities normally attendant on corporate existence, such as issuance of stock, election of directors, keeping of corporate records, and so forth; (2) inadequate capitalization; (3) the intermingling of corporate and personal finances; and (4) the amount of business discretion displayed by the purported alter ego corporation." *Am. Lecithin Co. v. Rebmann*, 2017 WL 4402535, at *8 (S.D.N.Y. Sept. 30, 2017).

The AC does not make the required showing under either standard.  No facts are offered to meet Singapore's high bar (as opposed to conclusory allegations), and the Opposition does not argue otherwise.  The Opposition also does not (and cannot) point to factual allegations satisfying the articulated factors considered by courts in this District.  There is no claim that the corporate entities did not observe corporate formalities.  No facts detail the level of discretion each entity had in carrying out its affairs, or that any was undercapitalized.  And critically, there

---

[5] *See In re Platinum and Palladium Antitrust Litig.*, 61 F.4th 242, 275 & n.11 (2d Cir. 2023) ("The parties disagree on whether English or federal common law governs . . . [w]e need not resolve that dispute because under neither approach can the plaintiffs succeed.").  The SEC mischaracterizes *Platinum and Palladium* by omitting the bolded language: "**Other courts have held that** federal common law governs alter-ego theories 'when a federal interest is implicated in the decision of whether to pierce the corporate veil.'"  *See* Opp. at 42; *see also Newman Cap. LLC v. Private Cap. Grp., Inc.*, 2024 WL 2115311, at *7 (S.D.N.Y. May 10, 2024) ("Second Circuit has yet to address whether to apply . . . federal common law, or the law of the forum, in assessing whether alter ego liability exists").

is no allegation of financial commingling, the *sin qua non* of pleading alter ego between a principal and an entity. *See Long Side Ventures*, 2023 WL 6386888, at *8 ("[T]he Second Circuit has found clear error where district courts have held an individual principal to be an alter-ego absent such evidence of financial commingling.").

Instead, the Opposition vaguely asserts that Mr. Sun somehow "blurred the distinctions" between Tron Foundation and BitTorrent Foundation by (i) announcing that both entities would work on blockchain-related projects; and (ii) displaying both corporate logos in two public appearances in January 2019. Opp. at 3. But that just goes to whether the two entities are distinct from each other, not whether they were alter egos *of Mr. Sun*.[6] Finally, while the AC makes the conclusory assertion that Mr. Sun has an interest in both entities, "[s]hared ownership . . . is insufficient basis for this Court to exercise personal jurisdiction under the alter ego theory. [E]ven in cases of substantial overlap [of ownership], a plaintiff must show not only the opportunity to exercise control, but actual domination." *HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, 2021 WL 918556, at *10 (S.D.N.Y. Mar. 10, 2021); *see also Bur-Tex Hosiery, Inc. v. World Tech Toys, Inc.*, 2024 WL 989841, at *9 (S.D.N.Y. Mar. 7, 2024) (no jurisdiction based on claim that defendant was alter ego because he owned and was entity's decision-maker).

And where are the facts supporting the supposed domination and control by Mr. Sun of either of the foreign entities? All the Opposition offers is the conclusory allegation that "Sun owned, controlled, and dominated the actions and dealings of the Tron Foundation and the BitTorrent Foundation, *and thus* those entities were Sun's alter egos." Opp. at 21 (emphasis

---

[6] To the extent the SEC argues that Tron Foundation and BitTorrent Foundation are alter egos of each other, no factual allegations back up that claim. *See J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001) ("[T]he Court is not persuaded that a failure to distinguish between [two entities] on a web page is sufficient to show" control of one entity by the other.); *see also Reynolds v. Binance Holdings Ltd.*, 481 F. Supp. 3d 997, 1006-07 (N.D. Cal. 2020) ("website 'marketing puffery carries *no weight* in establishing whether [two entities] are in fact alter egos" and "separate corporate entities presenting themselves 'as one online does not rise to the level of unity of interest required to show companies are alter egos.'") (emphasis in original).

added).  That self-serving statement is plainly insufficient.  *E.g.*, *Long Side Ventures*, 2023 WL

6386888, at *7-10 (noting failure to "set forth sufficient examples of alleged domination to

support [] alter-ego theory" and rejecting as insufficient "purely conclusory allegations of alter-

ego status."); *Am. Lecithin*, 2017 WL 4402535, at *9 (rejecting personal jurisdiction based on

"conclusory claim" of alter ego status).

### D.    There Is No Basis To Impute The U.S. Entity Contacts To Mr. Sun Either

The Opposition argues that Rainberry's contacts should be imputed to Mr. Sun because

he "exercises extensive control over Rainberry."  Opp. at 17.  The only ostensible basis for doing

so is the SEC's conclusory allegation that he "wholly owns, controls, and dominates the actions

of Rainberry" and stayed in a Rainberry-rented apartment "during business trips."  *Id*.  Those

general averments do nothing to support imputation – an exception to the general rule that

"[e]ach defendant's contacts with the forum . . . must be assessed individually."  *Tera Grp., Inc.

v. Citigroup, Inc.*, 2018 WL 4732426, at *3 (S.D.N.Y. Sept. 28, 2018).

No actual facts suggest Rainberry's corporate form may be disregarded.  Nothing shows

it was undercapitalized, that its assets were commingled with Mr. Sun's, that Mr. Sun misused

Rainberry facilities, or that the corporate form was used to perpetrate a wrongful act.  *See, e.g.*,

*Long Side Ventures*, 2023 WL 6386888, at *8.  And although the SEC asserts Mr. Sun "blurred

the distinctions among" Rainberry and the foreign entities, Opp. at 3 citing AC ¶¶ 13, 70-73, at

most, that speaks to differences *among the entities*, not whether Mr. Sun failed to observe

corporate formalities at Rainberry.  In any event, joint marketing "carries *no weight*" in the alter

ego assessment.  *Reynolds*, 481 F. Supp. 3d at 1006-07 (emphasis in original).[7]

---

[7] The claim that Rainberry employees used the "@tron.network" email domain (Opp. at 17) is also irrelevant, as that has nothing to do with whether "Rainberry's contacts with the U.S. should be imputed to Mr. Sun."  *See also NetApp, Inc. v. Nimble Storage, Inc.*, 2015 WL 400251, at *7 (N.D. Cal. Jan. 29, 2015) ("that [entities] share a website and email is an administrative . . . function . . . not necessarily indicative of an alter ego relationship.").

Rather than meet its pleading burdens under applicable law, the SEC relies again on *Terraform I*, where the Second Circuit imputed a foreign entity's contacts to its control person in a summary proceeding without elaboration. Opp. at 17 (citing *Terraform I*, 2022 WL 2066414, at *3 n.2). *Terraform I*, in turn, relied on *EMI Christian*, which allowed for imputation based on facts showing the foreign defendant "exercised extensive control over [the entity's] day-to-day activities" and "no one made any final decisions other than [the foreign defendant]." *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 98 & n.12 (2d Cir. 2016). More recently, a court imputed specific personal jurisdiction to a non-U.S. defendant based on allegations that he "control[led] both [the] high-level and the day-to-day operations" of the U.S. entity, including "[giving] final signoff on various decisions . . . including customer account opening processes, development of the front-end access, . . . creating a reserve to cover ACH deposits . . . personally approving [U.S. entity] employees obtaining certain real-time trading data . . . direct[ing] which investment opportunities [the U.S. entity] offered . . . [and] approving all [] expenditures exceeding $30,000." *SEC v. Binance Holdings Ltd.*, 2024 WL 3225974, at *31 (D.D.C. June 28, 2024) ("*Binance III*").

The AC alleges nothing close to the facts in these cases. No facts show that Mr. Sun exerts extensive control over Rainberry's day-to-day operations and business decisions. All that the Opposition offers in support of imputation is the conclusory (and factually incorrect) averment that "[f]rom [June 2018] to the present, [Mr.] Sun has wholly owned and controlled Rainberry" and his claimed use of a corporate apartment "during some of his business trips." Opp.; *see also id*. at 17, citing AC ¶¶ 11, 16.[8] The SEC cites no authority for the proposition that temporary use of a corporate apartment by overseas executives suffices to meet the

---

[8] The Opposition also cites AC ¶ 13, but those are just "assertions [that] are conclusory or reflect bare allegations that 'merely state the plaintiff['s] theory of specific jurisdiction," *Binance III*, 2024 WL 3225974, at *29, not facts establishing "extensive control."

requirements of specific personal jurisdiction, nor is there any allegation that Mr. Sun's use of

the apartment is connected in any way to the claims here.  And having failed to respond to

Defendant's authority, the SEC concedes that sole ownership is not enough.  *See* Mot. at 30

(citing *Empire United*, 557 F. App'x 40, 46 (2d Cir. 2014) for the proposition that "status as sole

shareholder . . . fails to establish alter ego liability").

### E.  The Alleged U.S. Contacts Do Not Suffice To Support Any Of The Claims Against The Foreign Defendants

The Opposition indiscriminately argues that five types of contacts, taken together, suffice

to establish specific jurisdiction over *all* Defendants for *all* claims.  They do not.

### 1.  The Bittrex Listing Application Does Not Support Specific Personal Jurisdiction Over the Foreign Defendants

The SEC suggests that *a single* contract with *a single* U.S. entity, by itself, is sufficient to

support specific personal jurisdiction over Mr. Sun and the Tron Foundation.  Opp. at 18 (citing

*SEC v. Terraform Labs Pte Ltd.*, 684 F. Supp. 3d 170, 187 (S.D.N.Y. 2023) ("*Terraform II*") for

the proposition that "alleging that a defendant 'form[ed] a contract with a [U.S.] corporation' is

normally enough, by itself, to support jurisdiction,").[9]  As noted, *Terraform I* was a subpoena

enforcement action, where the relevant jurisdictional contacts "related to the Mirror Protocol and

digital assets at issue in the SEC's investigation."  *Terraform I*, 2022 WL 2066414, at *4.  In that

context, the Second Circuit found that an agreement to sell $200,000 of the Mirror Protocol coins

to a U.S.-based trading platform was one factor (of many) supporting enforcement of the

subpoena.  *Id.* at *3; *see also Terraform II*, 684 F. Supp. 3d at 187 (considering same contract as

one factor supporting jurisdiction).  And *U.S. Titan*, on which both *Terraform* decisions rely, was

---

[9] To be more precise, *Terraform II* (and the decision on which it relies) says that "an allegation that a defendant '***negotiat[ed] and*** form[ed] a contract'" with a U.S. corporation is normally enough.  *Id.* (quoting *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152-53 (2d Cir. 2001) (emphasis added)).  Nothing suggests the Bittrex listing application was a negotiated agreement (as opposed to a simple form).

a **breach of contract** case.  241 F.3d 135.  In that case, the record showed that the defendant:

> [N]egotiat[ed] and form[ed] a contract with an American corporation located in New York . . . utilized a broker located in Connecticut, which communicated with Titan personnel in New York via telex and/or facsimile . . . Having engaged in this commercial conduct, Zhen Hua should have foreseen the possibility of being "haled into [an American] court" if a dispute *were to arise out of the negotiations*.

*Id.* at 152-53.

The facts here are very different.  The Bittrex listing application is not analogous to the contracts and issues in these cases.  *Cf.* AC ¶ 39.  This is not a breach of contract case between Bittrex and Tron Foundation.  The SEC's claims do not arise out of negotiations over or the terms of the Bittrex listing application.  And as to Mr. Sun, the SEC alleges only that he signed the agreement "between Bittrex and the Tron Foundation" on behalf of Tron Foundation.  *Id.*  As discussed, doing so is not a basis for asserting personal jurisdiction over him.

### 2. U.S. Travel Does Not Support Specific Personal Jurisdiction

Accounts of Mr. Sun's trips to the U.S. do not establish specific personal jurisdiction over him on any claim, much less over the foreign entities.  As the Motion made clear, to be relevant, U.S. travel must be tied to actions forming the basis of the claims.  Attempting to make that link, the Opposition asserts that Mr. Sun "travelled extensively to the United States **in connection with** the promotion, offer, and sale of TRX and BTT."  Opp. at 4, citing AC ¶ 11. (emphasis added).  This rewrites the AC, which makes the much more attenuated claim that: "Sun travelled extensively to the United States **during the time** that TRX and BTT were promoted, offered, and sold." AC ¶ 11 (emphasis added).  Absent allegations detailing what Mr. Sun supposedly did on these trips, that forms the basis of any claim, even extensive travel to and within the U.S. does not support specific personal jurisdiction.  *See* Mot. at 17-18, 22 (citing cases).  This makes sense.  As a court in this district explained, "[i]t would render the minimum contacts analysis meaningless to find that [defendant] purposefully avails itself of the U.S. forum

. . . if its employees travel to the United States to conduct business that is not related to the claims at issue." *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 180 (S.D.N.Y. 2021).[10]

The only specific allegations about Mr. Sun's activities in the United States relate to a single livestream (broadcast worldwide) and attending the niTron conference, both in San Francisco in January 2019. Opp. at 19. While the SEC asserts that these activities were to promote sales of TRX and BTT to "U.S. investors," the facts do not support that claim. *See* AC ¶¶ 78-79. Nor could they. For one thing, and as the SEC admits, U.S. investors were **restricted** from buying BTT. AC ¶ 95. Moreover, the AC recounts Mr. Sun speaking in general about the Tron and BitTorrent businesses and future plans to a worldwide audience. *Id.* ¶¶ 78-79. Absent allegations that the livestream specifically targeted U.S. investors, it does not support specific jurisdiction for the SEC's Section 5 claims. *See 79th Group, Inc. v. Moore*, 2024 WL 36992, at *13 (S.D.N.Y. Jan. 3, 2024) (requiring "proof that the [foreign] defendant's internet activity is expressly targeted at or directed to the forum state."); c*f. PlexCorps*, 2018 WL 4299983, at *18 (key fact was "intentional enticement of United States-based investors" via Facebook).

And as for the niTron Summit, as explained in the Motion (and left unaddressed by the Opposition), attending a conference cannot support personal jurisdiction. Mot. at 17, 22 (citing *U.S. ex rel. TZAC, Inc. v. Christian Aid*, 2021 WL 2354985, at *4 (S.D.N.Y. June 9, 2021) (a few trips to attend conferences in forum were "insufficient contacts" to support exercise of specific jurisdiction), *aff'd*, 2022 WL 2165751 (2d Cir. June 16, 2022)); *Absolute Activist Master Value Fund, Ltd. v. Ficeto*, 2013 WL 1286170, at *12 (S.D.N.Y. Mar. 28, 2013) ("fundraising trips" to the U.S. insufficient).[11]

[10] Although the SEC claims Mr. Sun spent over 300 days in the U.S. in 2018-2019, general contacts are not relevant to specific jurisdiction, unless the claim "arises out of or relates to" those contacts. *Goodyear*, 564 U.S. at 923-24.
[11] *PlexCorps*, the SEC's sole cited case on this point, does not hold otherwise. 2018 WL 4299983, at *10. As noted, *PlexCorps* involved jurisdictional contacts not alleged here, including setting up U.S.-based payment services and registering a site to facilitate purchases by U.S. buyers, *id.* at *10, 16-19, each arranged *during* a trip to the U.S.

**3.    "Internet Communications Sent To The U.S." Do Not Support Specific Personal Jurisdiction Over The Foreign Defendants**

The SEC contends that at the time of Mr. Sun's travel in the United States, "internet communications [were] sent to the U.S.," and that whitepapers, Tweets, posts, and emails were aimed here, and that these allegations, untethered though they are to any alleged "securities offering" or specific claim, somehow support jurisdiction over the foreign defendants. Opp. at 18.  These allegations are misleading and far from a jurisdictional basis for the claims alleged.

The whitepapers, for example, ***do not even relate*** to conduct at issue in this case.  As the SEC admits, "the [AC] does not [allege] the TRX ICO as an unregistered offer or sale." Opp. at 5 n.4.  Thus, the allegations that "[t]he TRX Whitepaper promoted an upcoming initial coin offering ('ICO')" (AC ¶ 32) are wholly irrelevant.  Similarly, the BTT Whitepaper, issued at the time of the BTT IEO, which was "exclusively available to non-U.S. accounts" (AC ¶¶ 76, 79, 81), tells us nothing, as "the [AC] does not [allege] the IEO of BTT as an unregistered offer or sale." Opp. at 11 n.5.  The SEC contends the whitepapers are relevant to jurisdiction ***nonetheless*** because, even though those communications ***do not*** concern offers at issue here, that "does not negate the Sun Defendants' conduct aimed at the United States—which is what matters for personal jurisdiction." *Id.* at 23.  This misses the point and misstates the law of specific jurisdiction, which cannot be based on describing an offering that is not in this case.

Likewise, it is well-established that "information on a passive website" accessible from the forum is not a sufficient basis for jurisdiction.  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 253 (2d Cir. 2007) ("[T]he mere existence of a website that is visible in a forum and that gives information about a company and its products is not enough, by itself, to subject a defendant to personal jurisdiction."); *DH Servs., LLC v. Positive Impact, Inc.*, 2014 WL 496875, at *5-6 (S.D.N.Y. Feb. 5, 2014) (internet posts are "similar to advertisements placed in nationally-

circulated newspapers. Courts have repeatedly found that a defendant's placement of such advertisements does not confer jurisdiction."); *see also* Mot. at 16. The SEC's only purported contrary authority, the non-precedential *Terraform I*, based jurisdiction on "extensive U.S. contacts" tied much more directly to the claims, which is not true here, and does not suggest that passive internet activity suffices. *See* Mot. at 15 (distinguishing *Terraform I*).

Nor is it enough for the SEC to argue that Mr. Sun or celebrities tweeted about "TRX" and BTT and had U.S. social media followers. *See* Opp. at 14, 20. Again, the SEC cites no authority basing jurisdiction on the fact that someone happens to have social media "followers" in a forum. *See Reliance First Cap., LLC v. Mid Am. Mortg., Inc.*, 2019 WL 2504039, at *10 (E.D.N.Y. June 17, 2019) (tweets do not create claim-related contacts with the forum).[12] As for third party tweets, they are irrelevant. As the Opposition admits, "the relationship with the forum must arise out of contacts that the defendant *himself* creates with the forum State," not others. Mot. at 16 (quoting *FrontPoint*, 2017 WL 3600425, at *7 (emphasis in original)).

### 4. Claimed "Wash Trading" Does Not Support Specific Jurisdiction

The Opposition argues that alleged "wash trading conducted on a U.S.-based trading platform also independently supports personal jurisdiction over [the foreign defendants]," Opp. at 19. This argument fails. The question is not whether claimed wrongdoing "independently" supports personal jurisdiction, but whether a sufficient nexus exists between each foreign defendant's U.S. contacts and the claimed bad acts. As explained in the Motion, and unrebutted in the Opposition, the AC can be searched in vain for such facts. *See* Mot. at 21-26.

---

[12] The SEC's cases (Opp. at 19-20) do not hold otherwise. In *PlexCorps*, the SEC "proffered evidence suggesting that [defendants] directed Facebook advertisements . . . to potential purchasers who were United States residents." 2018 WL 4299983, at *15. The ICO websites were set up by a defendant while in the U.S. and 25% of ICO buyers were U.S. residents. *Id.* at *4-5. No such evidence exists here. Tokens being available from unknown sellers in the secondary market is different in kind than the direct sales and targeted solicitation at issue in *PlexCorps*. Likewise, *SEC v. Straub* is inapposite, as it involved "publicly traded . . . ADRs listed on the NYSE and . . . registered with the SEC." 921 F. Supp. 2d 244, 255 (S.D.N.Y. 2013). This is not a case of securities on a U.S.-registered exchange.

*Stubos*, 634 F. Supp. 3d at 187 (Opp. at 19), does not support a different result.  Among other contacts supporting the manipulative trading claim there, the foreign defendant directed sales of "millions of his own shares" in U.S. companies to U.S. purchasers, "using the services of the U.S. OTC Markets" and a U.S. registered broker-dealer.  *Id*. at 174, 187-88.  No similar U.S. nexus is alleged regarding so-called "wash trading" here.  The AC largely describes activity abroad, and offers no facts suggesting anyone in the U.S. was harmed.  *See* Mot. at 21-26, 37-38. *See also Prime Int'l Trading, Ltd. v. BP P.L.C.*, 784 F. App'x 4, 9-10 (2d Cir. 2019) (rejecting specific personal jurisdiction where there was no allegation that defendant "conducted any physical [] trades in the United States"); *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, 2017 WL 1113080, at *4 (S.D.N.Y. Mar. 10, 2017) (absent allegation that market manipulation occurred *during* trip to forum, no suit-related contacts).[13]

### F.    Exercising Jurisdiction Over The Foreign Defendants Is Also Unreasonable

The SEC argues that jurisdiction is nearly always reasonable in SEC cases.  Opp. at 22. But as discussed above, all of the cases the SEC cites for this proposition involved ***extensive*** U.S. contacts not present here.  *See* § I.E.4 & nn.4, 11-12. (distinguishing *Stubos*, *PlexCorps*, *and Straub*); Mot. at 15 (distinguishing *Terraform I*).  Of the five reasonableness factors (Mot. at 27), the SEC's only argument is that it has "a strong federal interest" in alleged violations of the "federal securities laws."  Opp. at 22-23.  But even setting aside whether this case involves securities, U.S. law violations, or implicates SEC oversight, if that were enough, jurisdiction would ***always*** be reasonable based on the SEC's mere say so.  Or how or why that interest "outweigh[s] Singapore's interests," which has its own robust regulatory regime and is the "home" of the two foreign entities.  Mot. at 27.  On balance, the Court should find the exercise of

---

[13] BitTorrent Foundation is not alleged to have played any role in alleged wash trading.  The SEC merely claims that, at a later point in time, accounts involved were associated with BitTorrent Foundation.  *See* Opp. at 13-14. That is far from showing that BitTorrent Foundation ***actively directed*** "wash trading" conduct in the United States.

jurisdiction over the foreign defendants is unreasonable under the circumstances presented here.

### G.    If This Action Survives As To Rainberry, It Should Be Transferred

This case should be transferred to the Northern District of California if Rainberry is the sole remaining defendant.  Mot. at 27-28.  The SEC opposes on two grounds: (1) there were TRX "investors" in this District and tweets were available here; and (2) the SEC's chosen forum deserves deference.  Opp. at 25-26.  The first argument fails because no specific allegations tie Rainberry, a peer-to-peer technology Company, which is not in the digital assets business, to alleged offers of TRX to anyone, anywhere, let alone in this District.  *See* Mot. at 9, 18.  As for plaintiff's choice of forum (despite a robust San Francisco office), that is only one factor courts weigh, and the rest favor Rainberry. *See* Motion at 27-28.  Courts in this District have transferred SEC enforcement actions despite the presence of New York-based investors.  *See id.*; *see also SEC v. Hill Int'l, Inc.*, 2020 WL 2029591, at *3 (S.D.N.Y. Apr. 28, 2020).

## II.    ALL CLAIMS FAIL DUE TO IMPERMISSIBLE GROUP PLEADING

The SEC "cannot simply lump defendants together for pleading purposes" and hope the AC will survive against any one of them. *Nesbeth v. New York City Mgmt. LLC*, 2019 WL 110953, at *3 (S.D.N.Y. Jan. 4, 2019); *see also* Mot. at 28.  Challenged on this defect, the SEC insists that inserting the word "Sun" before "Defendants" (when lumping together a foreign national, two overseas foundations, and a California corporation) is not improper group pleading, but simply a "shorthand way to distinguish" claims against Mr. Sun and the entities from those against other defendants.  Opp. at 41-42.  That dodges the issue.  As the Opposition concedes, a complaint must "inform[] each defendant of the nature of [its] participation," but  that is far from "readily discernable" here, despite the SEC's protests otherwise.  Opp. at 41-42 & n.19.

Implicitly admitting the defect, the SEC tries to argue around it, asserting group pleading is permitted when an individual defendant "is alleged to be at the center of the scheme."  Opp. at

42, citing *SEC v. Mintz*, 2014 WL 1173096, at *17 (D.N.J. Mar. 18, 2024).  *Mintz* is both non-binding and distinguishable.  There, an investment advisor's principal was "the only actor," and *Mintz* distinguished that fact pattern from cases involving "claims against a group of defendants who each have different roles." *Id.*  Here, the SEC attempts to string together unrelated activities, reaching back five years, involving four separate defendants, involving unique tokens, and asserts claims based on distinct alleged offerings and actions.  Pleading nearly every allegation against the "Sun Defendants" in conclusory terms unsupported by specific fact, and irrespective of time, circumstance, or parties involved, fails to give any defendant adequate notice of the claims levied against him or it.  *See Medina v. Bauer*, 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004) (rejecting allegations for want of notice where plaintiff "lump[ed] all the defendants together and fail[ed] to distinguish their conduct").

The SEC's assertion that group pleading is appropriate because the entities were allegedly Mr. Sun's alter egos (Opp. at 42-43) also fails.  As explained above, §§ I.C-D, the SEC pleads (and the Opposition points to) virtually no facts relevant to proving alter ego status.[14]

## III.   THE CLAIMS REMAIN IMPERMISSIBLY EXTRATERRITORIAL

### A.     The Opposition Confirms The SEC Does Not Allege Domestic Transactions

*No offers.*  The Opposition argues for an expansive test for what qualifies as a domestic securities offer, relying on *SEC v. Balina*, 2024 WL 2332965, at *6 (W.D. Tex. May 22, 2024) to argue "conduct is 'domestic' if directed to the U.S."  Opp. at 37.  That nebulous standard is not the law. Opp. at 37-38.  Instead, courts here agree that a domestic offer must involve "(1) attempt[s] or offer[s,] in the United States, 'to dispose of' securities" or "(2) solicit[], in the United States, 'an offer to buy' securities."  *See SEC v. Ripple Labs, Inc.*, 2022 WL 762966, at

---

[14] Reliance on *Montle*, 65 F. App'x at 752-53 (Opp. at 43), is no help in this regard.  It affirmed alter ego based personal jurisdiction because the entity's sole purpose was to shield the yacht's owner from liability, "nothing" else.

*12 (S.D.N.Y. Mar. 11, 2022) ("*Ripple I*").  Under this test, "it is the location of the offerors . . . that is relevant."  *Id.* at *12-13.  None of the SEC's alleged "domestic offers" meet this test.[15]

The Opposition's attempt to characterize tweets as domestic offers fails.  Opp. at 37.  The AC does not claim that any tweet originated in the U.S., nor is it clear why a tweet noting TRX is available on Bittrex in blind bid/ask transactions (or, in the future, on other platforms) an "offer" *by* any Defendant.  *See* Mot. at 16, 21.  As for the January 2019 livestream discussing BTT, Opp. at 37, the BTT IEO is ***not in this case*** (*i.e.*, not alleged to be domestic offer), so that is irrelevant.  Opp. at 11 n.5.  And even so, whether people may ***one day*** be able to "use the bitcoin . . . or any cryptocurrency to buy the BTT in the future," from third parties, in unspecified jurisdictions, is not an *offer* to buy securities from Mr. Sun or any other defendant.  *Id.* at 37.  As for the belated attempt to argue Mr. Sun domestically "promot[ed] TRX . . . 300 days in 2018 and 2019," the only specific acts alleged (his participation in two January 2019 events) did not involve "offers." *Compare id.* at 38 *with* AC ¶¶ 77-78.  Unsupported by fact, the conclusory assertion that Rainberry was "an offeror of BTT" (Opp. at 38) also fails.

***No sales.***  The SEC agrees that *Morrison*'s transactional test applies to alleged sales and does not contest that this case does not involve "securities listed on domestic exchanges."  Opp. at 38-40.  Instead, the SEC asks the Court to apply the holding in *Williams v. Binance*, 96 F.4th 129, 137 (2d Cir. 2024) for a "domestic transaction in other securities."  But even applying *Williams*, the AC does not offer facts showing trades were matched on U.S. servers, or that U.S. terms of use applied, or that orders were placed in and payments sent from here.  *See* Mot. at 32. The detail needed to plead a domestic transaction under *Williams* is altogether missing.

---

[15] The argument that Regulation S governs the domesticity of offers under Section 5 (Opp. at 37 n.15) was squarely, rejected in *Ripple I*, 2022 WL 762966, at *11 ("reliance on § 230.901 for the general proposition that Section 5 does not apply extraterritorially does not signal an intent to establish § 230.903 as the test for [domestic offers].").

**This case is "predominately foreign."** The SEC asks this Court to ignore clear precedent to find that U.S. securities laws apply despite the "predominately foreign" nature of the claims. Opp. at 40 n.16. The SEC's attempt to distinguish both *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161 (2d Cir. 2021) and *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014), both of which are binding on this Court, misses the mark.

As an initial matter, the assertion that "the Sun Defendants *directly transacted* with investors who irrevocably committed to *purchasing* TRX and BTT while in the U.S." (Opp. at 40) is pure fiction. Those supposed "facts" are not found in the AC. No specific facts show that anyone "irrevocably committed" to a transaction in the U.S. Similarly, there is no support for the claim that anyone "*directly transacted*" with Defendants in the U.S., given that, and at most, the AC points to (1) blind bid/ask secondary market transaction not directly with Defendants and (2) airdrops, contests, and giveaways where **no purchase** occurred. Mot. at 33-36.

Unable to address those fundamental defects, the SEC recites facts from *Parkcentral* and concludes "[n]one . . . pertains here." *See* Opp. at 40. Not so. Just as in *Parkcentral*, this case does not "involve the purchase, sale or exchange of securities," *from* defendants, in the U.S. *Id.* It is also no help to point out that "*Cavello Bay* involved only foreign parties." *Id.* That is also true of most of the transactions alleged here. *See* Mot. at 35-36. Only a few U.S. persons are alleged to have received "TRX" in contests, and the SEC **admits** it does not know if a single U.S. person received BTT. Opp. at 13 n.6. This case remains "predominately foreign."[16]

### B.    The AC Also Fails The "Conduct and Effects" Test

**Little U.S.-based conduct.** The SEC relies heavily on the allegation that Bittrex is "a U.S. trading platform." Opp. at 34. Not quite. Bittrex was a **global** trading platform that

---

[16] The SEC offers no authority for the proposition that *Morrison* does not apply to Section 17(b).

happened to be headquartered in the U.S.  Mot. at 6.  While some of the supposed "wash trades" on Bittrex allegedly involved accounts opened and funded by U.S. nominees (Opp. at 37), that does not transform primarily overseas conduct into domestic conduct.  In this respect, the Opposition fails in its attempt to distinguish *Euro Trade & Forfaiting, Inc. v. Vowell*, Opp. at 35, which recognized that the conduct test is not met where *essential* acts occurred offshore, even if trading is on a U.S. securities market. 2002 WL 500672, at *22-28 (S.D.N.Y. Mar. 29, 2002).  Here, nearly all the allegedly wrongful activity allegedly occurred abroad.  *See* Mot. at 37.  Indeed, no well-pleaded facts support "wash" trading conducted by anyone in the U.S., much less activity designed to maintain or inflate the price of TRX here.  *See infra* § IV.A.

> **No U.S. effects.**  The SEC also never explains how wash trading in the *de minimis* amount alleged could have affected the trading volume or price of TRX in any discernable way in the U.S.  *See infra* § IV.A.  The AC does not even allege that anyone in the U.S. bought or sold TRX **on the same days** as trading by any Defendant.  The best the Opposition offers is speculation that manipulation affected U.S. markets, coupled with a failed effort to distinguish Defendants' authority, but citing no contrary law.  *See* Opp. at 35-36.  Speculation is far from the well-pleaded "foreseeable substantial effect" Dodd-Frank demands.  *See* Mot. at 36-38.[17]

> **C.   All Claims Fail Because No Investment Contract Is Alleged**

> **1.   Social Media Contests and Giveaways Do Not Satisfy *Howey***

> ***Contest Participants Did Not Expect Profits "From the Efforts of Others."***  The SEC does not dispute that "profits" to contest participants rely, "not [on Defendants'] 'essential managerial efforts,' but the luck of the draw."  Mot. at 41 (quoting *SEC v. Energy Grp. of Am., Inc.*, 459 F. Supp. 1234, 1240 (S.D.N.Y. 1978)).  Because *Howey* requires the SEC to plead an

---

[17] As for the new misstatement claim, a tweet from abroad is not U.S. conduct, and no facts suggest any U.S. effect.

investment contract, this alone is enough to find that no securities transaction is pleaded for the social media contests and giveaways. Rather than address this fatal logical flaw, the SEC pivots, suggesting Defendants' statements created a reasonable expectation of profits in the "Tron ecosystem." Opp. at 31-32. That is the wrong question. *Howey* does not ask whether "crypto assets themselves are or are not 'securities'" in the abstract; it asks whether tokens are offered or sold pursuant to investment contracts. *Binance III*, 2024 WL 3225974, at *11. Here, looking at "the entire set of understandings and expectations surrounding the offering," (*id.*), any expected "profit" by contest participants was a matter of **chance**, not the "efforts of others." Social media contests are not investment contracts.[18]

**Contest Participants Did Not "Invest Money."** *Howey*'s first prong requires the value exchanged to be "tangible and definable." *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 560 (1979). The SEC argues it is enough that contest participants "provided the exact . . . tasks . . . requested." Opp. at 31. The Supreme Court long ago rejected that toothless reading of *Howey*'s first prong, finding it is not met where "the purported investment is . . . relatively insignificant." *Teamsters*, 439 U.S. at 560.[19] Here, the notion that social media posts provided "'valuable consideration' in the form of advertising and publicity" (Opp. at 30) is not just unsupported conclusion, it is "indivisible" from other reasons one might have joined in, including being part of a viral moment, the thrill of chance, or an opportunity to win non-token prizes.[20]

Flawed logic also dooms the SEC's "risk of loss" argument. The SEC claims contest participants "bore the risk that the *tokens received* would lose value." Opp. at 31 n.13. But the

---

[18] The SEC also has no response to the argument that contest participants themselves created the materials allegedly promoting a reasonable expectation of profits. *See* Mot. at 41.

[19] Ignoring *Teamsters* and Defendants' other cases, the Opposition continues to rely solely on *Uselton v. Com. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 572 (10th Cir. 1991). *See* Opp. at 30-31. That decision does not help the SEC. *See* Mot. at 40 n.29 (distinguishing *Uselton*). There, employees "surrender[ed] . . . wages due them . . . in return for the right to acquire [] stock." *Uselton*, 940 F.2d at 575. Posting on social media is just not comparable.

[20] The SEC admits at least one contest offered non-crypto prizes. Opp. at 9 (first prize was "tickets to attend the 2019 'niTron Summit'"); *see also Binance III*, 2024 WL 3225974, at *16 (reasons for acquiring tokens may vary).

relevant "risk of loss" is the risk of losing the *consideration provided*.  *See SEC v. Coinbase, Inc.*, 2024 WL 1304037, at *30 (S.D.N.Y. Mar. 27, 2024) (discussing "risk of loss" with respect to assets "tendered to Coinbase").  The SEC's construct effectively renders risk of loss meaningless, because in every case there is risk that the value of the asset received may fall.

## 2.    Airdrops of BTT Do Not Satisfy *Howey*

As for BTT airdrops, the Opposition repeats the argument that "by purchasing and holding TRX, investors provided the Sun Defendants with valuable consideration."  Opp. at 29; AC ¶ 117.  But the "valuable consideration" the SEC identifies from "TRX" is nonsensical. How does buying or holding "TRX" constitute "promotion of BTT" or contribute to "the development of a secondary trading market for BTT"?  *Id.*  The SEC's argument also conflates possible benefits from giving away BTT (such as decentralizing holdings) with consideration provided **in exchange for** receiving BTT (there was none).  *Uselton*, the SEC's sole case, is of no help to it.  There, it was not incidental benefits to the employer (such as increased loyalty from stock options), but a right to wages **exchanged for** option interests that sufficed. 940 F.2d at 575.

Further, the claim that a purchase of "TRX" is an "investment of money" for purposes of free BTT airdrops (Opp. at 29) lacks a factual predicate.  As noted in the Motion (and unrebutted in the Opposition), the AC fails to allege that even one person bought "TRX" from a Defendant (anywhere, much less in the U.S.) and held it long enough to receive free BTT.  Mot. at 41.  As the AC admits, "TRX" traded on secondary markets long before the airdrops (AC ¶¶ 38-40), and so purchasers could obtain "TRX" without providing any value to any Defendant.  *See SEC v. Ripple Labs, Inc.*, 2023 WL 4507900, at *22-24 (S.D.N.Y. July 13, 2023) ("*Ripple II*") ("blind bid/ask" secondary sales are not investment contract transactions with defendants); *see also Binance III*, 2024 WL 3225974, at *43 (endorsing *Ripple II*).  And as with contests, the SEC

21

makes the same "risk of loss" error, arguing airdrop recipients risk loss if BTT's value drops. But again, the risk *Howey* contemplates is of the consideration exchanged. *Coinbase*, 2024 WL 1304037, at \*30. Where, as here, there is no consideration, there is no risk of loss.

### 3. Secondary Market Sales Do Not Satisfy *Howey*

The final type of transactions assailed by the SEC are secondary market sales.[21] Buyers do not (and cannot) know the counterparty in any given secondary market transaction, however. It defies common sense to claim that purchasers bought "TRX" (on Bittrex or any other platform) expecting those funds would be invested in a common enterprise when **the seller is unknown**. *See Ripple II*, 2023 WL 4507900, at \*22-24 (*Howey* not met for secondary market sales); *see also SEC v. LBRY, Inc.*, No. 21-cv-260, ECF No. 105 at 34:14-16 (D.N.H. Jan. 30, 2023) (declining to extend holding to secondary sales). *See* Mot. at 43 n.31. The SEC's cases provide no answer. In *Terraform II*, "defendants said that sales from purchases of *all* crypto-assets . . . would be fed back into the Terraform blockchain." 684 F. Supp. 3d at 198. In *Coinbase*, "developers advertise[d] . . . that capital raised through [secondary] retail sales of tokens will continue to be re-invested in the protocol." 2024 WL 1304037, at \*25. The SEC can point to no similar representation in the AC, because none is alleged.[22]

*Binance III* involved representations that BNB holders would benefit from the growth of the Binance exchange (an existing business enterprise). 2024 WL 3225974, at \*17-19. Buyers were told "[b]y holding BNB, you are effectively holding an influential share of the crypto project." *Id.* at \*18. Such statements were critical to the Court's finding that "after the ICO,

---

[21] The Opposition rewrites the AC to characterize sales on Bittrex as "primary" offerings. Opp. at 28, citing AC ¶ 56. The AC says no such thing, just that buyers "placed orders for TRX" on the platform. The Opposition's effort to distinguish secondary market cases is also a concession that the "primary" sales claim lacks factual support.

[22] The SEC tries to distinguish *Ripple* by arguing that "*all* investors received the same marketing communications and other public statements." Opp. at 28. That is **not** alleged in the AC, and even if it were, it does not explain why a reasonable investor would expect anything from any Defendant based on a purchase from an unidentified seller.

Binance continued to market the BNB to new buyers as an investment contract."  *Id.* at *21 n.15.

By contrast, the AC identifies no similar statements here.  The SEC does not allege that any

defendant told BTT buyers they would benefit from the growth of a common enterprise.  And the

only allegation related to "TRX" is a statement pulled out of context from the ICO whitepaper

back in 2017, about "ecosystem" growth.  *E.g.*, AC ¶¶ 33-34.  The ICO is not at issue here.  Opp.

at 5 n.4; *see also Binance III*, 2024 WL 3225974, at *21 n.15 (rejecting argument that

"representations made at the outset travel with the token").  *Binance III* also rejected the SEC's

claims based on similarly vague representations.  *Id.* at *22 ("ongoing representations about the

superiority of the platform that allegedly gave the tokens their value, but more is needed.").

## IV.    THE REMAINING CLAIMS ARE INADEQUATELY PLEADED

### A.    The Market Manipulation Allegations Are Insufficient and Illogical

The SEC concedes it offers only "illustrative examples" of supposed wash trading.  Opp.

at 44 n.23, 45.  This does not satisfy Rule 9(b).  *See U.S. ex rel. Perry v. Hooker Creek Asphalt*

*& Paving, LLC*, 565 F. App'x 669 (9th Cir. 2014) ("representative examples" insufficient under

Rule 9(b)).  The supposed "examples" here are negligible when compared to total "TRX"

volume in the period at issue.  *See* Mot. at 4 n.3, 44 n.32 and Ex. 1.  *SEC v. U.S. Env't, Inc.*, Opp.

at 45, specifically alleged wash sales "inflat[ed] the market price" in a particular timeframe.  82

F. Supp. 2d 237, 240 (S.D.N.Y. 2000).  Given that the alleged trades are a tiny fraction of overall

"TRX" volume, the SEC has not pleaded, and cannot plead, ***actual facts*** showing price impact.

It is also illogical to claim trading in such small amounts was intended to move the

market.  Mot. at 44-45.  The Opposition does not meaningfully respond.  It only offers a rote

assertion of nefarious intent that does not suffice to plead scienter, *see* Opp. at 44-45; *Gillis v.*

*QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600 (S.D.N.Y. 2016), not least which because a

legitimate purpose – market-making and liquidity – is evident from the face of the AC. *See* AC ¶¶ 176-77[23]; *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007). With no credible allegation of scienter, the market manipulation claims fail.

### B.    No One Aided Or Abetted Disclosure Violations

The Opposition does not rehabilitate the AC's lack of specific facts supporting a claim that Defendants aided and abetted disclosure violations because celebrities failed to disclose alleged compensation paid by an issuer or underwriter of securities. To begin with, ***no securities*** are tied to alleged celebrity promotions, so there is no predicate violation for aiding and abetting liability. *See supra* § III.C; IV.B; Mot. at 38-42. The Opposition also says nothing of substantial assistance beyond the bald claim that Mr. Sun "instructed" celebrities "not to disclose" being paid. Those are conclusions, not facts. *See* Mot. at 47-48. Missing are necessary details: who did Mr. Sun instruct, what did he say, and when?

Nor is knowledge of disclosure violations adequately alleged. No facts suggest that Mr. Sun – or any other Defendant – saw the celebrity tweets. The alleged "promotions" end abruptly once Mr. Sun learns of claims that celebrities may have been paid. *See* AC ¶ 194 (no celebrity tweets post-date Mr. Sun's February 16, 2021 tweet about alleged payments). Rather than address the points, the SEC just labels them "flatly at odds" with its allegations. Opp. at 46-47. Finally, the SEC's timeline does not add up. The only transactions postdating the early 2021 tweets are a few BTT contests. No "TRX" sales are alleged after 2019.

### C.    The Fraudulent Misstatement Claim Fails

The Opposition attempts, *for the first time*, to raise fraud claim based on Mr. Sun's tweet that the Tron Foundation was "not involved in" or "aware of" paying celebrities to tout, and "[i]f

---

[23] Although included in the original complaint, the AC conveniently omits that the communications referenced at AC ¶ 176 related to "market-making."

any celebrities are paid to promote TRON, we require them to disclose." Opp. at 47. This attempt to amend the AC should be rejected. *See Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 693 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 16 (2d Cir. 2013) (plaintiff "may not amend the pleadings yet again by articulating . . . in opposition to a motion to dismiss . . . a brand-new theory.") The newly minted fraud claim fails in any event, as it lacks all required elements under Section 10(b) and with the specificity Rule 9(b) requires. *See SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). No facts show the alleged misstatement ("If any celebrities are paid to promote TRON, we require them to disclose") was false, much less would be viewed as material by anyone. Nor is scienter adequately alleged. *Supra* § IV.A (no facts show Mr. Sun knew of allegedly paid promotions).

## V.    DEFENDANTS LACKED FAIR NOTICE OF THE SEC'S CLAIMS

The SEC argues *Howey* is all the notice needed. Not so. Courts struggle to apply *Howey* in crypto cases. *Binance III*, 2024 WL 3225974, at *11 ("[I]ntangible digital assets do not fit neatly into the rubric set forth in the mere seven pages that comprise the *Howey* opinion."). As for the DAO Report, it is not notice that the SEC would treat giveaways or contests as investment contracts. Neither one provides fair notice of the far-reaching theories pursued here.

**CONCLUSION**

The Court should dismiss all claims against all Defendants with prejudice.

Dated: July 31, 2024                  Respectfully submitted,

                                      FENWICK & WEST LLP

                                      By:   */s/ Jennifer C. Bretan*
                                              Jennifer C. Bretan

                                      *Attorneys for Defendants Tron Foundation Limited,*
                                      *BitTorrent Foundation Ltd., Justin Sun, and*
                                      *Rainberry, Inc.*